John S. Gibson  (SBN: 140647)
jsgibson@winston.com
Peter Perkowski (SBN: 199491)
pperkowski@winston.com
Veronica L. Harris  (SBN: 256120)
vharris@winston.com
WINSTON & STRAWN LLP
333 S. Grand Avenue, 38th Floor
Los Angeles, CA  90071-1543
Telephone: (213) 615-1700
Facsimile: (213) 615-1750

Attorneys for Plaintiff
NERO AG

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

|  |  |
|---|---|
| NERO AG, | Case No.  CV10 3672 |
| Plaintiff, | **NERO AG'S COMPLAINT FOR VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT** |
| vs. | |
| MPEG LA, L.L.C.,<br>and DOES 1 through 10, inclusive, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

*Winston & Strawn LLP*
*333 S. Grand Avenue*
*Los Angeles, CA 90071-1543*

NERO AG'S ANTITRUST COMPLAINT

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1    Plaintiff Nero AG ("Nero") hereby alleges against Defendants MPEG LA,

2  L.L.C. ("MPEG LA") and DOES 1 through 10, inclusive, as follows:

3  <u>**JURISDICTION AND VENUE**</u>

4    1.   This action arises under Section 2 of the Sherman Act, 15 U.S.C. § 2, and

5  Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

6    2.   This Court has original jurisdiction over the subject matter of this action

7  pursuant to 28 U.S.C. §§ 1331 and 1337.  The Court has jurisdiction over the Sherman

8  Act and Clayton Act claim pursuant to 28 U.S.C. § 1331 because the Sherman Act and

9  the Clayton Act are federal laws.

10    3.   Personal jurisdiction over MPEG LA is proper in this District under 15

11  U.S.C. §§ 15, 22 and 28, because MPEG LA maintains an office and transacts business

12  on a systematic and continuous basis in this District.  Further, the unlawful acts alleged

13  herein were performed and occurred in part within this District.

14    4.   Venue properly lies in this Court pursuant to 28 U.S.C. § 1391 in that, on

15  information and belief, MPEG LA resides and/or is doing business in this District on a

16  systematic and continuous basis, and many of the acts described below have been and

17  are being conceived, carried out, and made effective in this District.

18  <u>**INTRODUCTION**</u>

19    5.   While the federal antitrust laws do not prohibit the legal acquisition of

20  legal monopoly power, they do prohibit the willful maintenance, extension and abuse

21  of that power.  MPEG LA is the self-proclaimed "*world's leading* packager of patent

22  pools for standards and other technology platforms used in consumer electronics" in

23  the trillion-dollar digital video technology industry.  MPEG LA licenses patent pools

24  relating to standards (including the MPEG-2, MPEG-4 Visual, AVC ("AVC")

25  standards[1] at issue here) that virtually every company operating in the industry must

26  comply with.

27  ────────────

[1] The standards ensure compatibility and interoperability of devices manufactured by

28  different companies in the industry.  The *MPEG-2* Video and Systems coding

1

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1       6.      MPEG LA willfully maintains, extends and abuses its monopoly power

2   in the relevant technology markets—which are the worldwide markets for the licensing

3   of patents relating to the MPEG-2, MPEG-4 Visual, and AVC standards—within the

4   digital video technology industry.  In so doing, it stifles competition and innovation,

5   and harms consumers, in the relevant technology markets.

6       7.      Nero—an innovator of liquid media technology software (computer

7   software that allows users to play, create, receive or distribute digital video content

8   from personal computers, DVD players, cell phones, and other devices)—became a

9   licensee of the MPEG LA patent pools because compliance with the MPEG standards

10  is mandatory in order for Nero to sell software products in the area of multimedia.

11  Nero is therefore a consumer in the relevant technology markets and a competitor in

12  certain worldwide markets in the sale and distribution of products that comply with the

13  MPEG-2, MPEG-4 Visual, and AVC standards.

14  ***MPEG LA Representations To The DOJ That It Would Implement Pro-***

15  ***competitive Safeguards In Exercising Monopoly Power***

16      8.      Before MPEG LA obtained monopoly power in the relevant technology

17  markets, it sought a commitment from the Antitrust Division of the United States

18  Department of Justice ("DOJ") to not initiate an enforcement action against MPEG LA

19  for its proposed administration of the MPEG-2 patent pool.  By representing itself in a

---

21  standards, completed in 1993, are used in set-top boxes, DVD players and recorders,
    TVs, personal computers, game machines, cameras, DVD Video Discs and other
22  products involving digital video.  The *MPEG-4* Visual standard, completed in 1999, is
    used in media player and other personal computer software, mobile devices including
23  telephones, DVD players and recorder accessories such as DivX®, game machines,
    personal media player devices, security and surveillance systems equipment, still and
24  video cameras, subscription and pay-per view or title video mobile and internet
    services and other products.  And the *AVC* standard, completed in 2003, is a digital
25  video coding standard used in set-top boxes, media player and other personal
    computer software, mobile devices including telephones and mobile television
26  receivers, Blu-ray DiscTM players and recorders, Blu-ray video optical discs, game
    machines, personal media player devices, still and video cameras, subscription and
27  pay-per view or title video services, free broadcast television services and other
    products.

28                                      2
                        NERO AG'S ANTITRUST COMPLAINT

1   manner that it knew the DOJ would view favorably, MPEG LA obtained a June 26,

2   1997 Business Review Letter ("Business Review Letter") stating that, based upon

3   MPEG LA's representations, the DOJ was "not presently inclined to initiate antitrust

4   enforcement action" regarding the licensing arrangement.  The DOJ expressly

5   conditioned its then-current enforcement intention on MPEG LA's representations that

6   it would protect against potential anticompetitive effects of its licenses by

7   implementing certain pro-competitive safeguards, such as:

8   • **Engaging an independent expert to make sure that only essential**

9   **patents are placed in the MPEG-2 pool.**  MPEG LA told the DOJ in

10   1997 that the 27 essential patents in the pool for the 1993 MPEG-2

11   standard represented most of the essential patents.  In other words, there

12   are at most 53 essential patents.

13   • **Using the independent-expert mechanism to "weed[] out nonessential**

14   **patents"** from the pool, and thereby "ensure that the licensees will not

15   have to pay royalties for making MPEG-2 products that do not employ

16   the licensed patents."

17   • **Formulating and enforcing licensing terms that are fair, reasonable,**

18   **and nondiscriminatory.**

19   9.   MPEG LA's promises convinced the DOJ not to initiate antitrust

20   enforcement at that time, believing that MPEG LA would not abuse its monopoly

21   power in administering a pooled license of patents for the MPEG-2 standard.

22   *MPEG LA's Abuses Of Its Monopoly Power—And Failure to Implement*

23   *Safeguards—Despite Its Promises*

24   10.   But absolute power has corrupted MPEG LA absolutely.  Once MPEG

25   LA obtained monopoly power in the relevant technology markets, it used that power to

26   (i) willfully maintain or extend its monopolies for years beyond their natural expiration

27   (the term of the essential patents in each pool); and (ii) administer its licenses in an

28

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

3

1   unfair, unreasonable, and discriminatory manner that stifles competition and

2   innovation, and harms consumers, in the relevant markets in violation of Section 2 of

3   the Sherman Act.  That is, since obtaining the Business Review Letter, MPEG LA has

4   acted contrary to the manner that it represented to the DOJ it would act.  It has failed to

5   implement the promised pro-competitive safeguards.

6         11.    Instead, MPEG LA has done the very things that it promised the DOJ it

7   would guard against.  It has:

8        (a)    **Engaged a so-called "independent" expert who cannot perform the**

9             **role of *independent* patent-essentiality evaluator contemplated by the**

10            **DOJ because he has a financial interest in—and serves as a**

11            **compensated advocate for—MPEG LA.**  Rubenstein has directly

12            benefited from his association with MPEG LA in many ways that are

13            inconsistent with any notion of independence.  For example,

14              • Rubenstein helped to form MPEG LA with MPEG LA's

15                  founder, Mr. Futa,

16              • On information and belief, he was involved in the drafting to

17                  the first MPEG LA license agreements,

18              • he interprets questions from licensees about the interpretation,

19                  application, and enforcement of MPEG LA agreements,

20              • he has attended business settlement meetings on behalf of

21                  MPEG LA,

22              • he has testified before Congress on behalf of MPEG LA,

23              • he has authored and submitted various *Amicus Curiae* briefs on

24                  behalf of MPEG LA, and

25              • is referred to by MPEG-LA on its website as "MPEG LA's US

26                  patent counsel".

27

28

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

4

NERO AG'S ANTITRUST COMPLAINT

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

(b) **Used its non-independent expert to add some *800* newer patents to the MPEG-2 pool to extend the duration of its MPEG-2 License in light of the expiration dates of the older patents essential to the 1993 standard—despite MPEG LA telling the DOJ that there were no more than *53* essential patents.** The drastic and unforeseen increase in the number of patents suggests that hundreds of the newer patents added are nonessential ones which only serve to benefit MPEG-LA. As a result, therefore, far from "weeding out nonessential patents from the [MPEG-2] Portfolio," as the DOJ intended, MPEG LA unlawfully extends the duration of the patent pool, and forces licensees (who are consumers in the relevant technology markets) and ultimately, end-users (who are consumers in the downstream product markets) to pay royalties for making and distributing MPEG-2 products that do not practice the licensed patents. MPEG LA has thus maintained or extended its monopoly in the worldwide market for the licensing of patents relating to the MPEG-2 standard well beyond its natural duration and scope. On information and belief, MPEG LA has similarly extended the duration and scope of its monopoly power in the relevant technology markets for the licensing of patents relating to the MPEG-4 Visual and AVC standards by adding nonessential patents to its MPEG-4 Visual and AVC pools, which now contain more than 1,000 and 1,300 patents, respectively.

(c) **Formulated and imposed licensing terms that are unfair, unreasonable, and discriminatory** by: (i) charging licensees different royalty rates for the same MPEG-2 license; (ii) failing to make a downward adjustment to the MPEG-2 royalty rates commensurate with the rapid and dramatic decrease in cost of the products implementing the

MPEG-2 standard—*i.e.*, DVD players, digital and flat screen televisions, and the software that supports such products—since the pool's inception; (iii) collecting royalties—including administration fees—multiple times for the same device; and (iv) failing to communicate its policies equally to all licensees. Instead, by remaining silent on vital aspects of its licensing programs, MPEG LA has created a system that favors some licensees, such as insiders (*i.e.*, licensors), and disfavors others, such as outsiders (*i.e.*, non-licensor licensees). As a result, outsiders such as Nero have great difficulty planning technology changes and embarking on programs to research, develop, and implement technological innovations—and are charged supracompetitive royalties on distributions as to which they never agreed to pay royalties—while other licensees, such as insiders, do not face such problems.

### *Summary of Action*

12. As a result of its licensing monopolies, MPEG LA collects royalties—including administration fees—from the sale and/or distribution of almost every personal computer (and related software), DVD, DVD player, digital television set, mobile television receiver, TV set-top box, Blu-ray video optical disc, Blu-ray Disc$^{TM}$ player/recorder, media player, still camera, video camera, iPhone, BlackBerry, and pay-per-view video service in the world. Indeed, MPEG LA has estimated that through 2006 the value of MPEG-2 products (just one of the three standards at issue) in the market was expected to exceed half a *trillion* dollars.

13. MPEG LA's illegal maintenance or extension—and other abuses—of its monopoly power have resulted in substantial antitrust injury, detailed below, that stifles competition and innovation, and harms consumers, in the relevant technology markets.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

6

14.     To add insult to injury, MPEG LA used its illegal profits to pay exorbitant, Enron-esque salaries, bonuses and perquisites to its C-level officers (some of whom had an ownership interest in MPEG LA during the relevant period)—such as $22,000 per month rent for an administrative assistant's New York apartments.  On information and belief, such practices reflect a culture of greed that existed during the relevant period, and may still exist.  On information and belief, such a culture may have driven, and may still continue to drive, MPEG LA's willful maintenance or extension—and other abuses—of its monopoly power to maintain cash flows necessary to maintain the lifestyle that has accompanied such culture of greed.

15.     Nero seeks just compensation for—and an injunction to terminate— MPEG LA's unlawful maintenance, extension, and abuses of its monopoly power in violation of Section 2 of the Sherman Act.

## PARTIES

16.     Plaintiff Nero AG is a German private company with its principal place of business at Im Stoeckmaedle 13, Karlsbad, 76307, Germany.

17.     Defendant MPEG LA, L.L.C., aka MPEG Licensing Authority, is a Delaware limited liability company with its principal place of business at 6312 South Fiddlers Green Circle, Suite 400E, Greenwood Village, Colorado 80111.

18.     On information and belief, Defendants DOES 1 through 10 are individuals or corporations whose exact character is presently unknown and who conducted and are responsible for the matters of which Nero complains herein.  The true names and identities of DOES 1 through 10 are not presently known to Plaintiff. When such Defendants' true names and capacities are ascertained, Nero will amend, or seek leave of court to amend, this Complaint accordingly.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

7

**GENERAL ALLEGATIONS**

A.   **Nero AG—a Forerunner and Innovator in Liquid Media Technology—is One of MPEG LA's Licensees, and a Consumer, in the Relevant Technology Markets.**

19.   Nero is a creator of liquid media technology whose mission is to enable liquid content creation and distribution anytime, anywhere, and on any device. Nero provides consumers with the freedom to enjoy their music, photos, and videos, regardless of hardware or file format, by taking a unique device-neutral, standards-based approach to solution development.

20.   Nero has developed award-winning digital multimedia solutions that are among the industry leaders in sales and technology. For example, Nero Vision software allows individuals without technical knowledge to create family movies and to easily share their movies with friends and family using DVDs or the Internet. Millions of units of Nero's trusted software solutions have been distributed to consumers and businesses in the home, on the go, and in the office. Nero users worldwide enjoy products and applications that integrate key technologies designed to improve digital life.

21.   Nero's digital multimedia solutions for consumers require that Nero comply with various standards for digital television, DVDs, and other digital imaging technology, including the MPEG-2, MPEG-4 Visual, and AVC standards. Therefore, Nero must have access to those patents in MPEG LA's patent pools that are essential to comply with the standards. Nero was an early adopter of the MPEG-2 and other digital video standards, and thus was among the early licensees for MPEG LA's MPEG-2 patent pool. To distribute its products free from allegations of patent infringement, Nero has signed several MPEG LA license agreements, as set forth below.

22.   The three patent pool license agreements ("Licenses") at issue are:

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

a.   the MPEG-2 Patent Portfolio License (the "MPEG-2 License"), a true and correct copy of which is attached hereto as Exhibit 1;

b.   the MPEG-4 Visual Patent Portfolio License (the "MPEG-4 Visual License"), a true and correct copy of which is attached hereto as Exhibit 2; and

c.   the AVC Patent Portfolio License (the "AVC License"), a true and correct copy of which is attached hereto as Exhibit 3.

**B.   MPEG LA Has Monopoly Power in the Relevant Worldwide Technology Markets for the Licensing of Patents Relating to the MPEG-2 Standard, and the Subsequent MPEG-4 Visual and AVC Standards.**

23.   MPEG LA packages patents, some of which are essential to standards used in consumer electronics, as well as chemical, eCommerce, education, energy, environment, healthcare and biotechnology, manufacturing and materials, transportation and wireless technology.  Three of the standards for which MPEG LA has formed patent pools are MPEG-2, MPEG-4 Visual and AVC.  MPEG LA licenses patent pools relating to standards necessary to virtually every company operating in the digital video technology industry.  Through its patent pools, MPEG LA wields significant power over the industry.  MPEG LA has admitted its dominant position.  It asserts that MPEG LA's licensees "account[] for most MPEG-2 products in the current world market, including set-top boxes, DVD players, digital television sets, personal computers and DVD video discs."  Baryn Futa stated to the DOJ as MPEG LA's Chief Executive Officer and Manager "MPEG-2 licensees . . . make most of the MPEG-2 products in the current world market."

_**Standard Setting**_

24.   In 1988, the International Organization for Standardization established the Moving Pictures Experts Group (MPEG) to create standards for audio and video

9

1  compression.  MPEG thereafter created the MPEG-2, MPEG-4 Visual, and AVC

2  standards.

3  *__The MPEG-2 License__*

4      25.    In 1993, the MPEG-2 compressed video standard, which is now

5  mandatory for digital television, DVDs and DVD players, Blu-Ray discs and players,

6  among other technologies ("MPEG-2 standard"), faced a patent thicket.  In other

7  words, software and hardware manufacturers needed to meet the MPEG-2 standard to

8  distribute and sell their products.  But they could not do so without potentially

9  infringing upon patents essential to practice the standard.  Therefore, the single biggest

10 challenge to MPEG-2 standard adoption was access to these essential patents.

11     26.    MPEG LA seized the opportunity and created the first modern-day patent

12 pool.  MPEG-2 became the most successful standard in software and consumer

13 electronics history, with MPEG LA as the sole licensor of its MPEG-2 patent pool.

14 *__The Department of Justice's Business Review Letters__*

15     27.    On June 26, 1997, the DOJ issued a Business Review Letter addressing

16 potential antitrust concerns regarding MPEG LA's MPEG-2 patent pool.  In the letter,

17 the DOJ warned of the potential anticompetitive effects of abusing monopoly power in

18 administering the licensing of the pool.  The DOJ also outlined the potential pro-

19 competitive benefits of such a pool.  It concluded that it was "not presently inclined to

20 initiate antitrust enforcement action" regarding formation of the MPEG-2 patent pool.

21 Recognizing the potential for abuse, the DOJ conditioned its present inclination not to

22 initiate enforcement on the administrator, MPEG LA, (1) administering the licenses in

23 a fair and reasonable manner, and (2) ensuring that an independent expert evaluates the

24 patents scrupulously to make sure that only patents essential to the standard are in the

25 pool, among other conditions.  The DOJ "reserve[d] the right to bring an enforcement

26 action in the future if the actual operation of the [licensing of the pool] proves to be

27 anticompetitive in purpose or effect."

28

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

NERO AG'S ANTITRUST COMPLAINT

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1      28.    At the time of the June 26, 1997 Business Review Letter, MPEG LA
2   represented to the DOJ that the patent pool accounted for "27 Essential Patents, which
3   [were] most, but not all, of the Essential Patents."  Today, MPEG LA reports on its
4   website that, as of April 1, 2010, there are more than 800 purportedly essential U.S.
5   and foreign patents in that same pool.  The DOJ made its decision on the basis that
6   MPEG LA "would grant licenses under the Portfolio on a nondiscriminatory basis."
7   MPEG-LA emphasized the importance of an independent patent expert tasked with
8   determining the essentiality of the patents, noting that "[t]he Portfolio combines
9   patents that an independent expert has determined to be essential to compliance with
10  the MPEG-2 standard; there is no technical alternative to any of the Portfolio patents
11  within the standard."

12      29.    The DOJ expressed several concerns regarding the potential
13  anticompetitive effects.  It noted that "some patent pools can restrict competition,
14  whether among intellectual property rights within the pool or downstream products
15  incorporating the pooled patents."  And it pointed out the potential anticompetitive
16  effects that would stem from "aggregat[ing] competitive technologies and set[ting] a
17  single price."  "Such possible concerns might include the likelihood that the Licensors
18  could use the Portfolio license as a vehicle to disadvantage competitors in downstream
19  product markets . . . ."  The DOJ noted that "[a] licensing scheme premised on invalid
20  or expired intellectual property rights will not withstand antitrust scrutiny."  "By
21  weeding out nonessential patents from the [MPEG-2] Portfolio," the DOJ concluded,
22  "the independent-expert mechanism helps ensure that the licensees will not have to pay
23  royalties for making MPEG-2 products that do not employ the licensed patents."

24      30.    Likewise, in 1998, the DOJ issued a Business Review Letter addressing
25  its concerns regarding a DVD patent pool.  The DOJ concluded that it did not, at the
26  time, intend to launch an investigation; however, it expressed significant reservations.

27
28
                                    11

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

31.     In this letter, the DOJ once again noted the potential competitive hazards of such a patent pool.   The DOJ repeated an essential element in guarding against potential abuses of such patent pools—that the patent expert engaged to determine whether a particular patent is essential to the standard make the evaluation "scrupulously and independently."  It noted that "the structure of this pool, however, creates some concern about the expert's ability to apply this criterion entirely independent of the Licensors."  The DOJ concluded that "the patent-expert mechanism is flawed."  But the DOJ, once again, decided to take a wait-and-see approach regarding the independence of the patent expert.

32.     The DOJ asserted that if the licensors' "assurances prove insufficient either to ensure the expert's ability to function independently and objectively or to ensure that the pool will contain only essential patents, the [DOJ's] enforcement intentions as to the proposed arrangement might be very different."

33.     While appearing before the DOJ, MPEG LA's founder and then-Chief Executive Officer, Baryn Futa, stated:  "MPEG LA's business is to offer fair, reasonable, nondiscriminatory access under a single license to patents that are essential for the use of standards-based or other platform technologies."  As Mr. Futa pointed out, MPEG LA is not an innovator—it does not own any of the patents and it does not use the technology to provide products to consumers.  Instead, it sells a product that is a substitute to the impractical licensing of individual licenses.  And in doing so, MPEG LA collects "billions" of dollars in royalties on behalf of the patent holders.

34.     The proper administration of MPEG LA's monopoly power is necessary to insure competition and innovation in the digital video technology industry.  Mr. Futa has emphasized that among the important safeguards are "essentiality of patents, determination of essentiality, terms that are fair and reasonable . . . [and] nondiscrimination."  Futa also emphasized to the Department that, *"[a] license with*

1  *patents that have not been evaluated by an independent patent expert will lack*

2  *credibility,"* and that MPEG-2 "encourages . . . competition and innovation."

3      35.    At the time the DOJ issued its Letter, it accepted MPEG LA's

4  representations that it would (a) administer the MPEG-2 license in a fair, reasonable,

5  and nondiscriminatory manner, and (b) engage an expert to assess scrupulously and

6  independently the essentiality of patents included in the pool.  MPEG LA, however,

7  has, on information and belief, acted contrary to these representations, and in doing so

8  it has harmed consumers, competition, and innovation.

9  ***The MPEG-4 Visual License***

10      36.    MPEG LA's MPEG-4 Visual License provides access to patents

11  purportedly necessary to comply with the MPEG-4 Visual standard used in media

12  player and other personal computer software, mobile devices including telephones,

13  DVD players and recorder accessories such as DivX®, game machines, personal media

14  player devices, security and surveillance systems equipment, still and video cameras,

15  subscription and pay-per view or title video mobile and internet services and other

16  products ("MPEG-4 Visual standard").

17      37.    As of April 1, 2010, the MPEG-4 Visual License incorporates more than

18  1,000 U.S. and foreign patents owned by 31 different patent holders, as listed on

19  MPEG LA's website.

20      38.    As MPEG LA itself has asserted, the MPEG-4 Visual License enables

21  signatories to manufacture and sell products incorporating the MPEG-4 Visual

22  standard.

23  ***The AVC License***

24      39.    MPEG LA's AVC License provides access to patents purportedly

25  necessary to comply with the AVC standard used in set-top boxes, media player and

26  other personal computer software, mobile devices including telephones and mobile

27  television receivers, Blu-ray Disc[TM] players and recorders, Blu-ray video optical discs,

28   

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

13

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1  game machines, personal media player devices, still and video cameras, subscription

2  and pay-per-view or title video services, free broadcast television services, and other

3  products.

4      40.    As of May 1, 2010, the AVC License incorporates more than 1,300 U.S.

5  and foreign patents owned by 26 different licensors.

6      41.    As MPEG LA itself has asserted, the AVC License enables signatories to

7  manufacture and sell software incorporating the AVC digital video standard ("AVC

8  standard").

9  **C.    MPEG LA Unlawfully Maintains, Extends, and Abuses Its Monopoly**

10        **Power In The Relevant Technology Markets.**

11      42.    Notably, the DOJ in 1997 left "the day-to-day conduct of MPEG LA's

12  business, including its licensing activities, under the sole control of [Baryn] Futa

13  [MPEG LA's founder, then-Chief Executive Officer, and largest shareholder] and his

14  staff."  But this was like leaving the proverbial fox in charge of the hen house, because

15  MPEG LA's unchecked monopoly power has also permeated its business structure and

16  practices, leading to exorbitant, Enron-esque salaries, bonuses, and perks for

17  managerial employees.

18      43.    For example, in 2006, MPEG LA sued Futa, and its then-Chief Operating

19  Officer, Maria O'Reilly, for corporate waste.  As MPEG LA admits in its complaint

20  against the two former C-level officers, the corporate waste has included "lavish

21  'bonuses,' such as a Porsche automobile that cost over $110,000," regular personal use

22  of luxury cars purchased by MPEG LA (complete with salaried drivers) and private jet

23  service, "excessive compensation," and "grossed up bonuses" to make up for taxes due

24  on such bonuses.

25      44.    MPEG LA also alleges that Mr. Futa promoted an administrative

26  assistant with whom he was romantically involved.  The assistant, who started with an

27  annual salary of $45,725 in 1998, ultimately became the Chief Operating Officer and

28

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1  received total compensation of *$2.4 million* in 2005.  She also claimed entitlement to a

2  $9 million severance package in 2006.  MPEG LA also paid the assistant a $490,000

3  "bonus" to pay off the mortgages on her residences in Hawaii and purchase an

4  $110,000 Porsche car.  In addition, it paid $250,000 to buy—and $400,000 to

5  renovate—a condominium in Denver, Colorado for the assistant.  And MPEG LA paid

6  $22,000 per month for the assistant's two New York apartments.

7      45.    As MPEG LA's Chief Operating Officer, Maria O'Reilly, stated in

8  Counterclaims against the company—after MPEG LA sued both her and Baryn Futa,

9  its founder, Manager, and Chief Executive Officer, for corporate waste in 2006—

10  MPEG LA has "collect[ed] billions in revenues."  In fact, MPEG LA has wielded its

11  monopoly power with such success that it "typically awarded vehicles as bonuses to

12  Company executives."  Ms. O'Reilly got a "Porsche automobile" and "Dean Skandalis

13  [Manager of Licensing] likewise received a Mercedes Benz sports car," O'Reilly

14  alleged.  On information and belief, many of MPEG LA's executives have or have had

15  ownership interests in MPEG LA and thus benefit personally from MPEG LA's

16  scheme to artificially increase royalties.  For example, Futa has in the past identified

17  himself as MPEG LA's largest shareholder.

18      46.    The digital video technology industry has changed drastically since the

19  issuance of the DOJ's letter in 1997.  The very concerns that the DOJ expressed in

20  1997 and 1998 have materialized in the form of MPEG LA's monopoly abuses.  In

21  operation, MPEG LA's administration of the pools has proven to be anticompetitive

22  because it has (a) not upheld the independent-expert mechanism and has thereby added

23  numerous non-essential patents to the pools, and (b) not used its monopoly power in a

24  fair, reasonable, and nondiscriminatory manner.  MPEG LA has acted contrary to its

25  promises to the DOJ and has abused its monopoly power to unlawfully maintain or

26  extend its monopoly power in the relevant technology markets.

27

28

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1.  **MPEG LA's Non-independent Expert Adds Newer, Nonessential Patents To The Pools To Unlawfully Maintain and Extend Its Monopoly Power.**

47.  On information and belief, MPEG LA has failed to abide by the required independent-expert mechanism in the management and administration of the licensing of MPEG-2, and the subsequent MPEG-4 Visual and AVC standards.  Instead it has engaged a single patent-essentiality expert, Kenneth Rubenstein, who, on information and belief, is not independent.

48.  On information and belief, Rubenstein has been intimately involved in the creation of MPEG LA and the maintenance of its monopoly position, interacting with MPEG LA on a day-to-day basis since 1997.  On information and belief, Rubenstein has, among other things, directly benefited from his association with MPEG LA in many ways that are inconsistent with any notion of independence.  For example, on information and belief, Rubenstein (i) helped to form MPEG LA with MPEG LA's founder Mr. Futa, (ii) was involved in the drafting of the first MPEG LA Licenses, (iii) interprets questions from licensees about the interpretation, application, and enforcement of MPEG LA's Licenses, (iv) has attended business settlement meetings on behalf of MPEG LA, (v) has testified before Congress on behalf of MPEG LA, (vi) has authored and submitted various *Amicus Curiae* briefs on behalf of MPEG LA, and (vii) is referred to as MPEG LA's US patent counsel on MPEG-LA's website.

49.  Consistent with the 1997 Business Review Letter and MPEG LA's promises to the DOJ, Rubenstein cannot perform the role of an independent evaluator when he has a financial interest in MPEG LA and serves as a compensated advocate for MPEG LA.  This is particularly so since some of the members (i.e., owners) of the MPEG LA limited liability company are also owners of patents deemed "essential" and licensed through the MPEG LA patent pools.

50.     MPEG LA's success and that of Rubenstein are intertwined, and have been from the inception of MPEG LA.  On information and belief, Rubenstein is the leading person that MPEG LA has engaged to assess the essentiality of patents for its patent pools, including the MPEG-4 Visual and AVC pools.  Strong financial incentives exist for Mr. Rubenstein to participate with and support MPEG LA in its monopoly abuses.

51.     On information and belief, the non-independent Rubenstein has—in line with his financial interests and advocacy roles for MPEG LA—determined patent essentiality in a manner consistent with MPEG LA's interest in extending and abusing its monopoly power, but inconsistent with the interests of competition, innovation, and consumers in the relevant technology markets and with the representations MPEG LA made to the DOJ.  Because the MPEG-2 standard was approved in November 1993 and, at the time, the term of the patents would generally expire 17 years after issuance, the original, essential patents used to meet the standard logically have either expired or will expire shortly.  Therefore, MPEG LA's practice of adding newer, nonessential patents to the MPEG-2 pool as older, essential patents expire unlawfully extends the duration and scope of MPEG LA's monopolies in each of the relevant technology markets.  Through this anticompetitive behavior, MPEG LA has abused its monopoly power and harmed competition, innovation, and consumers in the relevant technology markets.

52.     Under MPEG LA's control, the number of licensors in MPEG-2 has increased from 9 to 26.  The number of patents that Rubenstein deems "essential" to the MPEG-2 standard has increased dramatically from 27 originally—which MPEG LA represented to the DOJ in 1997 were "most" of the essential patents—to more than 800 today.  MPEG LA is a private company, and there is no transparency regarding the evaluation of patents that may or may not be essential to the standards.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

17

53. While it might have been feasible in 1997 to negotiate individual licenses with the nine owners of the 27 essential MPEG-2 patents, it is infeasible, economically and practically, today to negotiate individual licenses with the 26 owners of the more than *800* MPEG-2 patents now claimed to be essential. To reduce the number of negotiations by eliminating truly non-essential patents, a technology innovator would have to conduct its own patent-essentiality investigations of the 800-plus patents in the pool. This would be prohibitively time-consuming and expensive and, therefore, economically and practically infeasible. In sum, MPEG LA's practice leaves no viable alternative but to license the entire pool.

54. In light of the number of patents in the MPEG-4 Visual and AVC pools, it is also infeasible to negotiate individual patent licenses in those relevant technology markets.

55. Although the individual licensing of each essential patent for a particular standard may be a substitute for the MPEG LA licenses in theory, in practice, on information and belief, no developer or manufacturer of MPEG-2, MPEG-4 Visual, or AVC products has met the standards or attempted to meet the standards by acquiring only individual patent licenses directly from patent owners.

**2. MPEG LA Engages In Unfair, Unreasonable, and Discriminatory Practices In Abuse Of Its Monopoly Power.**

56. MPEG LA has also abused its monopoly power in the relevant technology markets by creating and enforcing licensing terms in an unfair, unreasonable, and discriminatory manner that stifles competition and innovation, and harms consumers, in the relevant technology markets.

57. First, on information and belief, not all licensees are treated the same with respect to the amount of royalties they are charged. Some MPEG-2 licensees are charged $2.00 per unit, while others are charged $2.50 per unit.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

NERO AG'S ANTITRUST COMPLAINT

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

58.     Second, while MPEG LA has made a downward adjustment to the MPEG-2 royalty rates since the pool's inception, the amount of that adjustment has not been commensurate with the rapid and dramatic decrease in cost of the technology supported by the MPEG-2 standard—*i.e.*, DVD players, and digital and flat screen televisions. As a result, the effective royalty rate (when considered on a percentage of revenue basis) has risen substantially since 1997. This appears to be one of the consequences of MPEG LA extending the expiration date of the MPEG-2 license agreement from 2010 to 2015 while charging royalties for adding numerous non-essential patents that have no market value. The effectively higher royalty rate thus cannot be justified by the increased number of patents in the pool. As a result, licensees have had no alternative but to sign up for what in effect amounts to an extra four years of MPEG2 payments to MPEG-LA.

59.     Third, MPEG LA collects royalties—including administration fees — multiple times for the same device. For example, with a personal computer, the consumer likely indirectly pays for MPEG-2 patent royalties for the operating system, and again for peripherals and software added to the computer.

60.     Fourth, MPEG LA has also failed to communicate its policies equally to all licensees. Instead by remaining silent on vital aspects of its licensing programs, MPEG LA has created a system that favors insiders (*i.e.*, licensors) and acts against outsiders (*i.e.*, non-licensor licensees). As a result, outsiders such as Nero have great difficulty planning technology changes and embarking on programs to research, develop, and implement technological innovations, while insiders do not face such problems.

        a.     MPEG-2 Royalty Rates Are Discriminatory.

61.     On information and belief, not all licensees are treated the same with respect to the amount of royalties they are charged. Some MPEG-2 licensees are charged $2.00 per unit, while others are charged $2.50 per unit.

19

b.       MPEG-2 Royalties Are Supracompetitive In Light Of Rapidly Decreasing Cost And Pricing Of MPEG-2 Technology.

62.     The relatively static nature of the royalties charged by MPEG LA is evidence of abuse of monopoly power to maintain supracompetitive pricing.  Since the 1990s, there have been continual and dramatic advances in technology.  This is particularly true in the digital video technology industry.  As a result of such progress, the cost and prices of such technologies have continually and dramatically decreased.  The royalty rates MPEG LA charges for MPEG-2, in contrast, have not decreased in line with the parallel decreases in the prices of related technologies.

63.     MPEG LA has also maintained supracompetitive royalty rates, by not reducing the royalties to reflect the expiration of seminal or essential patents.

c.       MPEG-2 Royalties Are Supracompetitive In Light Of MPEG LA's Extension Of the License Through 2015 Because Royalties Will Be Collected On Nonessential Patents For Another Four Years.

64.     Moreover, as part of its scheme to improperly extend its monopoly power, MPEG LA is now coercing its licensees to extend their MPEG-2 Licenses beyond a reasonable term (until December 31, 2015), so that it can continue to collect royalties on nonessential patents.  The new MPEG-2 License contains a five-year lock out on licensees' right to terminate upon 30 days notice.  It provides:  "Voluntary Termination.  Licensee may not terminate this Agreement prior to December 31, 2015.  Following that date, a Licensee may terminate this Agreement by providing thirty (30) Days' written notice."

65.     This coercive behavior contravenes a critical basis upon which the DOJ reached its conclusions in the 1997 Business Review Letter regarding MPEG-2.  As the DOJ noted, the original MPEG-2 License allows "[ea]ch Portfolio licensee [to] terminate its license on 30 days' written notice [with no lock-out period]."  MPEG LA has removed this important termination right in the new MPEG-2 License.  Nero and

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

20

NERO AG'S ANTITRUST COMPLAINT

1  other licensees will have no choice but to sign this agreement because the current
2  MPEG-2 License expires at the end of 2010, and MPEG LA asserts that its MPEG-2
3  pool will still contain essential, unexpired patents during the five-year period.  As
4  alleged herein, it would be economically infeasible for Nero and other licensees to
5  conduct the necessary investigations to open licensing negotiations with individual
6  patent owners.

7           d.     MPEG LA has failed to communicate its policies equally to all
8                  licensees.

9      66.    The administration of these important patent pools by a single private
10  company has led to substantial monopoly abuses.  Simply put, MPEG LA has been
11  allowed to wield its power over an entire industry under a veil of secrecy.  Such
12  unchecked power has enabled MPEG LA to coerce supracompetitive royalties.  An
13  example of this behavior and of MPEG LA's failure to communicate its policies
14  equally to all licensees is its treatment of Nero in connection with time-limited free
15  trials.

16  *Time-limited Free Trials Are Commonly Treated As Sales And Returns In The Industry*

17     67.    Time-limited free trials are essential to the digital video technology
18  industry.  Companies creating high tech products in a constantly changing industry use
19  time-limited free trials to allow customers to discover and try out new products and
20  technologies.  For example, a consumer is able to download a new software product for
21  free and try it out for a limited period of time (typically, fifteen or thirty days) before
22  deciding to purchase it.  When the trial period expires, the consumer can choose to
23  upgrade to the full version of the product or let the subscription expire.

24     68.    Time-limited free trials are important to competition and innovation.  The
25  ability to offer time-limited free trials enables competitors to demonstrate the benefits
26  of their products to consumers.  This fosters competition based on product quality and
27  usefulness rather than other factors, such as marketing dollars and name recognition

28

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

21

NERO AG'S ANTITRUST COMPLAINT

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1   (which favor the biggest companies and disadvantage new entries into the market).

2   Time-limited free trials also thus encourage innovation, furthering competitors' efforts

3   to continually create added value to the consumer.  If a consumer chooses to upgrade

4   to the full version, then both parties benefit:  Nero receives revenue and pays a royalty

5   to MPEG LA for the upgrade.

6        69.   The concept of a sale and return and/or the payment of royalties for net

7   sales is well known in many industries, including this one.  Further, it is common

8   practice in the industry to treat time-limited free trials differently than sales upon

9   which royalties are ultimately paid.  Such practice is in line with the treatment of time-

10   limited free trials in a competitive market.  The overwhelming majority of time-limited

11   free trials do not result in an upgrade.  Time-limited free trials that do not result in an

12   upgrade do not provide any revenue to the distributor.  If the distributor were required

13   to pay a royalty for each time-limited free trial as if it were an actual sale, time-limited

14   free trials would be eliminated because of the large negative return to the distributor.

15        70.   At all relevant times, MPEG LA has been well aware that time-limited

16   free trials are a standard practice in the digital video technology industry.  Indeed,

17   because time-limited free trials are a well-known practice in the industry, most, if not

18   all, licensors address them in some manner.  They do so because licensors also benefit

19   from increased royalties due to the greater potential for purchases (*i.e.*, upgrades).

20        71.   In a competitive market, time-limited free trials would continue to be

21   widely used because of their pro-competitive effects and benefits to end-users of the

22   products.  MPEG LA's abusive conduct has eliminated or significantly decreased (in a

23   discriminatory manner) the availability of time-limited free trials in the markets for

24   MPEG-4 Visual and AVC products.  This anticompetitive result not only injures Nero,

25   it also injures consumers, competition, and innovation.

26   *MPEG LA Confirms That A Time-limited Free Trial Is A Sale And A Return*

27        72.   MPEG LA began offering the MPEG-2 License in 1997.

28

22

NERO AG'S ANTITRUST COMPLAINT

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

73.     In 2001, Nero decided to support the MPEG-2 standard and entered into MPEG LA's MPEG-2 License.

74.     Nero was an early adopter of MPEG LA's MPEG-2 Patent Pool, which now has over 1,500 licensees.

75.     As with many in the industry, time-limited free trials were an essential part of Nero's business model. Nero intended to use time-limited free trials to market and sell software incorporating the MPEG-2 standard.

76.     Although time-limited free trials are essential to exposing consumers to the benefits of new software, an individual time-limited free trial has no market value due to the extremely small percentage of time-limited free trials that actually result in upgrades. Therefore, Nero would continue to use time-limited free trials only if it were not required to pay a royalty for each time-limited free trial distributed.

77.     Before signing the MPEG-2 License, Nero inquired with MPEG LA whether royalty payments would be required for time-limited free trials. Because Nero intended to use time-limited free trials as an integral part of its business plan, the answer to this question was crucial to Nero.

78.     In response to Nero's inquiry regarding time-limited free trials, MPEG LA responded that it would treat a time-limited free trial as a sale and then a return. MPEG LA's treatment of time-limited free trials as sales and subsequent returns was described in a July 2001 email from Dean Skandalis, MPEG LA's Manager of Licensing, to Richard Lesser, Nero's founder.

79.     In the email, MPEG LA confirmed: "we assume that a licensee will account for that as a 'return' by paying a royalty on every product sent out and taking a credit for those returned."

80.     Therefore, as long as the time-limited free trial was deactivated after the thirty-day period, MPEG LA would not require a royalty payment.

81.     The MPEG-2 License states:

23

NERO AG'S ANTITRUST COMPLAINT

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

> "**1.30 Sale (Sold)** - shall mean any sale, rental, lease, license or other form of distribution of an MPEG-2 Royalty Product to an end user, either directly or through a chain of distribution."
> (Ex. 1, ¶ 1.30.)

82.     According to MPEG LA's interpretation of a "sale," as clarified by its correspondence with Nero, a transaction is categorized as a "sale" for purposes of actually collecting a royalty payment only when the sale is *not* followed by a return. Because MPEG LA considered a time-limited free trial a sale and a return, a time-limited free trial did not require a royalty payment.

83.     With MPEG LA's express knowledge and approval, Nero used time-limited free trials—each treated as a sale and return—as an essential part of its business model. Therefore, Nero was not required to pay a royalty for time-limited free trials of MPEG-2 products that did not result in an upgrade.

*The Relevant Portions Of The MPEG-4 Visual And AVC Licenses Are Virtually Identical To The MPEG-2 License*

84.     On or about April 21, 2003, Nero and MPEG LA entered into the MPEG-4 Visual License, which had an effective date of January 1, 2000.

85.     On or about December 23, 2004, MPEG LA and Nero entered into the AVC License, which had an effective date of August 1, 2002.

86.     The definition of a "sale" in the MPEG-4 Visual and AVC Licenses is virtually identical to that in the MPEG-2 License.

    a.     MPEG-2:

> "**1.30 Sale (Sold)** - shall mean any sale, rental, lease, license or other form of distribution of an MPEG-2 Royalty Product to an end user, either directly or through a chain of distribution."
> (Ex. 1, ¶ 1.30.)

NERO AG'S ANTITRUST COMPLAINT

b.    MPEG-4 Visual:

> **"1.39 Sale (Sell) (Sold)** - shall mean any sale, rental, lease, license, copying, reproduction, Transmission, or other form of distribution of an MPEG-4 Visual Royalty Product or the Transmission of MPEG-4 Video for use in connection with an MPEG-4 Visual Royalty Product." (Ex. 2, ¶ 1.39.)

c.    AVC:

> **"1.39 Sale (Sell) (Sold) (Seller)** - shall mean any sale, rental, lease, license, copying, transfer, reproduction, Transmission, or other form of distribution of an AVC Product or the transmission by any means of AVC video either directly or through a chain of distribution." (Ex. 3, ¶ 1.39.)

87.    Not only is the definition of "sale" effectively the same in the MPEG-2, MPEG-4 Visual and AVC Licenses, none of the three Licenses mentions or defines the concept of a "return." Therefore, the treatment of a return subsequent to a sale should and must have the same effect under the MPEG-4 Visual and AVC Licenses as it did under the MPEG-2 License.

88.    Indeed, just as under the MPEG-2 License, under both the MPEG-4 Visual and AVC Licenses, MPEG LA does *not* require a royalty payment for a sale and a return.

89.    Through its conduct, and written and oral agreements and communications, MPEG LA created an ambiguity in the definition of a "sale" under its licenses by treating distributions of software under the same circumstances sometimes as "sales" that require the payment of net positive royalties, and sometimes as sales and returns that do *not* require the payment of net positive royalties.

90.    Once again, in 2007, MPEG LA confirmed its treatment of time-limited free trials as a sale and a return as it had in 2001. In February 2007, Dean Skandalis,

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

NERO AG'S ANTITRUST COMPLAINT

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1  MPEG LA's Manager of Licensing—and perhaps an owner of an interest in MPEG
2  LA—approved a letter to Lite-On IT Corp., a Nero customer, emphasizing that time-
3  limited free trials of MPEG-2 products would be treated as sales and returns.

4       91.    Throughout this six-year period from 2001 to 2007, MPEG LA
5  confirmed its treatment of time-limited free trials as sales and returns verbally, in
6  writing, and by conduct.  During this period, MPEG LA undoubtedly knew that Nero
7  was distributing large numbers of trials with the understanding that it would be
8  responsible for royalty payments only on those distributions that resulted in purchased
9  upgrades.

10       92.    The MPEG-2, MPEG-4 Visual, and AVC Licenses are the only
11  commercially viable option in the relevant technology markets for those, such as Nero,
12  whose business depends on being able to meet the respective standards.   This
13  necessity and the fact that the licenses are presented to licensees on "take-it-or-leave-
14  it" terms, means that MPEG LA, as a monopolist, was solely and uniquely able to
15  clarify the definition of "sale" and the treatment of time-limited free trials under its
16  licenses.  Individual licensees, such as Nero, have absolutely no power to negotiate the
17  terms of any MPEG LA license.  Nor do the licensees have any input regarding the
18  license's terms or definitions therein.  Instead, as the sole licensor of the patent
19  portfolios, MPEG LA requires that "[a]ll Licensees sign the same License." A licensee
20  does not have the opportunity to add clarity to a license. This power rests solely with
21  MPEG-LA.

22  *In 2008, MPEG LA Changes Its Position On Time-limited Free Trials And Demands*
23  *Unjustified And Supracompetitive Royalties—And Retroactive Interest Thereon—*
24  *Exceeding $15 Million*

25       93.    In a sudden and abrupt about-face, in or around February 2008, several
26  months after commencing an audit of payments for MPEG-2, MPEG-4 Visual, and

27

28

26

NERO AG'S ANTITRUST COMPLAINT

1  AVC, MPEG LA informed Nero that it intended to treat time-limited free trials of

2  MPEG-4 Visual and AVC products as a sale without a return.

3       94.    After MPEG LA made its demand for royalties on time-limited free

4  trials, Nero informed MPEG LA that its demand defied the agreements, MPEG LA's

5  representations and the parties' course of conduct, performance, and dealing.

6  Nevertheless, MPEG LA wants to hide behind the New York Parol Evidence Rule to

7  keep the Court from seeing evidence of (a) MPEG LA's intentional misrepresentations

8  and (b) the parties' agreement, course of conduct, and course of performance regarding

9  the treatment of time-limited free trials.

10      95.    After learning that MPEG LA now intended to treat time-limited free

11 trials as a sale rather than a sale and a return, Nero promptly stopped the use of MPEG-

12 4 Visual and AVC time-limited free trials as quickly as was commercially possible.

13      96.    MPEG LA wielded its monopoly power to intentionally foster confusion

14 regarding the treatment of time-limited free trials under its licenses.  It was aware that

15 there was more than one clear understanding amongst licensees regarding the payment

16 of royalties for free trials under the MPEG-2, MPEG-4 Visual, and AVC Licenses.

17 But MPEG LA intentionally refused to address the issue of time-limited free trials or

18 returns in the MPEG-4 Visual and AVC Licenses so as to set up an opportunity to

19 demand a windfall of tens of millions of dollars in supracompetitive royalties.

20      97.    On information and belief, MPEG LA has discriminately provided

21 information to licenses and has unfairly enforced license terms.  Thus, MPEG LA

22 manipulates competition and prices in the markets.

23      98.    Such conduct is an abuse of monopoly power that clearly runs afoul of

24 MPEG LA's promise—and the DOJ's reliance on the promise—to license its portfolios

25 in a fair, reasonable and nondiscriminatory manner.

26

27

28

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

NERO AG'S ANTITRUST COMPLAINT

*In Furtherance Of Its Scheme, MPEG LA Engaged And Manipulated A Non-independent Auditor To Illogically Conclude From Identical Facts and Contract Language That MPEG-2 Time-limited Free Trials Are Sales and Returns, But That MPEG-4 Visual And AVC Time-limited Free Trials Are Not*

99.    In October 2007, MPEG LA engaged KPMG to conduct an audit of Nero, including an evaluation of royalties paid as a result of MPEG-2, MPEG-4 Visual, and AVC related sales.

100.    Under the MPEG-2, MPEG-4 Visual and AVC Licenses, MPEG LA was required to engage "an *independent* certified public accountant(s) or equivalent ('Auditor')" "acceptable to Licensee." (Ex. 1, ¶ 3.10.2.1; Ex. 2, ¶ 3.12.2.1; Ex. 3, ¶ 3.12.2.1 (emphasis added).) But the auditor engaged was not independent. Instead, on information and belief, MPEG LA wrongfully engaged a biased auditor to assist it in its scheme to extort supracompetitive royalties from Nero.

101.    In performing the audit for MPEG-2, KPMG assumed that each time-limited free trial was to be treated as a sale and a return and thus did not require a royalty payment.

102.    In fact, according to the audit invoice, the results of the audit showed that Nero and its subsidiaries have overpaid MPEG LA for royalties based on MPEG-2 usage by $1,521,886. MPEG LA has refused to reimburse Nero for this overpayment.

103.    KPMG also audited Nero's books and records for the period of July 1, 2004, through June 30, 2007, with respect to the MPEG-4 Visual License and January 1, 2005, through June 30, 2007, with respect to the AVC License.

104.    Importantly, KPMG reached contradictory conclusions regarding the calculation of royalties on distributions of time-limited free trials under the MPEG-2 License, on the one hand, and the MPEG-4 Visual and AVC Licenses, on the other hand. First, with the sole exception of time-limited free trials, KPMG concluded that all distributions constituting a sale and a return of Nero's software incorporating any

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1   of the three standards (MPEG-2, MPEG-4 Visual, or AVC) require a net royalty

2   payment of $0.  For example, KPMG concluded that a distribution through a retailer,

3   distributor, reseller or a website download requires a payment only for net sales (sales

4   less returns).  Second, KPMG applied this same conclusion—the concept of "net

5   sales"—in calculating royalties payable for distributions of time-limited free trials of

6   MPEG-2 software.  KPMG reached an entirely different conclusion, however,

7   regarding royalties payable for distributions of MPEG-4 Visual and AVC time-limited

8   free trials.  It did not recognize a deduction for returns.  As a result, while KPMG

9   concluded that time-limited free trials under the MPEG-2 License are sales and

10  returns—requiring net royalty payments of *$0*, it reached a contradictory conclusion

11  that time-limited free trials under the MPEG-4 Visual and AVC Licenses are sales

12  without returns—requiring net royalty payments exceeding *$12 million*.  The virtually

13  indistinguishable facts and contract language involved in the MPEG-2, MPEG-4

14  Visual, and AVC Licenses impugn KPMG's contradictory conclusions.

15      105.   On January 6, 2009, MPEG LA sent one invoice to Nero for the results of

16  the audit report covering MPEG-2, MPEG-4 Visual, and AVC.  Nero, however, has

17  no way to confirm the audit results.  MPEG LA demands that Nero pay KPMG's bill

18  for the MPEG-4 Visual and AVC audits, but has refused to provide Nero with a copy

19  of the audit report or any other meaningful substantiation of its results.

20      106.   As the unreasonable treatment of time-limited free trials under the

21  different Licenses shows, KPMG was not independent.  On information and belief,

22  MPEG LA acted in bad faith and intentionally pressured KPMG to interpret issues and

23  make findings contrary to reason and in accordance with MPEG LA's untenable

24  position.  On information and belief, MPEG LA likewise instructed KPMG not to

25  respond when Nero requested an explanation for the illogical treatment of identical

26  facts and contract language.  In fact the audit was provided to MPEG-LA and MPEG-

27  LA issued its invoice based on the results of the audit during a time that KPMG had

28

1    open promises to Nero to explain how it justified treating trials differently under each

2    agreement when the same relevant language appeared in each agreement and where in

3    each instance MPEG-LA was the entity licensing the patent portfolio.

4        107.   MPEG LA's manipulation of the audit, in contravention to provisions in

5    the Licenses, is yet another example of its abusive practices.  As a result of such

6    conduct, the audit purportedly found that Nero underpaid royalties for the MPEG-4

7    Visual and AVC Licenses by $12,115,829 plus interest, totaling more than $15

8    million.  On information and belief, this alleged underpayment was almost entirely the

9    result of MPEG LA's assertion that Nero should have to pay royalties for time-limited

10   free trials.  MPEG LA has acted unlawfully to gain a windfall in royalties for free

11   trials that have little or no market value.

**FIRST CLAIM FOR RELIEF**

**(Unlawful Maintenance, Extension, and/or Abuse of Monopoly Power in**

**Violation of Section 2 of the Sherman Act)**

15      108.   Nero repeats and realleges the allegations of paragraphs 1 through 107

16   above, as if fully restated herein.

17      109.   MPEG LA possesses monopoly power in the relevant technology

18   markets, which are the worldwide markets for the licensing of patents relating to the

19   MPEG-2, MPEG-4 Visual, and AVC standards.

20      110.   Patents give their owners the right to exclude others from making, using,

21   offering for sale, selling, or importing the invention in the absence of a license.  Where,

22   as here, the numerous patent owners agreed to participate in pools administered solely

23   by MPEG LA, it was implicitly and explicitly stated that MPEG LA would license the

24   patent pools in a fair, reasonable, and nondiscriminatory manner.

25      111.   Upon information and belief, new entries into the market are unlikely.

26   Access to patents that are essential to comply with the MPEG-2, MPEG-4 Visual, and

27   AVC standards is necessary for entry into the respective licensing markets.  And the

28

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

NERO AG'S ANTITRUST COMPLAINT

1 patent holders with essential patents in MPEG LA's pools have no incentive to grant
2 others the right to license their patents with the goal of creating a patent pool that
3 would compete with one that already gives them billions of dollars in passive income.
4 The numerous significant, and in practicality, insurmountable barriers prevent entry
5 into the relevant technology markets.  These barriers to entry in conjunction with
6 MPEG LA's monopoly position allow MPEG LA to maintain unchecked power in
7 those technology markets.

8       112.    Access to patents in MPEG LA's patent portfolios that are essential to
9 comply with the MPEG-2, MPEG-4, and AVC standards is crucial to the digital video
10 technology industry for the development and manufacture of its software and
11 hardware, including digital television, DVD players, DVDs, Blu-Ray players and discs,
12 cameras, as well as media players on computers, game machines and other personal
13 devices.

14       113.    MPEG LA's practice of adding newer, nonessential patents to its pools
15 has made acquiring individual licenses from each patent holder practically and
16 economically infeasible for consumers in the markets for the licensing of these
17 standards.  While it might have been feasible in 1997 to negotiate individual licenses
18 with the nine owners of the 27 essential MPEG-2 patents, it is absolutely infeasible
19 today to negotiate individual licenses with the 26 owners of the more than 800 MPEG-
20 2 patents now claimed to be essential.  To reduce the number of negotiations by
21 eliminating truly non-essential patents, a technology innovator would have to conduct
22 its own patent-essentiality investigations of the 800-plus patents in the pool.  This
23 would be prohibitively expensive and time-consuming and, therefore, infeasible
24 economically and practically.  Indeed, neither Nero nor, on information and belief, any
25 developer or manufacturer of MPEG-2, MPEG-4 Visual, or AVC products has met the
26 standards by acquiring only individual patent licenses directly from patent owners.

27

28

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

NERO AG'S ANTITRUST COMPLAINT

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1    114.   Accordingly, there are no reasonably interchangeable substitutes for the

2   licensing of MPEG LA's patent pools in the relevant technology markets.  Sellers of

3   products that incorporate the standards at issue must do business with MPEG LA to

4   compete in the downstream product markets.  MPEG LA has virtually 100% market

5   share in the relevant worldwide markets for the licensing of patents relating to the

6   MPEG-2, MPEG-4 Visual, and AVC standards.

7    115.   On information and belief, MPEG LA has willfully maintained, extended

8   and otherwise abused its monopoly power in the relevant technology markets, in

9   violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, by engaging in the

10   anticompetitive conduct alleged herein.

11    116.   The acts alleged herein have had a not insubstantial effect on interstate

12   commerce in that such conduct has and will restrain and adversely effect interstate

13   commerce by, among other things, impeding competition throughout the United States

14   in the relevant technology markets.

15    117.   The abusive and discriminatory conduct alleged herein is a misuse of

16   MPEG LA's monopoly position as the sole administrator of the MPEG-2, MPEG-4

17   Visual, and AVC patent pools.

18    118.   MPEG LA's abusive conduct has had and/or is likely to have the

19   following anticompetitive consequences, among others, in the relevant technology

20   markets:

21      a.   an improper temporal extension of MPEG LA's monopoly by

22          including nonessential patents in its pools and making the Licenses

23          essentially non-cancellable by licensees;

24      b.   maintaining MPEG LA's monopoly after it would have otherwise

25          terminated with the expiration of the essential patents;

26      c.   an improper extension in the scope of MPEG LA's monopoly by

27          including nonessential patents in its pools;

28

d.      supracompetitive royalties in the relevant technology markets—
resulting in higher prices to consumers, such as Nero, in the
relevant technology markets, and to consumers, such as end-users,
of products that incorporate the MPEG-2, MPEG-4, or AVC
standards; and

e.      unfair, unreasonable, and discriminatory licensing conditions that
are subject to change at the will of MPEG LA and that do not
reflect market conditions, stifling competition and innovation.

119.    The injury to Nero is of the type that the antitrust laws were designed to prevent and flows from that which makes MPEG LA's actions unlawful.  As a result of MPEG LA's anticompetitive conduct, Nero has been and is being harmed in its business or property in an amount to be proven at trial.

120.    Therefore, MPEG LA's unlawful actions have caused, and will continue to cause, Nero irreparable harm for which it has no adequate remedy at law.

121.    In sum, MPEG LA's predatory and abusive conduct has caused antitrust injury to innovation, competition, and consumers in the relevant technology markets.

122.    Unless enjoined, the natural and proximate result of MPEG LA's conduct will be to leave the monopolist to its abusive practices substantially injuring innovation, competition, and consumers in the relevant technology markets.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Nero AG prays that this Court enter judgment on its Complaint awarding to Nero, and against MPEG LA:

1.      Damages suffered by Nero on account of MPEG LA's acts in violation of Section 2 of the Sherman Act (15 U.S.C. § 2), plus interest, with such amounts increased by a factor of three, pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15(a));

2.      Other damages according to proof;

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

33

1      3.      Injunctive relief, pursuant to, among other things, Section 16 of the

2   Clayton Act (15 U.S.C. § 26), to prevent future unlawful monopoly maintenance,

3   extension, and/or abuses;

4      4.      Nero's costs of suit, including, without limitation, expert, consultant, and

5   witness fees;

6      5.      Nero's attorney's fees pursuant to Section 4 of the Clayton Act (15

7   U.S.C. § 15(a)); and

8      6.      Such other and further relief as the Court may deem just and proper.

9

10  Dated: May 14, 2010                    Respectfully Submitted,

11                                         Winston & Strawn LLP

12

13                                         By:

                                           John S. Gibson
14                                         Attorneys for Plaintiff
                                           NERO AG
15

16

17

18

19

20

21

22

23

24

25

26

27

28

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

**DEMAND FOR JURY TRIAL**

Plaintiff Nero AG demands a trial by jury of all the claims asserted in this Complaint so triable.


Dated:  May 14, 2010                    Respectfully Submitted,

                                        Winston & Strawn LLP


                                        By: _____
                                             John S. Gibson

                                             Attorneys for Plaintiff
                                             NERO AG

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

35

NERO AG'S ANTITRUST COMPLAINT

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Valerie Baker Fairbank and the assigned discovery Magistrate Judge is Ralph Zarefsky.

The case number on all documents filed with the Court should read as follows:

## CV10- 3672 VBF (RZx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

========================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] Western Division | [ ] Southern Division | [ ] Eastern Division |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

Name & Address:
John S. Gibson (SBN: 140647)
Peter E. Perkowski (SBN: 199491)
Veronica L. Harris (SBN: 256120)
Winston & Strawn LLP
333 South Grand Avenue, Los Angeles, CA 90071

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NERO AG, <br><br> PLAINTIFF(S) <br><br> v. <br><br> MPEG LA, L.L.C., <br> and DOES 1 through 10, inclusive, <br><br> DEFENDANT(S). | **CASE NUMBER** <br><br> CV 10 3672 VBF (RZx) <br><br><br> **SUMMONS** |

TO:   DEFENDANT(S):   MPEG LA, c/o Orly Z. Elson, Esq., Sullivan & Cromwell,
         1888 Century Park East, Los Angeles, CA 90067

    A lawsuit has been filed against you.

    Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _____John S. Gibson, Esq._____, whose address is Winston & Strawn LLP, 333 South Grand Avenue, 38th Floor, Los Angeles, CA  90071 .  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

                                        Clerk, U.S. District Court

Dated:      May 14, 2010                    By: _____
                                            Deputy Clerk

                                            (Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                          **SUMMONS**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| NERO AG | MPEG LA |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| John S. Gibson (SBN: 140647); Peter E. Perkowski (SBN: 199491); Veronica L. Harris (SBN: 256120) Winston & Strawn, 333 S. Grand Avenue, Los Angeles, CA 90071 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff    ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant    ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify):    ☐ 6 Multi-District Litigation    ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:    JURY DEMAND:** ☒ Yes    ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes    ☒ No        ☐ MONEY DEMANDED IN COMPLAINT: $_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Complaint for violations of Section 2 of the Sherman Act

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☒ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | IMMIGRATION | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | | | | |
| | ☐ 290 All Other Real Property | | | | |

CV10 3672

FOR OFFICE USE ONLY:   Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)                    CIVIL COVER SHEET                    Page 1 of 2

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☒ No   ☐ Yes
If yes, list case number(s): _____

**VIII(b).  RELATED CASES:**  Have any cases been previously filed in this court that are related to the present case? ☐ No   ☒ Yes
If yes, list case number(s): _____ 2:10-CV-0382 RGK (PJWx) _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)   ☒ A.  Arise from the same or closely related transactions, happenings, or events; or
                                               ☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
                                               ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
                                               ☐ D.  Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:**  (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Colorado |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
   Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

X.  SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date   May 14, 2010

   **Notice to Counsel/Parties:**   The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings
or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed
but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |