**CONFORM COPY**

John S. Gibson  (SBN: 140647)
jsgibson@winston.com
Peter Perkowski  (SBN: 199491)
pperkowski@winston.com
Veronica L. Harris  (SBN: 256120)
vharris@winston.com
WINSTON & STRAWN LLP
333 S. Grand Avenue, 38th Floor
Los Angeles, CA  90071-1543
Telephone:(213) 615-1700
Facsimile:  (213) 615-1750

Attorneys for Plaintiff
NERO AG

FILED
CLERK, U.S. DISTRICT COURT

OCT  4 2010

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| NERO AG,<br><br>                Plaintiff,<br><br>      vs.<br><br>MPEG LA, L.L.C.,<br>and DOES 1 through 10, inclusive,<br><br>          Defendants. | Case No.  10-cv-3672-MRP-RZ<br><br>**NERO AG'S**<br>**FIRST AMENDED COMPLAINT**<br>**FOR VIOLATIONS OF**<br>**SECTION 2 OF THE SHERMAN ACT**<br><br>**DEMAND FOR JURY TRIAL** |

*Winston & Strawn LLP*
*333 S. Grand Avenue*
*Los Angeles, CA 90071-1543*

NERO AG'S FIRST AMENDED COMPLAINT

1    Plaintiff Nero AG ("Nero") hereby alleges against Defendants MPEG LA,

2  L.L.C. ("MPEG LA") and DOES 1 through 10, inclusive, as follows:

3                              **JURISDICTION AND VENUE**

4    1.    This action arises under Section 2 of the Sherman Act, 15 U.S.C. § 2, and

5  Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

6    2.    This Court has original jurisdiction over the subject matter of this action

7  pursuant to 28 U.S.C. §§ 1331 and 1337.  The Court has jurisdiction over the Sherman

8  Act and Clayton Act claim pursuant to 28 U.S.C. § 1331 because the Sherman Act and

9  the Clayton Act are federal laws.

10    3.    Personal jurisdiction over MPEG LA is proper in this District under 15

11  U.S.C. §§ 15, 22 and 28, because MPEG LA maintains an office and transacts business

12  on a systematic and continuous basis in this District.  Further, the unlawful acts alleged

13  herein were performed and occurred in part within this District.

14    4.    Venue properly lies in this Court pursuant to 28 U.S.C. § 1391 in that, on

15  information and belief, MPEG LA resides and/or is doing business in this District on a

16  systematic and continuous basis, and many of the acts described below have been and

17  are being conceived, carried out, and made effective in this District.

18                              **INTRODUCTION**

19    5.    While the federal antitrust laws do not prohibit the legal acquisition of

20  legal monopoly power, they do prohibit the willful maintenance, extension and abuse

21  of that power.  MPEG LA is the self-proclaimed "*world's leading* packager of patent

22  pools for standards and other technology platforms used in consumer electronics" in

23  the trillion-dollar digital video technology industry.  MPEG LA licenses patent pools

24  relating to standards (including the MPEG-2 standard[1] at issue here) with which

25  virtually every company operating in the industry must comply.

26  _____

27  [1] The standards ensure compatibility and interoperability of devices manufactured by
    different companies in the industry.  The MPEG-2 Video and Systems coding

28  standards, completed in 1993, are used in set-top boxes, DVD players and recorders,

1

*Winston & Strawn LLP*
*333 S. Grand Avenue*
*Los Angeles, CA 90071-1543*

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

6.     MPEG LA willfully maintains, extends and abuses its monopoly power in the relevant technology market—which is the worldwide market for the licensing of patents relating to the MPEG-2 standard.[2]  In so doing, it stifles competition and innovation, and harms consumers, in the relevant technology market.

7.     Nero—an innovator of liquid media technology software (computer software that allows users to play, create, receive or distribute digital video content from personal computers, DVD players, cell phones, and other devices)—became a licensee of the MPEG-2 patent pool because compliance with the MPEG-2 standard is mandatory in order for Nero to sell software products in the area of multimedia.  Nero is therefore a consumer in the relevant technology market and a competitor in certain downstream markets in the sale and distribution of products that comply with the MPEG-2 standard.

### *MPEG LA's Representations To The DOJ That It Would Implement Pro-competitive Safeguards In Exercising Monopoly Power*

8.     Before MPEG LA obtained monopoly power in the relevant technology market, it sought a commitment from the Antitrust Division of the United States Department of Justice ("DOJ") to not initiate an enforcement action against MPEG LA for its proposed administration of the MPEG-2 patent pool.  By representing itself in a manner that it knew the DOJ would view favorably, MPEG LA obtained a June 26, 1997 Business Review Letter ("Business Review Letter") stating that, based upon MPEG LA's representations, the DOJ was "not presently inclined to initiate antitrust enforcement action" regarding the licensing arrangement.  (A true and correct copy of the Business Review Letter is attached hereto as Exhibit 1.)  The DOJ expressly

---

TVs, personal computers, game machines, cameras, DVD Video Discs and other products involving digital video.

[2] To be sure, as a theoretical matter the relevant technology market could include patents and technology relating to standards competitive with (i.e., substitutes for) the MPEG-2 standard.  But there are no such substitute standards as the MPEG-2 standard is mandatory for Digital Television, DVD players, Blu-ray players, and similar video devices.

NERO AG'S FIRST AMENDED COMPLAINT

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

conditioned its then-current enforcement intention on MPEG LA's representations that it would protect against potential anticompetitive effects of its licenses by implementing certain pro-competitive safeguards, such as:

- **Engaging an independent expert to make sure that only "essential patents" are placed in the MPEG-2 pool.** By an "essential patent," MPEG LA and the DOJ meant any patent that claimed a product or method necessary for compliance with the MPEG-2 standard—i.e., a patent that a product complying with the standard would necessarily infringe. MPEG LA told the DOJ in 1997 that the 27 essential patents in the pool for the 1993 MPEG-2 standard represented most of the essential patents. In other words, there are at most 53 essential patents.

- **Using the independent-expert mechanism to "weed[] out nonessential patents" from the pool**, and thereby "ensure that the licensees will not have to pay royalties for making MPEG-2 products that do not employ the licensed patents." Thus, the DOJ wanted to ensure that licensees would not pay royalties on patents that were not infringed by the licensees' products.

- **Formulating and enforcing licensing terms that are fair, reasonable, and nondiscriminatory.**

9.      MPEG LA's promises convinced the DOJ not to initiate antitrust enforcement at that time, believing that MPEG LA would not abuse its monopoly power in administering a pooled license of patents for the MPEG-2 standard.

### *MPEG LA's Abuses Of Its Monopoly Power—And Failure to Implement Safeguards—Despite Its Promises*

10.      But absolute power has corrupted MPEG LA absolutely. Once MPEG LA obtained monopoly power in the relevant technology market, it used that power to (i) willfully maintain or extend its monopoly beyond its natural expiration (the term of

3

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1   the essential patents in the MPEG-2 pool); (ii) restrain competition; and (iii) administer

2   its licenses in an unfair, unreasonable, and discriminatory manner that stifles

3   competition and innovation, and harms consumers, in the relevant market in violation

4   of Section 2 of the Sherman Act.  That is, since obtaining the Business Review Letter,

5   MPEG LA has acted contrary to the manner that it represented to the DOJ it would act.

6   It has failed to implement the promised pro-competitive safeguards.

7       11.     Instead, MPEG LA has done the very things that it promised the DOJ it

8   would guard against.  It has:

9   (a)   **Engaged a so-called "independent" expert (Kenneth Rubenstein) who**

10        **cannot perform the role of *independent* patent-essentiality evaluator**

11        **contemplated by the DOJ because he has a financial interest in—and**

12        **serves as a compensated advocate for—MPEG LA.**  (Rubenstein's

13        non-independence is alleged in further detail in Paragraph 36 herein.)

14  (b)   **Used its non-independent expert to add some *800* patents to the**

15        **MPEG-2 pool, thus extending the duration of its MPEG-2 License**

16        **beyond the expiration dates of the older patents essential to the 1993**

17        **standard and restraining individual licensing.**  The drastic and

18        unforeseen increase in the number of patents suggests that hundreds of

19        added patents are nonessential ones which only serve to benefit MPEG

20        LA.  Indeed, as alleged in more detail in Paragraphs 39-41 herein,

21        numerous U.S. patents in the MPEG-2 pool are ***not*** essential to making

22        and selling a product that complies with the relevant MPEG-2 standard.

23        As a result, therefore, far from "weeding out nonessential patents from

24        the [MPEG-2] Portfolio," as the DOJ intended, MPEG LA unlawfully

25        extends the duration of the patent pool, and forces licensees (who are

26        consumers in the relevant technology market) and ultimately, end-users

27        (who are consumers in the downstream product markets) to pay royalties

28

NERO AG'S FIRST AMENDED COMPLAINT

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1   for making and distributing MPEG-2 products that do not practice the

2   licensed patents.  MPEG LA has thus maintained or extended its

3   monopoly in the worldwide market for the licensing of patents relating to

4   the MPEG-2 standard well beyond its natural duration and scope.  It has

5   also restrained competition from substitutes to a pool license—in the

6   form of individual licensing—by making it unrealistic for licensees to

7   wade through and evaluate the hundreds of nonessential patents claimed

8   to be essential in order to determine which owners they must contact to

9   negotiate individual licensing.

10   (c)   **Used the Extended MPEG-2 License to prohibit—and thereby**

11   **restrain—individual licensing during the time that it would otherwise**

12   **be most likely to compete with MPEG LA's pool licensing.**

13   As the DOJ noted, the original MPEG-2 License provided that each

14   licensee could terminate its license on 30 days' written notice.  The DOJ

15   viewed this provision as an important pro-competitive measure because

16   licensees could thus easily opt for individual licensing with individual

17   patent holders when the licensees determined that individual licensing

18   has become more attractive than the pool license.  As alleged in further

19   detail in Paragraph 45 herein, individual licensing would be in especially

20   high demand—and would be priced lower in the aggregate than MPEG

21   LA's pool pricing—in the waning years of the pool (in approximately

22   2014 through 2016), when only a few unexpired patents remain.  (For

23   example, there will be only about 10 unexpired U.S. patents left in the

24   pool after December 31, 2014, and only about six unexpired U.S. patents

25   left in the pool after April 28, 2015.)   But MPEG LA caused Nero and

26   other licensees to sign an Extended MPEG-2 License that removes

27   licensees' 30-day termination right, thereby prohibiting individual

28   5

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1  licensing from 2010 through January 2016—which includes the very

2  period during which individual licensing would otherwise provide fierce

3  competition for MPEG LA's pool licensing.  If Nero did not sign the

4  Extended MPEG-2 License, Nero would have paid an extra 50 cents per

5  codec throughout 2010 under the previous MPEG-2 License.  In order to

6  compete in an industry with small margins, Nero was forced to sign the

7  new agreement, which extended the term from December 2010 to

8  January 2016.  In addition, by reason of the conduct alleged herein, Nero

9  did not have the realistic or practical opportunity to pursue individual

10  licensing as an alternative to signing the Extended MPEG-2 License.[3] As

11  a result, the License is now the exclusive means of licensing the MPEG-2

12  patents, as alleged in further detail in Paragraph 43 herein.  Therefore, no

13  matter what efforts licensees, such as Nero, might make to contact

14  individual patent owners to negotiate individual licensing during 2010

15  through January 2016, such licensing is not realistic as a practical matter

16  because the terms of the License forbid such licensing until after January

17  2016.  Moreover, the Extended MPEG-2 License appears to require

18  payment of royalties on a product compliant with the MPEG-2 standard

19  regardless of whether or not that product infringes any unexpired patent

20  in the country in which the product is manufactured or sold.

21  (d)  **Formulated and imposed licensing terms that are unfair,**

22  **unreasonable, and discriminatory** by: (i) charging licensees different

23  royalty rates for the same MPEG-2 license;  (ii) collecting royalties—

24  including administration fees—multiple times for the same device; and

25

26  [3] In any event, in press releases found on MPEG LA's website, MPEG LA seems to boast about its practice of having its members and other patent owners file

27  simultaneous infringement litigation in multiple jurisdictions against a licensee who did not agree to the pool license.  This served as a big stick to force licensees to sign

28  the Extended MPEG-2 License.

6

1           (iii) entering into secret "side letters" with some licensees which provide

2           terms different than for other licensees.

3    ***Summary of Action***

4        12.    As a result of its licensing monopoly, MPEG LA collects royalties—

5    including administration fees—from the sale and/or distribution of almost every

6    personal computer (and related software), DVD, DVD player, digital television set,

7    mobile television receiver, TV set-top box, Blu-ray video optical disc, Blu-ray Disc[TM]

8    player/recorder, and media players.  Indeed, MPEG LA has estimated that through

9    2006 the value of MPEG-2 products in the market was expected to exceed half a

10   *trillion* dollars.

11       13.    MPEG LA's illegal maintenance or extension—and other abuses—of its

12   monopoly power have resulted in substantial antitrust injury, detailed below, that

13   stifles competition and innovation, and harms consumers, in the relevant technology

14   market.

15       14.    Nero seeks just compensation for—and an injunction to terminate—

16   MPEG LA's unlawful maintenance, extension, and abuses of its monopoly power in

17   violation of Section 2 of the Sherman Act.

18

19

20

21

22

23

24

25

26

27

28

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

NERO AG'S FIRST AMENDED COMPLAINT

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

## PARTIES

15.     Plaintiff Nero AG is a German private company with its principal place of business at Im Stoeckmaedle 18, Karlsbad, 76307, Germany.

16.     Defendant MPEG LA, L.L.C., aka MPEG Licensing Authority, is a Delaware limited liability company with its principal place of business at 6312 South Fiddlers Green Circle, Suite 400E, Greenwood Village, Colorado 80111.

17.     On information and belief, Defendants DOES 1 through 10 are individuals or corporations whose exact character is presently unknown and who conducted and are responsible for the matters of which Nero complains herein.  The true names and identities of DOES 1 through 10 are not presently known to Plaintiff.  When such Defendants' true names and capacities are ascertained, Nero will amend, or seek leave of court to amend, this First Amended Complaint accordingly.

## GENERAL ALLEGATIONS

A.     **Nero AG—a Forerunner and Innovator in Liquid Media Technology—is One of MPEG LA's Licensees, and a Consumer, in the Relevant Technology Market.**

18.     Nero is a creator of liquid media technology whose mission is to enable liquid content creation and distribution anytime, anywhere, and on any device.  Nero provides consumers with the freedom to enjoy their music, photos, and videos, regardless of hardware or file format, by taking a unique device-neutral, standards-based approach to solution development.

19.     Nero has developed award-winning digital multimedia solutions that are among the industry leaders in sales and technology.  For example, Nero Vision software allows individuals without technical knowledge to create family movies and to easily share their movies with friends and family using DVDs or the Internet.  Millions of units of Nero's trusted software solutions have been distributed to consumers and businesses in the home, on the go, and in the office.  Nero users

8

1 worldwide enjoy products and applications that integrate key technologies designed to
2 improve digital life.

3     20.    Nero's digital multimedia solutions for consumers require that Nero
4 comply with various standards for digital television, DVDs, and other digital imaging
5 technology, including the MPEG-2 standard. Therefore, Nero must have access to
6 those patents in MPEG LA's patent pool that are essential to comply with the standard.
7 Nero was an early adopter of the MPEG-2 and other digital video standards, and thus
8 was among the early licensees for MPEG LA's MPEG-2 patent pool. The patent pool
9 license agreement ("License") at issue is the MPEG-2 Patent Portfolio License (the
10 "MPEG-2 License"), a true and correct copy of which is attached hereto as Exhibit 2.

11 **B.**    **MPEG LA Has Monopoly Power in the Relevant Worldwide Technology**
12       **Market for the Licensing of Patents Relating to the MPEG-2 Standard.**

13     21.    MPEG LA packages patents, some of which are essential to standards
14 used in consumer electronics, as well as chemical, eCommerce, education, energy,
15 environment, healthcare and biotechnology, manufacturing and materials,
16 transportation and wireless technology. One of the standards for which MPEG LA has
17 formed a patent pool is MPEG-2. MPEG LA licenses patent pools relating to
18 standards necessary to virtually every company operating in the digital video
19 technology industry. Through its patent pools, MPEG LA wields significant power
20 over the industry. MPEG LA has admitted its dominant position. It asserts that MPEG
21 LA's licensees "account[] for most MPEG-2 products in the current world market,
22 including set-top boxes, DVD players, digital television sets, personal computers and
23 DVD video discs." Baryn Futa, MPEG LA's then Chief Executive Officer and
24 Manager, stated to the DOJ: "MPEG-2 licensees . . . make most of the MPEG-2
25 products in the current world market."

26
27
28

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

NERO AG'S FIRST AMENDED COMPLAINT

*Standard Setting*

1
2    22.    In 1988, the International Organization for Standardization established
3    the Moving Pictures Experts Group (MPEG) to create standards for audio and video
4    compression.  MPEG thereafter created the MPEG-2 standard.

5    **The MPEG-2 License**

6    23.    In 1993, the MPEG-2 compressed video standard, which is now
7    mandatory for digital television, DVDs and DVD players, Blu-Ray discs and players,
8    among other technologies ("MPEG-2 standard"), faced a patent thicket.  In other
9    words, software and hardware manufacturers needed to meet the MPEG-2 standard to
10   distribute and sell their products.  But they could not do so without potentially
11   infringing upon patents essential to practice the standard.  Therefore, the single biggest
12   challenge to MPEG-2 standard adoption was access to these essential patents.

13   24.    MPEG LA seized the opportunity and created the first modern-day patent
14   pool.  MPEG-2 became the most successful standard in software and consumer
15   electronics history, with MPEG LA as the sole licensor of its MPEG-2 patent pool.

16   **The Department of Justice's Business Review Letters**

17   25.    On June 26, 1997, the DOJ issued a Business Review Letter addressing
18   potential antitrust concerns regarding MPEG LA's MPEG-2 patent pool.  In the letter,
19   the DOJ warned of the potential anticompetitive effects of abusing monopoly power in
20   administering the licensing of the pool.  The DOJ also outlined the potential pro-
21   competitive benefits of such a pool.  It concluded that it was "not presently inclined to
22   initiate antitrust enforcement action" regarding formation of the MPEG-2 patent pool.
23   Recognizing the potential for abuse, the DOJ conditioned its present inclination not to
24   initiate enforcement on the administrator, MPEG LA, (1) administering the licenses in
25   a fair and reasonable manner, and (2) ensuring that an independent expert evaluates the
26   patents scrupulously to make sure that only patents essential to the standard are in the
27   pool, among other conditions.  The DOJ "reserve[d] the right to bring an enforcement

28
                                    10

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

1    action in the future if the actual operation of the [licensing of the pool] proves to be
2    anticompetitive in purpose or effect."

3        26.    At the time of the June 26, 1997 Business Review Letter, MPEG LA
4    represented to the DOJ that the patent pool accounted for "27 Essential Patents, which
5    [were] most, but not all, of the Essential Patents." Today, MPEG LA reports on its
6    website that, as of October 1, 2010, there are more than 800 purportedly essential U.S.
7    and foreign patents in that same pool. The DOJ made its decision on the basis that
8    MPEG LA "would grant licenses under the Portfolio on a nondiscriminatory basis."
9    MPEG LA emphasized the importance of an independent patent expert tasked with
10   determining the essentiality of the patents, noting that "[t]he Portfolio combines
11   patents that an independent expert has determined to be essential to compliance with
12   the MPEG-2 standard; there is no technical alternative to any of the Portfolio patents
13   within the standard."

14       27.    The DOJ expressed several concerns regarding the potential
15   anticompetitive effects. It noted that "some patent pools can restrict competition,
16   whether among intellectual property rights within the pool or downstream products
17   incorporating the pooled patents." And it pointed out the potential anticompetitive
18   effects that would stem from "aggregat[ing] competitive technologies and set[ting] a
19   single price." "Such possible concerns might include the likelihood that the Licensors
20   could use the Portfolio license as a vehicle to disadvantage competitors in downstream
21   product markets . . . ." The DOJ noted that "[a] licensing scheme premised on invalid
22   or expired intellectual property rights will not withstand antitrust scrutiny." "By
23   weeding out nonessential patents from the [MPEG-2] Portfolio," the DOJ concluded,
24   "the independent-expert mechanism helps ensure that the licensees will not have to pay
25   royalties for making MPEG-2 products that do not employ the licensed patents."

26

27

28

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

11

NERO AG'S FIRST AMENDED COMPLAINT

28.     Likewise, in 1998, the DOJ issued a Business Review Letter addressing its concerns regarding a DVD patent pool.  The DOJ concluded that it did not, at the time, intend to launch an investigation; however, it expressed significant reservations.

29.     In this letter, the DOJ once again noted the potential competitive hazards of such a patent pool.   The DOJ repeated an essential element in guarding against potential abuses of such patent pools—that the patent expert engaged to determine whether a particular patent is essential to the standard make the evaluation "scrupulously and independently."  It noted that "the structure of this pool, however, creates some concern about the expert's ability to apply this criterion entirely independent of the Licensors."  The DOJ concluded that "the patent-expert mechanism is flawed."  But the DOJ, once again, decided to take a wait-and-see approach regarding the independence of the patent expert.

30.     The DOJ asserted that if the licensors' "assurances prove insufficient either to ensure the expert's ability to function independently and objectively or to ensure that the pool will contain only essential patents, the [DOJ's] enforcement intentions as to the proposed arrangement might be very different."

31.     While appearing before the DOJ, MPEG LA's founder and then-Chief Executive Officer, Baryn Futa, stated:  "MPEG LA's business is to offer fair, reasonable, nondiscriminatory access under a single license to patents that are essential for the use of standards-based or other platform technologies."  As Mr. Futa pointed out, MPEG LA is not an innovator—it does not own any of the patents and it does not use the technology to provide products to consumers.  Instead, it sells a product that is a substitute to the licensing of patents on an individual basis.  And in doing so, MPEG LA collects "billions" of dollars in royalties on behalf of the patent holders.

32.     The proper administration of MPEG LA's monopoly power is necessary to insure competition and innovation in the digital video technology industry.  Mr. Futa has emphasized that among the important safeguards are "essentiality of patents,

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

NERO AG'S FIRST AMENDED COMPLAINT

1   determination of essentiality, terms that are fair and reasonable . . . [and]

2   nondiscrimination." Futa also emphasized to the DOJ that, *"[a] license with patents*

3   *that have not been evaluated by an independent patent expert will lack credibility,"* and

4   that MPEG-2 "encourages . . . competition and innovation."

5       33.    At the time the DOJ issued its Letter, it accepted MPEG LA's

6   representations that it would (a) administer the MPEG-2 license in a fair, reasonable,

7   and nondiscriminatory manner, and (b) engage an expert to assess scrupulously and

8   independently the essentiality of patents included in the pool. MPEG LA, however,

9   has, on information and belief, acted contrary to these representations, and in doing so

10  it has harmed consumers, competition, and innovation.

11  **C.    MPEG LA Unlawfully Maintains, Extends, and Abuses Its Monopoly**

12      **Power In The Relevant Technology Market.**

13      34.    The digital video technology industry has changed drastically since the

14  issuance of the DOJ's letter in 1997. The very concerns that the DOJ expressed in

15  1997 and 1998 have materialized in the form of MPEG LA's monopoly abuses. In

16  operation, MPEG LA's administration of the MPEG-2 pool has proven to be

17  anticompetitive because it has (a) not upheld the independent-expert mechanism and

18  has thereby added numerous nonessential patents to the pools, (b) imposed practical

19  and contractual restraints on individual licensing, and (c) not used its monopoly power

20  in a fair, reasonable, and nondiscriminatory manner. MPEG LA has acted contrary to

21  its promises to the DOJ and has abused its monopoly power to unlawfully maintain or

22  extend that power in the relevant technology market.

23      **1.    MPEG LA Uses A Non-independent Patent-essentiality Expert.**

24      35.    On information and belief, MPEG LA has failed to abide by the required

25  independent-expert mechanism in the management and administration of the licensing

26  of the MPEG-2 standard. Instead, it has engaged a patent-essentiality expert, Kenneth

27  Rubenstein, who, on information and belief, is not independent.

28

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

13

NERO AG'S FIRST AMENDED COMPLAINT

36.     On information and belief, Rubenstein has been intimately involved in the creation of MPEG LA and the maintenance of its monopoly position, interacting with MPEG LA on a day-to-day basis since 1997.  On information and belief, Rubenstein has, among other things, directly benefited from his association with MPEG LA in many ways that are inconsistent with any notion of independence.  For example, on information and belief, Rubenstein (i) helped to form MPEG LA with MPEG LA's founder, Mr. Futa, (ii) was involved in the drafting of the first MPEG LA Licenses, (iii) interprets questions from licensees about the interpretation, application, and enforcement of MPEG LA's Licenses, (iv) has attended business settlement meetings on behalf of MPEG LA, (v) has testified before Congress on behalf of MPEG LA, (vi) has authored and submitted various *Amicus Curiae* briefs on behalf of MPEG LA, and (vii) is referred to as MPEG LA's U.S. patent counsel on MPEG LA's website.

37.     In order to be consistent with the 1997 Business Review Letter and MPEG LA's promises to the DOJ, Rubenstein cannot perform the role of an independent evaluator when he has a financial interest in MPEG LA and serves as a compensated advocate for MPEG LA. This is particularly so because some of the members (i.e., owners) of the MPEG LA limited liability company are also owners of patents deemed "essential" and licensed through the MPEG LA patent pools.  When advantageous to do so, MPEG LA has represented to courts that it is inseparable from its members.  In matters involving Kenneth Rubenstein, however, MPEG LA tells courts that MPEG LA is independent from its members.

38.     MPEG LA's success and that of Rubenstein are intertwined, and have been from the inception of MPEG LA.  On information and belief, Rubenstein is the leading person that MPEG LA has engaged to assess the essentiality of patents for its patent pools, including the MPEG-2 pool.  Strong financial incentives exist for Mr. Rubenstein to participate with and support MPEG LA in its monopoly abuses.

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

NERO AG'S FIRST AMENDED COMPLAINT

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

**2.      MPEG LA's Non-independent Expert Adds Nonessential Patents To The MPEG-2 Pool To Unlawfully Maintain and Extend Its Monopoly Power and To Restrain Individual Licensing.**

39.     On information and belief, the non-independent Rubenstein has—in line with his financial interests and advocacy roles for MPEG LA—determined patent essentiality in a manner consistent with MPEG LA's interest in extending and abusing its monopoly power, but inconsistent with the interests of competition, innovation, and consumers in the relevant technology market and with the representations MPEG LA made to the DOJ.  Because the MPEG-2 standard had Committee Drafts by November 1993 and was approved in November 1994 and, at the time, the term of the patents would generally expire 17 years after issuance, the original, essential patents used to meet the standard logically have either expired or will expire shortly.  Indeed, according to MPEG LA's website (a true and correct copy of a relevant portion of which is attached hereto as Exhibit 3), the MPEG-2 patent pool now contains hundreds of expired United States and foreign patents.  Examples of these expired patents include U.S. Patent Nos. 4,970,590; 4,813,056; 4,796,087; 4,901,075; and 4,849,812; and these patents' numerous foreign counterparts as identified in Exhibit 3.  Therefore, MPEG LA's practice of adding nonessential patents to the MPEG-2 pool as older, essential patents expire unlawfully extends the duration and scope of MPEG LA's monopoly in the relevant technology market.  Through this anticompetitive behavior, MPEG LA has abused its monopoly power and harmed competition, innovation, and consumers in the relevant technology market.

40.     Under MPEG LA's control, the number of licensors in MPEG-2 has increased from 9 to 26.  The number of patents that Rubenstein deems "essential" to the MPEG-2 standard has increased dramatically from 27 originally—which MPEG LA represented to the DOJ in 1997 were "most" of the essential patents—to more than 800 today.  Many of the patents added to the MPEG-2 pool are *not* essential for

1    complying with the MPEG-2 standard because, for example and not by way of

2    limitation,  they address such peripheral matters as encryption (e.g., U.S. Patent No.

3    5,420,866), hardware-implemented MPEG-2 (e.g., U.S. Patent Nos. 4,833,543

4    and 4,849,812), transmission of multiple program streams (e.g., U.S. Patent No.

5    5,420,866), remote tower transmission and the like (e.g., U.S. Patent Nos. 5,420,866

6    and 5,457,701), telecine processing schemes (e.g., U.S. Patent No. 5,461,420),

7    and digital playback in real time (e.g., U.S. Patent No. 5,453,790).  Those patents and

8    others are not infringed by the products offered by Nero and other similarly-situated

9    (MPEG-2-compliant) companies, and, as a result, these patents are not essential to

10   complying with the MPEG-2 standard.  On information and belief, such nonessential

11   patents were added to the MPEG-2 pool only to extend the ultimate expiration date of

12   the pool and/or to make individual licensing impracticable.

13        41.    The allegations of nonessentiality herein are consistent with the view of

14   nonessentiality that the DOJ expressed in its Business Review Letter.  The DOJ quotes

15   the draft MPEG LA agreements with the patent owners as defining an MPEG-2

16   Essential Patent to mean, "any Patent claiming an apparatus and/or a method

17   **necessary for compliance** with the MPEG-2 Standard . . . ."  (Ex. 1 n. 4 (p. 3)

18   (emphasis added).)  Contrary to those draft agreements submitted to the DOJ and upon

19   which the DOJ relied, MPEG LA and Rubenstein added numerous patents to the

20   MPEG-2 pool which patents are not "necessary for compliance with the MPEG-2

21   Standard."

22        42.    While it might have been feasible in 1997 to negotiate individual licenses

23   with the nine owners of the 27 essential MPEG-2 patents, it is infeasible, economically

24   and practically, today to negotiate individual licenses with the 26 owners of the more

25   than *800* MPEG-2 patents now claimed to be essential.  To reduce the number of

26   negotiations by eliminating truly nonessential patents, a technology innovator would

27   have to conduct its own patent-essentiality investigations of the 800-plus patents in the

28

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

16

1  pool. This would be prohibitively time-consuming and expensive and, therefore,

2  economically and practically infeasible. For example, when submitting a patent for

3  evaluation of essentiality, MPEG LA in the past has required a fee of $8,500.00.

4  Therefore, for an individual licensee to review the essentiality of all the patents in the

5  patent pool would cost in excess of $7 million. This process would be less expensive if

6  a licensee could start it by reviewing documents relating to Rubenstein's patent-

7  essentiality determinations. But Nero has requested such documents, and MPEG LA

8  has refused to produce them. Therefore, this litigation is the only means of obtaining

9  review of such documents. In sum, MPEG LA's practice leaves no viable alternative

10  but to license the entire pool.

11      **3.**     **The Extended MPEG-2 License prohibits—and thereby restrains—**

12      **individual licensing during the time that it would otherwise be most**

13      **likely to compete with MPEG LA's pool licensing.**

14      43.     In addition to practical and economic impediments, MPEG LA has

15  recently added a contractual bar to independent licensing. MPEG LA has now

16  imposed amendments to the MPEG-2 License which prohibit Nero and other licenses

17  from terminating the License until January 31, 2016. The extended MPEG-2 License

18  ("Extended MPEG-2 License") contains a five-year lock out on licensees' right to

19  terminate upon 30 days notice. (A true and correct copy of the Extended MPEG-2

20  License is attached hereto as Exhibit 4.) It provides: "Voluntary Termination.

21  Licensee may not terminate this Agreement prior to December 31, 2015. Following

22  that date, a Licensee may terminate this Agreement by providing thirty (30) Days'

23  written notice." Prior to the amendment, Nero and other licenses could terminate the

24  MPEG-2 License upon thirty days notice and thereby opt for individual licensing

25  negotiations with individual patent holders. As a result of the amendments, however,

26  individual licensing is now prohibited through January 31, 2016. As a result, the

27  MPEG-2 License is now the exclusive means of licensing the MPEG-2 patents, exactly

28

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

17

1   the opposite of the critical representations that MPEG LA made to the DOJ in

2   connection with the Business Review Letter.  As the DOJ noted, the original MPEG-2

3   License allows "[ea]ch Portfolio licensee [to] terminate its license on 30 days' written

4   notice [with no lock-out period]."  MPEG LA has removed this important termination

5   right in the Extended MPEG-2 License.  As alleged in further detail in Paragraph 11

6   herein, Nero realistically had no choice but to sign the Extended MPEG-2 License in

7   December 2009.

8       44.    Because almost all of the presently unexpired MPEG-2 patent-pool

9   patents will expire prior to January 31, 2016, but for the amendments to the License,

10  individual licensing would have become an increasingly competitive option for Nero

11  and other licensees between the present and January 31, 2016.  The fact that numerous

12  patents are also not essential to making, selling, or using a product compliant with the

13  standard would have made such individual licensing an even more competitive option

14  absent the amendments.

15      45.    Absent the restraint on competition imposed by the Extended MPEG-2

16  License, individual licensing would, at some point prior to January 31, 2016, become

17  less expensive in the aggregate than MPEG LA's pool licensing for most licensees,

18  while individual licensors of the few essential, unexpired patents would receive higher

19  royalties than they receive from MPEG LA.  At least by that point in time and for some

20  licensees, individual licensing would be a less costly alternative to the pool license.

21  Yet it would also enable the few remaining owners of essential patents to obtain higher

22  revenues from individually licensing those patents than they could obtain from those

23  licensees through the pool because they would not have to share revenues with the

24  owners of the nonessential and expired patents.  (After taking its administration fee off

25  the top, MPEG LA divides the remaining portion of each royalty payment received

26  among the MPEG-2 pool patent owners on a pro rata basis according to the percentage

27  of each owner's patents in the pool.  For example, an owner of one out of the

28

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

NERO AG'S FIRST AMENDED COMPLAINT

1   approximately 800 patents in the pool receives a one-eight hundredth (1/800) share of
2   each $2.00 royalty paid (less MPEG LA's administration fee)—that is, less than
3   $0.0025.)

4   **4.     MPEG LA Engages In Unfair, Unreasonable, and Discriminatory**
5   **Practices In Abuse Of Its Monopoly Power.**

6   46.     MPEG LA has also abused its monopoly power in the relevant
7   technology market by creating and enforcing licensing terms in an unfair,
8   unreasonable, and discriminatory manner that stifles competition and innovation, and
9   harms consumers.

10   47.     First, on information and belief, not all licensees are treated the same
11   with respect to the amount of royalties they are charged.  Some MPEG-2 licensees are
12   charged $2.00 per unit, while others are charged $2.50 per unit.

13   48.     Second, MPEG LA collects royalties—including administration fees—
14   multiple times for the same device.  For example, with a personal computer, the
15   consumer likely indirectly pays for MPEG-2 patent royalties for the operating system,
16   and again for peripherals and software added to the computer.

17   49.     Third, on information and belief, MPEG LA enters into secret "side
18   letters" with some licensees which provide terms different than for other licensees.
19   While MPEG LA claims that all licensees sign the same agreement and are subject to
20   the same terms, the special side letters which, on information and belief, give some
21   licensees special allowances belie MPEG LA's assertion.

22   <u>**FIRST CLAIM FOR RELIEF**</u>
23   **(Unlawful Maintenance, Extension, and/or Abuse of Monopoly Power in**
24   **Violation of Section 2 of the Sherman Act)**

25   50.     Nero repeats and realleges the allegations of paragraphs 1 through 49
26   above, as if fully restated herein.

27
28

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

NERO AG'S FIRST AMENDED COMPLAINT

51.     MPEG LA possesses monopoly power in the relevant technology market, which is the worldwide market for the licensing of patents relating to the MPEG-2 standard.

52.     Patents give their owners the right to exclude others from making, using, offering for sale, selling, or importing the invention in the absence of a license.  Where, as here, the numerous patent owners agreed to participate in pools administered solely by MPEG LA, it was implicitly and explicitly stated that MPEG LA would license the MPEG-2 patent pool in a fair, reasonable, and nondiscriminatory manner.

53.     Upon information and belief, new entries into the market are unlikely. Access to patents that are essential to comply with the MPEG-2 standard is necessary for entry into the relevant licensing market.  And the patent holders with essential patents in MPEG LA's MPEG-2 pool have no incentive to grant others the right to license their patents with the goal of creating a patent pool that would compete with one that already gives them billions of dollars in passive income.  The numerous significant, and in practicality, insurmountable barriers prevent entry into the relevant technology market.  These barriers to entry in conjunction with MPEG LA's monopoly position allow MPEG LA to maintain unchecked power in the relevant technology market.

54.     Access to patents in MPEG LA's MPEG-2 pool that are essential to comply with the MPEG-2 standard is crucial to the digital video technology industry for the development and manufacture of its software and hardware, including personal computers (and related software), DVDs, DVD players, digital television sets, mobile television receivers, TV set-top boxes, Blu-ray video optical discs, Blu-ray DiscTM players/recorders, and media players.

55.     As more fully alleged above, MPEG LA's practice of adding nonessential patents to its MPEG-2 pool has made acquiring individual licenses from each patent holder practically and economically unrealistic for consumers in the market

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

20

1  for the licensing of patents relating to the MPEG-2 standard.  Moreover, the

2  amendments to the MPEG-2 License, as a contractual matter, prohibit Nero and other

3  licensees from terminating the MPEG-2 License and opting for individual license

4  negotiations with individual patent owners until January 31, 2016.  The MPEG-2

5  License, as a practical and contractual matter, has effectively become the exclusive

6  means to license whatever unexpired patents remain that are essential to making, using,

7  or selling a product that complies with the relevant MPEG-2 standard.  Accordingly,

8  there are no reasonably interchangeable substitutes for the licensing of the MPEG-2

9  patent pool in the relevant technology market.  Sellers of products that incorporate the

10  standard at issue must do business with MPEG LA in order to compete in the

11  downstream product markets.  MPEG LA has virtually a 100% market share in the

12  relevant worldwide market for the licensing of patents relating to the MPEG-2

13  standard.

14        56.    On information and belief, MPEG LA has willfully maintained, extended

15  and otherwise abused its monopoly power in the relevant technology market, in

16  violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, by engaging in the

17  anticompetitive conduct alleged herein.

18        57.    The acts alleged herein have had a not insubstantial effect on interstate

19  commerce in that such conduct has and will restrain and adversely effect interstate

20  commerce by, among other things, impeding competition throughout the United States

21  in the relevant technology market.

22        58.    The abusive and discriminatory conduct alleged herein is a misuse of

23  MPEG LA's monopoly position as the sole licensor and administrator of the MPEG-2

24  patent pool.

25        59.    MPEG LA's abusive conduct has had and/or is likely to have the

26  following anticompetitive consequences, among others, in the relevant technology

27  market:

28

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

21

NERO AG'S FIRST AMENDED COMPLAINT

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

    a.    a restraint on individual licensing and other competition by virtue of the Extended MPEG-2 License being exclusive and non-cancellable by licensees until January 31, 2016;

    b.    an improper temporal extension of MPEG LA's monopoly power after it would have otherwise terminated with the expiration of some or all of the essential patents in the pool;

    c.    an improper extension of the scope of MPEG LA's monopoly by including numerous nonessential patents in the MPEG-2  pool and by imposing contractual provisions that have such a purpose or effect;

    d.    supracompetitive royalties in the relevant technology market—resulting in higher prices to consumers, such as Nero, in the upstream relevant technology market, and to consumers, such as end-users, in the downstream product markets of products that incorporate the MPEG-2 standards; and

    e.    unfair, unreasonable, and discriminatory licensing conditions that are subject to change at the will of MPEG LA and that do not reflect market conditions, stifling competition and innovation.

60.    The injury to Nero is of the type that the antitrust laws were designed to prevent and flows from that which makes MPEG LA's actions unlawful.  As a result of MPEG LA's anticompetitive conduct, Nero has been and is being harmed in its business or property in an amount to be proven at trial.

61.    Therefore, MPEG LA's unlawful actions have caused, and will continue to cause, Nero irreparable harm for which it has no adequate remedy at law.

62.    In sum, MPEG LA's predatory and abusive conduct alleged herein has caused antitrust injury to innovation, competition, and consumers in the relevant technology market.

NERO AG'S FIRST AMENDED COMPLAINT

63.     Unless enjoined, the natural and proximate result of MPEG LA's conduct will be to leave the monopolist to its abusive practices, substantially injuring innovation, competition, and consumers in the relevant technology market.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Nero AG prays that this Court enter judgment on its First Amended Complaint awarding to Nero, and against MPEG LA:

1.     Damages suffered by Nero on account of MPEG LA's acts in violation of Section 2 of the Sherman Act (15 U.S.C. § 2), plus interest, with such amounts increased by a factor of three, pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15(a));

2.     Other damages according to proof;

3.     Injunctive relief, pursuant to, among other things, Section 16 of the Clayton Act (15 U.S.C. § 26), to prevent future unlawful monopoly maintenance, extension, and/or abuses;

4.     Nero's costs of suit, including, without limitation, expert, consultant, and witness fees;

5.     Nero's attorney's fees pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15(a)); and

6.     Such other and further relief as the Court may deem just and proper.

Dated:  October 4, 2010

Respectfully Submitted,

Winston & Strawn LLP

By: _John S. Gibson_
John S. Gibson
Attorneys for Plaintiff
NERO AG

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

23

NERO AG'S FIRST AMENDED COMPLAINT

## **DEMAND FOR JURY TRIAL**

Plaintiff Nero AG demands a trial by jury of all the claims asserted in this First Amended Complaint so triable.

Dated:  October 4, 2010

Respectfully Submitted,

Winston & Strawn LLP

By:  John S. Gibson

John S. Gibson

Attorneys for Plaintiff
NERO AG

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

24

# CERTIFICATE OF SERVICE

I, Cathy H. Lauren, declare as follows:

I am a resident of the State of California, over the age of 18 years, and not a party to the within action.  My business address is Winston & Strawn LLP, 333 South Grand Avenue, 38th Floor, Los Angeles, CA  90071-1543.

On October 4, 2010, I caused to be served the following document:

**DEFENDANT NERO AG'S FIRST AMENDED COMPLAINT FOR VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT**

I caused the document listed above to be served:

☑      by causing to be personally delivered the document(s) listed above to the persons at the address set forth below.

<u>Attorneys for Plaintiffs</u>

Michael H. Steinberg
Orly Z. Elson
SULLIVAN & CROMWELL LLP
1888 Century Park East
Suite 2100
Los Angeles, CA  90067
Email: steinbergm@sullcrom.com
Email: elsono@sullcrom.com

I declare that I am employed in the office of a member of the bar of this Court under whose direction the service was made.

Executed on October 4, 2010, at Los Angeles, California.

*Cathy H. Lauren*
_____
Cathy H. Lauren

Winston & Strawn LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543

# Exhibit 1



**DEPARTMENT OF JUSTICE**
Antitrust Division

**JOEL I. KLEIN**
*Acting Assistant Attorney General*

*Main Justice Building*
*950 Pennsylvania Avenue. N.W.*
*Washington. D.C. 20530-0001*
(202) 514-2401 / (202) 616-2645 (f)
antitrust@justice.usdoj.gov (internet)
http://www.usdoj.gov (World Wide Web)

June 26, 1997

<u>VIA FAX</u>

Gerrard R. Beeney, Esq.
Sullivan & Cromwell
125 Broad Street
New York, NY 10004-2498

Dear Mr. Beeney:

This is in response to your request on behalf of the Trustees of Columbia University, Fujitsu Limited, General Instrument Corp., Lucent Technologies Inc., Matsushita Electric Industrial Co., Ltd., Mitsubishi Electric Corp., Philips Electronics N.V., Scientific-Atlanta, Inc., and Sony Corp. (collectively the "Licensors"), Cable Television Laboratories, Inc. ("CableLabs"), MPEG LA, L.L.C. ("MPEG LA"), and their affiliates for the issuance of a business review letter pursuant to the Department of Justice's Business Review Procedure, 28 C.F.R. § 50.6.  You have requested a statement of the Department of Justice's antitrust enforcement intentions with respect to a proposed arrangement pursuant to which MPEG LA will offer a package license under the Licensors' patents that are essential to compliance with the MPEG-2 compression technology standard, and distribute royalty income among the Licensors.

I.   <u>The Proposed Arrangement</u>

A.   <u>The MPEG-2 Standard</u>

The MPEG-2 standard has been approved as an international standard by the Motion Picture Experts Group of the International Organization for Standards (ISO) and the International Electrotechnical Commission (IEC) and by the International Telecommunication Union Telecommunication Standardization Sector

**EXHIBIT 1 PAGE 25**

Page 2

("ITU-T").  It contains nine operative parts.  Only Parts 1 (ISO/IEC 13818-1) and 2 (ISO/IEC 13818-2), which deal with systems and video, are relevant to the proposed activity.

Part 1, concerning systems, describes: (a) a syntax and semantics for combining separate video and audio bitstreams into a single bitstream, either a "program" stream for storage on a medium such as a digital video disk, or a "transport" stream, for transmission of multiple programs; and (b) a demultiplexer for breaking the bitstream down into its constituent video and audio bitstreams.

Part 2 describes (a) a common syntax and semantics of a bitstream containing compressed video, and (b) a decoder for decompressing the bitstream.  MPEG-2 video compression allows considerable savings in the amount of data, and thus storage and transmission space, required to reproduce video sequences, by eliminating redundant information both within a particular image, as where a background is of all the same color, and between images, as where particular figures remain unmoved from one moment to the next.[1]

The video and systems parts of the MPEG-2 standard will be applied in many different products and services in which video information is stored and/or transmitted, including cable, satellite and broadcast television, digital video disks, and telecommunications.  However, compliance with the standards will infringe on numerous patents owned by many different entities.  Consequently, a number of firms that participated in the development of the standard formed the MPEG-2 Intellectual Property Working Group ("IP Working Group") to address intellectual property issues raised by the proposed standard.  Among other things, the IP Working Group sponsored a search for the patents that covered the technology essential to compliance with the proposed standard and explored the creation of a mechanism to convey those essential intellectual property rights to MPEG-2 users.[2]  That exploration led ultimately to an agreement among the Licensors, CableLabs and Baryn S. Futa

---

[1]Notably, neither Part 1 nor Part 2 dictates a particular method for encoding video or programs into the specified syntax and semantics.  Users of the standard are thus free to develop and use the encoding method they find most advantageous, while preserving the compatibility necessary to the integrity of the standard.

[2]The patent search and the use of an independent expert to conduct the search are discussed in greater detail below.

EXHIBIT 1 PAGE 26

Page 3

establishing MPEG LA as a Delaware Limited Liability Company.[3]

Each of the Licensors owns at least one patent that the IP Working Group's patent search identified as essential to compliance with the video and/or systems parts of the MPEG-2 standard (hereinafter "MPEG-2 Essential Patent" or "Essential Patent").[4]  Among them, they account for a total of 27 Essential Patents, which are most, but not all, of the Essential Patents. Pursuant to a series of four proposed agreements, the Licensors will combine their Essential Patents into a single portfolio (the "Portfolio") in the hands of a common licensing administrator that would grant licenses under the Portfolio on a nondiscriminatory basis, collect royalties, and distribute them among the Licensors pursuant to a pro-rata allocation based on each Licensor's proportionate share of the total number of Portfolio patents in the countries in which a particular royalty-bearing product is made and sold.[5]

This arrangement is embodied in a network of four proposed agreements: (1) an Agreement Among Licensors, in which the Licensors commit to license their MPEG-2 Essential Patents jointly through a common License Administrator and agree on basic items including the Portfolio license's authorized fields of use, the amount and allocation of royalties, and procedures for adding patents to, and deleting them from, the Portfolio; (2) a Licensing Administrator Agreement between the Licensors and MPEG LA, pursuant to which MPEG LA assumes the tasks of licensing the Portfolio to MPEG-2 users and collecting and distributing royalty income; (3) a license from each Licensor to MPEG LA for the purpose of granting the Portfolio License; and (4) the Portfolio license itself.

B.   MPEG LA

Pursuant to the Licensing Administrator Agreement, MPEG LA will:  (1) grant a worldwide, nonexclusive sublicense under the

_____

[3]Amended and Restated Limited Liability Company Agreement of MPEG LA, L.L.C. ("LLC Agreement").  Previously CableLabs' executive vice president and chief operating officer, Baryn Futa is now Manager of MPEG LA.

[4]Each of the draft agreements submitted with your letter defines "MPEG-2 Essential Patent" as "any Patent claiming an apparatus and/or a method necessary for compliance with the MPEG-2 Standard [defined generally as the MPEG-2 video and systems standards] under the laws of the country which issued or published the Patent." _E.g._, MPEG-2 Patent Portfolio License ("Portfolio License"), § 1.18.

[5]_Id._, § 5.1.

EXHIBIT 1 PAGE 27

Page 4

Portfolio to make, use and sell MPEG-2 products "to each and every potential Licensee who requests an MPEG-2 Patent Portfolio License and shall not discriminate among potential licensees";[6] (2) solicit Portfolio licensees;[7] (3) enforce and terminate Portfolio license agreements;[8] and (4) collect and distribute royalties.[9]  For this purpose, each MPEG-2 Licensor will grant MPEG LA a nonexclusive license under its Essential Patents,[10] while retaining the right to license them independently for any purpose, including for making MPEG-2-compliant products.[11]

The Licensing Administrator Agreement places the day-to-day conduct of MPEG LA's business, including its licensing activities, under the sole control of Futa and his staff.  The other owners retain some control, however, over "major decisions," including approval of budgets and annual financial statements, extraordinary expenditures, entry into new businesses, mergers and acquisitions, and the sale or dissolution of the corporation.[12]

C.    The MPEG-2 Portfolio

As noted above, the Portfolio initially will consist of 27 patents, which constitute most, but not all, Essential Patents. These 27 patents were identified in a search carried out by an independent patent expert under the sponsorship of the IP Working Group.  Once the MPEG-2 standard was largely in place, the IP Working Group issued a public call for the submission of patents that might be infringed by compliance with the MPEG-2 standard. CableLabs, whose COO Futa was an active participant in the IP Working Group, retained an independent patent expert familiar with the standard and the relevant technology to review the submissions.  In all, the expert and his assistant reviewed approximately 8000 United States patent abstracts and studied

---

[6] Licensing Administrator Agreement, § 3.2.

[7] Id., § 3.1.

[8] Id., § 3.14.  The Licensors, however, may veto a planned enforcement action or termination, by a vote of 2/3 of the licensors.  Id.

[9] Agreement Among Licensors, § 2.1.

[10] License from Licensor to Licensing Administrator, §§ 2.1-2.5, 2.8.  Three of the Licensors, Columbia University, Fujitsu, and Mitsubishi, each own only one Essential Patent.

[11] Agreement Among Licensors, § 2.8.

[12] LLC Agreement, § 7.03.

EXHIBIT 1 PAGE 28

Page 5

about 800 patents belonging to over 100 different patentees or assignees.  No submission was refused, and no entity or person that was identified as having an essential patent was in any way excluded from the effort in forming the proposed joint licensing program.

The proposed agreement among the Licensors creates a continuing role for an independent expert as an arbiter of essentiality.  It requires the retention of an independent expert to review patents submitted to any of the Licensors for inclusion in the Portfolio[13] and to review any Portfolio patent which an MPEG-2 Licensor has concluded is not essential or as to which anyone has claimed a good-faith belief of non-essentiality.[14]  In both cases, the Licensors are bound by the expert's opinion.[15]

The Portfolio's composition may also change for other reasons.  A patent will be deleted promptly from the Portfolio upon a final adjudication of invalidity or unenforceability by a tribunal of competent jurisdiction in the country of its issuance.[16]  The expiration of a Licensor's last-to-expire Portfolio patent, or a final adjudication of invalidity or unenforceability of its last remaining Portfolio patent, terminates the Licensor's participation in the Portfolio and the Agreement Among Licensors.[17]  Each MPEG-2 Licensor may terminate its participation in the Portfolio license on 30 days' notice; however, all existing Portfolio licenses will remain intact.[18]

D.   The Portfolio License

The planned license from MPEG LA to users of the MPEG-2 standards is a worldwide, nonexclusive, nonsublicensable license under the Portfolio patents for the manufacture, sale, and in most cases, use of: (1) products and software designed to encode

---

[13]Agreement Among Licensors, § 6.1.

[14]Agreement Among Licensors, § 2.4.2.

[15]However, they need not consult the expert if they agree unanimously in good faith that a submitted patent is an Essential Patent, id., § 2.4.1, or that a Portfolio patent is not essential, id., § 6.1.1.

[16]Id., § 2.5.  Although the Licensing Administrator Agreement does not explicitly direct MPEG LA to do so, we understand that Essential Patents will be deleted from the Portfolio as they expire.

[17]Id., § 7.1.

[18]Id., § 2.3.

EXHIBIT 1 PAGE 29

Page 6

and/or decode video information in accordance with the MPEG-2 standard; (2) products and software designed to generate MPEG-2 program and transport bitstreams; and (3) so-called "intermediate products," such as integrated circuit chips, used in the aforementioned products and software.[19]  The license grant to use encoding-related products and software for recording video information on a "packaged medium," e.g., encoding a motion picture for copying on digital video disks, is separate from the other grants for the same products and software.[20]

The Portfolio license expires January 1, 2000, but is renewable at the licensee's option for a period of not less than five years, subject to "reasonable amendment of its terms and conditions."[21]  That "reasonable amendment" may not, however, increase royalties by more than 25%.[22]  Each Portfolio licensee may terminate its license on 30 days' written notice.  The per-unit royalties are those agreed upon in the Agreement Among Licensors, but they are subject to reduction pursuant to a "most-favored-nation" clause.[23]  The royalty obligations are predicated on actual use of one or more of the licensed patents in the unit for which the royalty is assessed.[24]  The Portfolio license imposes no obligation on the licensee to use only the licensed patents and explicitly leaves the licensee free independently to develop "competitive video products or video services which do

---

[19]Patent Portfolio License, §§ 2.1-2.5.  The intermediate product license grant as to intermediate products limits the right to use such products to internal development and testing purposes.  Id., § 2.1.

[20]Id., § 2.4.  Whereas most of the royalties are set at $4.00 per licensed product, the royalty for use of encoding products for packaged-medium recordings is measured by the production of packaged media.  For packaged media recordings directed to "personal, family or household" use, the royalty is $.04 per packaged medium times the number of "MPEG-2 Video Events" recorded on it.  Id., § 3.1.6.1.  For MPEG-2 Packaged Media directed to commercial channels such as rental and broadcast, the royalty is $.40 per packaged medium times the number of "MPEG-2 Video events" thereon.  Id., § 3.1.6.2.

[21]Id., § 6.1.

[22]Id.

[23]Id., § 7.7.

[24]Id., §§ 2.1-2.5.

EXHIBIT 1 PAGE 30

Page 7

not comply with the MPEG-2 Standard."[25]

The Portfolio license will list the Portfolio patents in an
attachment.[26]  It also explicitly addresses the licensee's
ability, and possible need, to obtain Essential Patent rights
elsewhere.  The Portfolio license states that each Portfolio
patent is also available for licensing independently from the
MPEG-2 Licensor that had licensed it to MPEG LA[27] and that the
license may not convey rights to all Essential Patents.[28]

The license's grantback provision requires the licensee to
grant any of the Licensors and other Portfolio licensees a
nonexclusive worldwide license or sublicense, on fair and
reasonable terms and conditions, on any Essential Patent that it
has the right to license or sublicense.[29]  The Licensors' per-
patent share of royalties is the basis for determining a fair and
reasonable royalty for the grantback.[30]  Alternatively, a
licensee that controls an Essential Patent may choose to become
an MPEG-2 Licensor and add its patent to the Portfolio.[31]
Failure to honor the grantback requirement constitutes a material
breach of the license, giving MPEG LA the right to terminate the
license unless the licensee has cured the breach within 60 days
after MPEG LA sends it notice of the breach.[32]

A separate provision allows for partial termination of a
licensee's Portfolio license as to a particular MPEG-2 Licensor's
patents.  Pursuant to Section 6.3, an MPEG-2 Licensor may direct
MPEG LA to withdraw its patents from the Portfolio license if the
licensee has (a) brought a lawsuit or other proceeding against
the MPEG-2 Licensor for infringement of an Essential Patent or an
MPEG-2 Related Patent ("Related Patent") and (b) refused to grant
the MPEG-2 Licensor a license under the Essential Patent or MPEG-

---

[25]Id., § 7.8.  We understand this to mean that licensees are
free also to develop technological alternatives to the MPEG-2
compression standard.

[26]Id., § 1.21.

[27]Id., § 4.3.

[28]Id.

[29]Id., § 7.3.

[30]Id.

[31]Id., § 7.4.

[32]Id., § 6.2.

EXHIBIT 1 PAGE 31

Page 8

2 Related Patent on fair and reasonable terms and conditions.[33]
As with the grantback, the per-patent share of Portfolio license
royalties is the basis for determining a fair and reasonable
royalty for the licensee's patent.[34]  Upon the withdrawal of the
MPEG-2 Licensor's patents from the licensee's Portfolio license,
the licensee may seek a license on the withdrawn patents directly
from the MPEG-2 Licensor, which remains subject to its
undertaking to the ISO and/or the ITU-T to license on fair and
reasonable terms and conditions.[35]

---

[33]Id., § 6.3.  The Portfolio license, like several of the
relevant documents, defines "MPEG-2 -Related Patent" as "any
Patent which is not an MPEG-2 Essential Patent but which has one
or more claims directed to an apparatus or a method that may be
used in the implementation of a product or a service designed in
whole or in part to exploit the MPEG-2 Standard under the laws of
the country which issued or published the Patent." Id., § 1.23.
Read literally, this definition could encompass any patent
capable of being employed in a product or service that exploits
the MPEG-2 standard.  At the extreme, it would take in any patent
relevant not only to MPEG-2 applications but also to unrelated
products, as well as patents on products or services that someone
might build into an MPEG-2 Royalty Product -- for example, a
patented informational display on a DVD player.

You have informed the Department, however, that such a
broad, literal interpretation was not the intent of the drafters
of the Patent Portfolio License and that your clients would
construe the term "MPEG-2 Related Patents" to encompass only
patents which, as applied, constitute implementations of the
MPEG-2 standard.  Further, you have told the Department that it
is exceedingly unlikely that any Related Patent would have any
utility for any application other than MPEG-2.

[34]Id.

[35]Similarly, Sections 2.9 and 2.10 of the Agreement Among
Licensors authorize each Licensor to instruct MPEG LA to withhold
its Portfolio patents from any potential licensee that either:
(1) has sued the Licensor for infringement of an Essential Patent
or a Related Patent, and the Licensor has decided to counter with
a claim of infringement of its Portfolio patents; or (2) has been
sued by the Licensor for infringement of the Portfolio patents.
We understand these provisions to apply only to ongoing
litigation and not to authorize the vindictive withholding of
Portfolio patents after the infringement suit has been resolved.

EXHIBIT 1 PAGE 32

Page 9

II.   Analysis

    A.   The Patent Pool in General

    An aggregation of patent rights for the purpose of joint package licensing, commonly called a patent pool, "may provide competitive benefits by integrating complementary technologies, reducing transaction costs, clearing blocking positions, and avoiding costly infringement litigation."[36]  By promoting the dissemination of technology, patent pools can be procompetitive.[37]  Nevertheless, some patent pools can restrict competition, whether among intellectual property rights within the pool or downstream products incorporating the pooled patents or in innovation among parties to the pool.[38]

    A starting point for an antitrust analysis of any patent pool is an inquiry into the validity of the patents and their relationship to each other.  A licensing scheme premised on invalid or expired intellectual property rights will not withstand antitrust scrutiny.[39]  And a patent pool that aggregates competitive technologies and sets a single price for them would raise serious competitive concerns.  On the other hand, a combination of complementary intellectual property rights, especially ones that block the application for which they are jointly licensed, can be an efficient and procompetitive method of disseminating those rights to would-be users.

    Based on your representations to us about the complementary nature of the patents to be included in the Portfolio, it appears that the Portfolio is a procompetitive aggregation of intellectual property.  The Portfolio combines patents that an independent expert has determined to be essential to compliance with the MPEG-2 standard; there is no technical alternative to any of the Portfolio patents within the standard.  Moreover, each Portfolio patent is useful for MPEG-2 products only in

---

    [36]Department of Justice-Federal Trade Commission, Antitrust Guidelines for the Licensing of Intellectual Property ("IP Guidelines"), § 5.5.

    [37]Id.

    [38]Id.

    [39]See, e.g., United States v. Pilkington plc, 1994-2 Trade Cas. (CCH) ¶ 70,842 (D. Ariz. 1994)(consent decree resolving antitrust suit against exclusive licenses premised on technology covered by expired patents).

EXHIBIT 1 PAGE 33

Page 10

conjunction with the others.[40]  The limitation of the Portfolio
to technically essential patents, as opposed to merely
advantageous ones, helps ensure that the Portfolio patents are
not competitive with each other and that the Portfolio license
does not, by bundling in non-essential patents, foreclose the
competitive implementation options that the MPEG-2 standard has
expressly left open.

The continuing role of an independent expert to assess
essentiality is an especially effective guarantor that the
Portfolio patents are complements, not substitutes.  The relevant
provisions of the Agreement Among Licensors appear well designed
to ensure that the expert will be called in whenever a legitimate
question is raised about whether or not a particular patent
belongs in the Portfolio; in particular, they seem designed to
reduce the likelihood that the Licensors might act concertedly to
keep invalid or non-essential patents in the Portfolio or to
exclude other essential patents from-admission to the Portfolio.

B.   Specific Terms of the Agreements

Despite the potential procompetitive effects of the
Portfolio license, we would be concerned if any specific terms of
any of the contemplated agreements seemed likely to restrain
competition.  Such possible concerns might include the likelihood
that the Licensors could use the Portfolio license as a vehicle
to disadvantage competitors in downstream product markets; to
collude on prices outside the scope of the Portfolio license,
such as downstream MPEG-2 products; or to impair technology or
innovation competition, either within the MPEG-2 standard or from
rival compression technologies.  It appears, however, that the
proposed arrangement will not raise any significant competitive
concerns.

1.   Effect on Rivals

There does not appear to be any potential for use of the
Portfolio license to disadvantage particular licensees.  The
Agreement Among Licensors commits the Licensors to
nondiscriminatory Portfolio licensing, and the Licensing
Administrator agreement both vests sole licensing authority in
MPEG LA and explicitly requires MPEG LA to offer the Portfolio
license on the same terms and conditions to all would-be
licensees.  Thus, maverick competitors and upstart industries

---

[40]The Department presumes from the information you have
provided us that the Portfolio patents are valid.  Should this
prove not to be so, the Department's analysis and enforcement
intentions would likely be very different.  As noted above, the
Agreement Among Licensors provides for the deletion from the
Portfolio of licenses held invalid or unenforceable.

EXHIBIT 1 PAGE 34

Page 11

will have access to the Portfolio on the same terms as all other
licensees.  The Portfolio license's "most-favored-nation" clause
ensures further against any attempt to discriminate on royalty
rates.[41]

    Although it offers the Portfolio patents only as a package,
the Portfolio license does not appear to be an illegal tying
agreement.  The conditioning of a license for one intellectual
property right on the license of a second such right could be a
concern where its effect was to foreclose competition from
technological alternatives to the second.  In this instance,
however, the essentiality of the patents -- determined by the
independent expert -- means that there is no technological
alternative to any of them and that the Portfolio license will
not require licensees to accept or use any patent that is merely
one way of implementing the MPEG-2 standard, to the detriment of
competition.  Moreover, although a licensee cannot obtain fewer
than all the Portfolio patents from MPEG LA, the Portfolio
license informs potential licensees that licenses on all the
Portfolio patents are available individually from their owners or
assignees.  While the independent expert mechanism should ensure
that the Portfolio will never contain any unnecessary patents,
the independent availability of each Portfolio patent is a
valuable failsafe.  The list of Portfolio patents attached to the
Portfolio license will provide licensees with information they
need to assess the merits of the Portfolio license.

        2.    Facilitation of Collusion

    From what you have told us, there does not appear to be
anything in the proposed agreements that is likely to facilitate
collusion among Licensors or licensees in any market.  Although
MPEG LA is authorized to audit licensees,[42] confidentiality
provisions prohibit it from transmitting competitively sensitive
information among the Licensors or other licensees.[43]  Further,
since the contemplated royalty rates are likely to constitute a
tiny fraction of MPEG-2 products' prices, at least in the near
term, it appears highly unlikely that the royalty rate could be
used during that period as a device to coordinate the prices of
downstream products.

        3.    Effect on Innovation

    It further appears that nothing in the arrangement imposes

_____

    [41]Portfolio License, § 7.7.

    [42]Licensing Administrator Agreement, § 3.15; Portfolio
License, § 3.9.2.

    [43]Portfolio license, § 5.1.

EXHIBIT 1 PAGE 35

Page 12

any anticompetitive restraint, either explicitly or implicitly,
on the development of rival products and technologies.  Nothing
in the Agreement Among Licensors discourages, either through
outright prohibition or economic incentives, any Licensor from
developing or supporting a rival standard.  As noted above, the
Portfolio license explicitly leaves licensees free independently
to make products that do not comply with the MPEG-2 standard and
premises royalty obligations on actual use of at least one
Portfolio patent.[44]  Since the Portfolio includes only Essential
Patents, the licensee's manufacture, use or sale of MPEG-2
products will necessarily infringe the Portfolio patents.  By
weeding out non-essential patents from the Portfolio, the
independent-expert mechanism helps ensure that the licensees will
not have to pay royalties for making MPEG-2 products that do not
employ the licensed patents.

    The license's initial duration, to January 1, 2000, does not
present any competitive concern.  While the open-ended renewal
term of "no less than five years" holds open the possibility of a
perpetual license, its competitive impact will depend
substantially on whether any of the "reasonable amendments" made
at that time increase the license's exclusionary impact.  While
the term "reasonable" is the  Portfolio license's only limitation
on the Licensors' ability to impose onerous non-royalty terms on
licensees at renewal time, the 25% cap on royalty increases and
the "most-favored-nation" clause appear to constrain the
Licensors' ability to use royalties to exploit any locked-in
installed base among its licensees.

    Nor does the Portfolio license's grantback clause appear
anticompetitive.  Its scope, like that of the license itself, is
limited to Essential Patents.  It does not extend to mere
implementations of the standard or even to improvements on the
essential patents.[45]  Rather, the grantback simply obliges
licensees that control an Essential Patent to make it available
to all, on a nonexclusive basis, at a fair and reasonable
royalty, just like the Portfolio patents.  This will mean that
any firm that wishes to take advantage of the cost savings
afforded by the Portfolio license cannot hold its own essential

---

[44]Cf. United States v. Microsoft Corp., 1995-2 Trade Cas.
(CCH) ¶ 71,096 (D.D.C. 1995)(consent decree resolving suit
against, among other things, use of per-processor royalty for
license of dominant operating system).

[45]Consequently, much of the section on grantbacks in the IP
Guidelines is not directly applicable to this provision.  The
ultimate question, though, is the same:  whether, by reducing
licensees' incentives to innovate, the grantback causes
competitive harm that outweighs its procompetitive effects.  See
IP Guidelines, § 5.6.

EXHIBIT 1 PAGE 36

Page 13

patents back from other would-be manufacturers of MPEG-2
products.  While easing, though not altogether clearing up, the
holdout problem,[46] the grantback should not create any
disincentive among licensees to innovate.  Since the grantback
extends only to MPEG-2 Essential Patents, it is unlikely that
there is any significant innovation left to be done that the
grantback could discourage.[47]  The grantback provision is likely
simply to bring other Essential Patents into the Portfolio,
thereby limiting holdouts' ability to exact a supracompetitive
toll from Portfolio licensees and further lowering licensees'
costs in assembling the patent rights essential to their
compliance with the MPEG-2 standard.

     In different circumstances, the right of partial termination
set forth in Section 6.3 of the Portfolio license could raise
difficult competition issues.  That section provides that, on
instruction from any Licensor, MPEG LA, pursuant to its
obligations under the Licensing Administrator Agreement, shall
withdraw from a particular licensee's portfolio license that
Licensor's patent or patents if the licensee has sued the
Licensor for infringement of an Essential Patent or a Related
Patent and refused to grant a license on the allegedly infringed
patent on "fair and reasonable terms."

     Of course, a licensee's refusal to license an Essential
Patent on fair and reasonable terms, as required by Section 7.3
of the Portfolio License, is grounds for termination of the
Portfolio license altogether.  Even though MPEG LA may choose not
to exercise its right to terminate, a Licensor that has been
denied a license may invoke the less drastic partial termination
provision, which is mandatory on MPEG LA.  Partial termination
would force the licensee to negotiate with the Licensor as if the
pool had never existed.  Thus, while the partial termination
right leaves the licensee no worse off than it was in the absence
of the pool, it enforces the Essential Patent grantback, which,
as discussed above, appears procompetitive.

     The right of partial termination could have a very different
impact on a Portfolio licensee that owns a Related Patent.  No
matter how attractive the licensee's patented implementation of
the MPEG-2 standard may be, by definition the Related Patent will

---

[46]Any non-manufacturing owner of an Essential Patent, in
contrast, can still be a holdout, having no need for the
Portfolio license.

[47]Improvements on MPEG-2 Essential Patents and technological
alternatives to the Essential Patents would not be Essential
Patents themselves and would not be subject to the grantback.
Therefore, the grantback should not discourage their
development.

EXHIBIT 1 PAGE 37

Page 14

not be essential to compliance with the standard.  And, not being
essential, the patent is not subject to the Section 7.3
grantback.  If the Portfolio licensee that owns a Related Patent
chooses not to license others to use its technology, those others
may still have alternatives to choose from.  But if a Licensor
chooses to infringe the Portfolio licensee's Related Patent after
having been denied a license, the Portfolio licensee's decision
to sue for infringement could cause it to become unable, at least
temporarily, to comply with the MPEG-2 standard.[48]

The MPEG-2 Licensor is not entirely unconstrained:
Importantly, as you have pointed out, its undertakings to the ISO
and/or the ITU-T obligate it to license on fair and reasonable
terms.  However, it is not clear that this general commitment
alone deprives the Licensor of the ability to impair competition.
The partial termination right may enable Licensors to obtain
licenses on Related Patents at royalty levels below what they
would have been in a competitive market.  Consequently, the
partial termination right may dampen licensees' incentives to
invest in research and development of MPEG-2 implementations,
undercutting somewhat the benefits of the openness of the MPEG-2
standard and the prospects for improvements on the Essential
Patents.

This impact on the incentive to innovate within the MPEG-2
standard would be of particular concern were the partial
termination right designed to benefit all portfolio licensees.
In that event, the partial termination right would function much
like a compulsory grantback into the Portfolio.  Licensees that
owned Related Patents would not be able to choose among and
negotiate freely with potential users of their inventions.  The
licensees' potential return from their R&D investments could be
curtailed drastically, and the corresponding impact on their
incentive to innovate could be significant.

Here, however, the partial termination right, unlike the
grantback, protects only the Licensors.  Other portfolio
licensees have no right under the pool license to practice fellow
licensees' inventions.  And the Licensors are likely to be
restrained in exercising their partial termination rights because
the development of Related Patents will enhance MPEG-2 and, thus,

---

[48]Since, as noted in note 33 above, it is exceedingly
unlikely that a Related Patent would ever have any utility
outside the MPEG-2 standard, it is correspondingly unlikely that
an owner of a Related Patent would ever have cause to sue an
MPEG-2 Licensor for infringement of that patent in connection
with the manufacture, use or sale of anything other than MPEG-2-
related products or services.  If Section 6.3 were used in
response to such an infringement action, we could have serious
concerns.

EXHIBIT 1 PAGE 38

Page 15

the value of the Portfolio.  The long-term interest of the
Licensors is generally to encourage innovation in Related
Patents, not to stifle it.

Moreover, the partial termination right may have
procompetitive effects to the extent that it functions as a
nonexclusive grantback requirement on licensees' Related Patents.
It could allow Licensors and licensees to share the risk and
rewards of supporting and improving the MPEG-2 standard by
enabling Licensors to capture some of the value they have added
to licensees' Related Patents by creating and licensing the
Portfolio.[49]  In effect, the partial termination right may enable
Licensors to realize greater returns on the Portfolio license
from the licensees that enjoy greater benefits from the license,
while maintaining the Portfolio royalty at a level low enough to
attract licensees that may value it less.  This in turn could
lead to more efficient exploitation of the Portfolio technology.

Therefore, in light of both its potentially significant
procompetitive effects and the limited potential harm it poses to
Portfolio licensees' incentives to innovate, the partial-
termination clause appears on balance unlikely to be
anticompetitive.

III. Conclusion

Like many joint licensing arrangements, the agreements you
have described for the licensing of MPEG-2 Essential Patents are
likely to provide significant cost savings to Licensors and
licensees alike, substantially reducing the time and expense that
would otherwise be required to disseminate the rights to each
MPEG-2 Essential Patent to each would-be licensee.  Moreover,
the proposed agreements that will govern the licensing
arrangement have features designed to enhance the usual
procompetitive effects and mitigate potential anticompetitive
dangers.  The limitation of the Portfolio to technically
essential patents and the use of an independent expert to be the
arbiter of that limitation reduces the risk that the patent pool
will be used to eliminate rivalry between potentially competing
technologies.  Potential licensees will be aided by the provision
of a clear list of the Portfolio patents, the availability of the
Portfolio patents independent of the Portfolio, and the warning
that the Portfolio may not contain all Essential Patents.  The
conditioning of licensee royalty liability on actual use of the
Portfolio patents, the clearly stated freedom of licensees to
develop and use alternative technologies, and the imposition of
obligations on licensees' own patent rights that do not vitiate
licensees' incentives to innovate, all serve to protect
competition in the development and use of both improvements on,

---

[49] See IP Guidelines, § 5.6.

EXHIBIT 1 PAGE 39

and alternatives to, MPEG-2 technology.

For these reasons, the Department is not presently inclined to initiate antitrust enforcement action against the conduct you have described. This letter, however, expresses the Department's current enforcement intention. In accordance with our normal practices, the Department reserves the right to bring an enforcement action in the future if the actual operation of the proposed conduct proves to be anticompetitive in purpose or effect.

This statement is made in accordance with the Department's Business Review Procedure, 28 C.F.R. § 50.6. Pursuant to its terms, your business review request and this letter will be made publicly available immediately, and any supporting data will be made publicly available within 30 days of the date of this letter, unless you request that part of the material be withheld in accordance with Paragraph 10(c) of the Business Review Procedure.

Sincerely,

Joel I. Klein

JIK/cjk

EXHIBIT 1 PAGE 40

# Exhibit 2

250 Steele Street   Suite 300
Denver, Colorado 80206
303  331.1880
FAX  303  331.1879



VIA DHL

December 14, 2001

Dear Licensee:

This letter constitutes an Agreement by and between MPEG LA® and the undersigned Licensee that any and all prior MPEG-2 Patent Portfolio Licenses are hereby cancelled upon the effectiveness of the attached MPEG-2 Patent Portfolio License.

Best regards,

Baryn S. Futa
Manager and CEO
MPEG LA, L.L.C.

Agreed to:

Licensee: Ahead Software AG

By: _____          Date: Dec. 20th, 2001
        (authorized signatory)

## MPEG-2 PATENT PORTFOLIO LICENSE

This Agreement is made this       1st     day of       January, 2002       , by and between MPEG LA, L.L.C., a limited liability company of Delaware having a principal place of business in Denver, Colorado, U.S.A. (hereinafter "Licensing Administrator"); and Ahead Software AG       , having a principal place of business at    Im Stoeckmaedle 18 , Karlsbad, 76307 Germany

(hereinafter "Licensee").

**WHEREAS,** ISO/IEC JTC 1 and The International Telecommunications Union have jointly adopted an international standard relating to video data compression and data transport, formally known as ISO/IEC 13818-1 and 13818-2, and referred to in this Agreement as the "MPEG-2 Standard" (as more fully defined herein below);

**WHEREAS,** Canon Inc., a corporation of Japan, having a principal place of business in Tokyo, Japan; The Trustees of Columbia University in the City of New York, a not-for-profit corporation of New York, U.S.A., having a principal place of business in New York City, New York, U.S.A.; France Télécom, société anonyme, a corporation of France, having a principal place of business in Paris, France; Fujitsu Limited, a corporation of Japan, having a principal place of business in Kawasaki, Japan; GE Technology Development, Inc., a corporation of Delaware, U.S.A., having a principal place of business in Princeton, New Jersey, U.S.A; General Instrument Corporation, a corporation of Delaware, U.S.A., having a principal place of business in Horsham, Pennsylvania, U.S.A.; Hitachi, Ltd., a corporation of Japan, having a principal place of business in Tokyo, Japan; KDDI Corporation, a corporation of Japan, having a principal place of business in Tokyo, Japan; Koninklijke Philips Electronics N.V. ("PENV"), a corporation of The Netherlands, having a principal place of business in Eindhoven, The Netherlands, and U.S. Philips Corporation ("USPC"), a corporation of Delaware, U.S.A., having a principal place of business in Tarrytown, N.Y., U.S.A. (PENV and USPC being hereinafter referred to, individually or collectively, as "Philips"); Matsushita Electric Industrial Co., Ltd., a corporation of Japan, having a principal place of business in Osaka, Japan; Mitsubishi Electric Corporation, a corporation of Japan, having a principal place of business in Tokyo, Japan; Nippon Telegraph and Telephone Corporation, a corporation of Japan, having a principal place of business in Tokyo, Japan; Samsung Electronics Co., Ltd., a corporation of Korea, having a principal place of business in Seoul, Korea; SANYO Electric Co., Ltd., a corporation of Japan, having a principal place of business in Osaka, Japan; Scientific-Atlanta, Inc., a corporation of Georgia, U.S.A., having a principal place of business in Norcross, Georgia, U.S.A.; Sony Corporation, a corporation of Japan, having a principal place of business in Tokyo, Japan; Toshiba Corporation, a corporation of Japan, having a principal place of business in Tokyo, Japan; and Victor Company of Japan, Limited, a corporation of Japan, having a principal place of business in Yokohama, Japan (hereinafter collectively the "Licensors" or individually "Licensor," as more fully defined in this Agreement), each own and have the right to license, or have the right to sublicense one or more patents, utility models and/or allowed patent or utility model applications published for opposition which claim apparatus and/or methods necessary for compliance with the MPEG-2 Standard (hereinafter referred to as "MPEG-2 Essential Patent(s)");

v1/1/02



**EXHIBIT 2 PAGE 42**

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

**WHEREAS,** each Licensor believes that the MPEG-2 Standard represents a significant advance in the field of digital video data compression for transmission and storage, which will make available innovative new products and services to the public, and for this reason desires to encourage widespread adoption of the MPEG-2 Standard by video product and video service industries throughout the world;

**WHEREAS,** each Licensor has signed an ISO undertaking or hereby commits to make available licenses and/or sublicenses under any and all MPEG-2 Essential Patents licensable or sublicensable by the Licensor to any individual, company or other entity desiring such a license and/or sublicense on fair, reasonable and nondiscriminatory terms and conditions;

**WHEREAS,** each Licensor has granted the Licensing Administrator a worldwide, nonexclusive license and/or sublicense under all MPEG-2 Essential Patents licensable or sublicensable by the Licensor to allow the Licensing Administrator to grant worldwide, non-exclusive sublicenses under all such MPEG-2 Essential Patent(s) under the terms hereof;

**WHEREAS,** the Licensors desire to make available through the Licensing Administrator, license rights under their respective MPEG-2 Essential Patents in a single sublicense for the convenience of any individual, company or other entity desirous of acquiring such rights, thereby avoiding the need of such individual, company or other entity to obtain a separate license from each of the Licensors under its MPEG-2 Essential Patent(s);

**WHEREAS,** the Licensing Administrator desires to grant MPEG-2 Patent Portfolio Licenses to all individuals, companies and other entities desiring such a license under the terms and conditions set forth herein;

**WHEREAS,** nothing in this Agreement precludes the respective Licensors from licensing or sublicensing rights under individual MPEG-2 Essential Patent(s) to make, use, sell, or offer to sell products or processes including but not limited to the rights licensed in the MPEG-2 Patent Portfolio License;

**WHEREAS,** Licensee understands that this MPEG-2 Patent Portfolio License is offered for the convenience of Licensee and that Licensee is free to contact any Licensor to negotiate a license for any patent offered herein on terms and conditions different from those set forth herein which may be mutually acceptable to such Licensee and Licensor; and

**WHEREAS,** Licensee desires for its own convenience to obtain rights under the MPEG-2 Essential Patent(s) of all the Licensors in a single sublicense from the Licensing Administrator under the terms hereof.

**NOW, THEREFORE,** the Licensing Administrator AND Licensee AGREE AS FOLLOWS:

**EXHIBIT 2 PAGE 43**

**MPEG-2 PATENT PORTFOLIO
LICENSE (cont'd.)**

**0.    EFFECTIVE DATE**

    **0.1** .   This License Agreement shall be deemed effective as of June 1, 1994.

**1.    DEFINITIONS**

The definitions set forth in this Article shall apply to the following terms when used with initial capital letters in this Agreement, its attachments, and amendments hereto.

    **1.1    Affiliate** - shall mean a corporation, company, or other entity which now or hereinafter, directly or indirectly, controls, is controlled by or is under common control with a party.  The term "control" as used in this Section 1.1 shall mean ownership of more than 50% of the outstanding shares representing the right to vote for directors or other managing officers of such corporation, company or other entity, or for a corporation, company or other entity which does not have outstanding shares, more than 50% of the ownership interest representing the right to make decisions for such corporation, company or other entity; provided, however, such corporation, company or other entity shall be deemed an Affiliate only so long as such "control" exists.

    **1.2    Agreement** - shall mean this sublicense between the Licensing Administrator and Licensee, including exhibits, attachments, amendments and modifications hereto.

    **1.3    Channel (Channels)** - shall mean a single path for transmitting signals, including by way of example and without limitation, a path which is separated from another path by frequency division or time division.

    **1.4    Confidential Information** - shall mean any information given to the Licensing Administrator pursuant to Article 5 of this Agreement which is designated "confidential" by Licensee.

    **1.5    Consumer Product** - shall mean a Licensed Product, which is not an MPEG-2 Intermediate Product, Sold directly to an end user primarily for personal, family, or household use, including without limitation a cable television "set top box", a direct satellite broadcast converter, and a personal computer having a manufacturer's suggested retail price of less than $15,000 U.S. or the equivalent in the currency of another country.  For purposes of this Agreement, an MPEG-2 Packaged Medium shall not be considered a Consumer Product.



**EXHIBIT 2 PAGE 44**

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

1.6    **Days** - shall mean calendar days unless otherwise specifically stated in this Agreement.

1.7    **Licensed Product (Licensed Products)** - shall mean any product, including software, licensed under Article 2 of this Agreement.

1.8    **Licensors (individually Licensor)** - shall mean Canon Inc.; The Trustees of Columbia University in the City of New York; France Télécom, société anonyme; Fujitsu Limited; GE Technology Development, Inc.; General Instrument Corporation; Hitachi Ltd.; KDDI Corporation; Koninklijke Philips Electronics N.V.; U.S. Philips Corporation; Matsushita Electric Industrial Co., Ltd.; Mitsubishi Electric Corporation; Nippon Telegraph and Telephone Corporation; Samsung Electronics Co., Ltd.; SANYO Electric Co., Ltd.; Scientific-Atlanta, Inc.; Sony Corporation; Toshiba Corporation; and Victor Company of Japan, Limited subject to additions and deletions from time to time, identified in Attachment 1 hereto.

1.9    **Manufacture (Manufactured)** - shall mean fabrication, assembly, or otherwise making of substantially the entire finished MPEG-2 Royalty Product.

1.10   **Movie** - shall mean a single motion picture as well as related video materials typically packaged with the motion picture including, without limitation, previews of other motion pictures, information about the making of the motion picture or the artists appearing therein. Movie shall not include a second motion picture regardless of whether such second motion picture is related to the first.

1.11   **MPEG-1 Standard** - shall mean the MPEG-1 video standard as defined in ISO document IS 11172.

1.12   **MPEG-2 Bundled Decoding Software** - shall mean (i) any storage medium, including by way of example and without limitation, magnetic tape, magnetic disk and CD ROM, storing an operating system having one or more computer programs for decoding video information in accordance with the MPEG-2 Standard, and which is Sold; or (ii) an operating system having one or more computer programs for decoding video information in accordance with the MPEG-2 Standard, and which is directly distributed to an end user through electronic communication means. For purposes of this Agreement, MPEG-2 Bundled Decoding Software licensed or sold to a computer manufacturer and loaded in a computer product Sold by the computer manufacturer shall be deemed an MPEG-2 Intermediate Product.

v1/1/02                                              4



**EXHIBIT 2 PAGE 45**

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

1.13    **MPEG-2 Bundled Encoding Software** - shall mean (i) any storage medium, incorporating an operating system having one or more computer programs for encoding video information into a format in compliance with the MPEG-2 Standard, and which is Sold, including by way of example and without limitation, magnetic tape, magnetic disk and CD ROM; or (ii) an operating system having one or more computer programs for encoding video information into a format in compliance with the MPEG-2 Standard, and which is directly distributed to an end user through electronic communication means. For purposes of this Agreement, MPEG-2 Bundled Encoding Software licensed or sold to a computer manufacturer and loaded in a computer product Sold by the computer manufacturer shall be deemed an MPEG-2 Intermediate Product.

1.14    **MPEG-2 Decoding Product** - shall mean any instrumentality or combination of instrumentalities, including by way of example and without limitation:   a television receiver; cable, terrestrial broadcast and satellite broadcast receiving equipment; a computer card; a camcorder; video telecommunications equipment; video packaged media playback equipment; and video game equipment, which is primarily designed in whole or in part for decoding video information in accordance with the MPEG-2 Standard, and which is Sold. For purposes of this Agreement, a computer or digital processor loaded with MPEG-2 Decoding Software or MPEG-2 Bundled Decoding Software shall be deemed an MPEG-2 Decoding Product.

1.15    **MPEG-2 Decoding Software** - shall mean:  (i) any storage medium, including by way of example and without limitation, magnetic tape, magnetic disk and CD ROM, storing one or more computer programs designed in whole or in part for decoding video information in accordance with the MPEG-2 Standard, and which is Sold; (ii) one or more computer programs designed in whole or in part for decoding video information in accordance with the MPEG-2 Standard and which is directly distributed to an end user through electronic communication means; or (iii) one or more computer programs designed in whole or in part for decoding video information in accordance with the MPEG-2 Standard that are included in an MPEG-2 Packaged Medium together with video information in a format in compliance with the MPEG-2 Standard. MPEG-2 Decoding Software shall not mean software which is part of an operating system. For purposes of this Agreement, MPEG-2 Decoding Software licensed or sold to a computer manufacturer and loaded in a computer product Sold by the computer manufacturer shall be deemed an MPEG-2 Intermediate Product.

1.16    **MPEG-2 Distribution Encoding Product** - shall mean an MPEG-2 Encoding Product which is primarily designed for encoding video information into a format in compliance with the MPEG-2 Standard and for commercial distribution of



**EXHIBIT 2 PAGE 46**

**MPEG-2 PATENT PORTFOLIO LICENSE (cont'd.)**

such encoded video information, including by way of example and without limitation, distribution by terrestrial broadcast, satellite broadcast, and cable transmission. For purposes of this Section 1.16, the term "distribution" shall not be construed to include distribution by way of MPEG-2 Packaged Medium.

1.17 **MPEG-2 Encoding Product** - shall mean any instrumentality or combination of instrumentalities, including by way of example and without limitation, television signal transmitting equipment, a computer card, a camcorder, video telecommunications equipment and consumer video recording equipment, which is primarily designed in whole or in part for encoding video information into a format in compliance with the MPEG-2 Standard, and which is Sold. For purposes of this Agreement, a computer or digital processor loaded with MPEG-2 Encoding Software or MPEG-2 Bundled Encoding Software shall be deemed an MPEG-2 Encoding Product.

1.18 **MPEG-2 Encoding Software** - shall mean: (i) any storage medium, including by way of example and without limitation, magnetic tape, magnetic disk and CD ROM, storing one or more computer programs designed for encoding video information into a format in compliance with the MPEG-2 Standard, and which is Sold; or (ii) one or more computer programs designed for encoding video information in compliance with the MPEG-2 Standard, and which is directly distributed to an end user through electronic communication means. MPEG-2 Encoding Software shall not mean software which is part of an operating system. For purposes of this Agreement, MPEG-2 Encoding Software licensed or sold to a computer manufacturer and loaded in a computer product Sold by the computer manufacturer shall be deemed an MPEG-2 Intermediate Product.

1.19 **MPEG-2 Essential Patent** - shall mean any Patent claiming an apparatus and/or method necessary for compliance with the MPEG-2 Standard under the laws of the country which issued or published the Patent.

1.20 **MPEG-2 Intermediate Product** - shall mean any instrumentality or combination of instrumentalities, including by way of example and without limitation an integrated circuit chip or chip set, a subsystem circuit board(s), firmware, and software, which is primarily designed to be used, alone or with other instrumentalities, to encode or decode video information in a format in compliance with the MPEG-2 Standard, or to produce a transport stream or program stream in accordance with the MPEG-2 Standard, but which is not a product that is Sold.

v1/1/02

6



**EXHIBIT 2 PAGE 47**

**MPEG-2 PATENT PORTFOLIO
LICENSE (cont'd.)**

1.21    **MPEG-2 Packaged Medium (Media)** - shall mean any storage medium, including by way of example and without limitation magnetic tape, magnetic disk and optical disk, storing one or more MPEG-2 Video Events.

1.22    **MPEG-2 Patent Portfolio** - shall mean the portfolio of MPEG-2 Essential Patent(s) identified in Attachment 1 hereto, which portfolio may be supplemented or reduced from time to time in accordance with the provisions of this Agreement.

1.23    **MPEG-2 Patent Portfolio Patent** - shall mean an MPEG-2 Essential Patent under which a Licensor has the right to grant a license or sublicense to a third party with the right of such third party to grant sublicenses, and which is included in the MPEG-2 Patent Portfolio.

1.24    **MPEG-2 Related Patent** - shall mean any Patent which is not an MPEG-2 Essential Patent but which has one or more claims directed to an apparatus or a method that may be used in the implementation of a product or a service designed in whole or in part to exploit the MPEG-2 Standard under the laws of the country which issued or published the Patent.

1.25    **MPEG-2 Royalty Product** - shall mean a hardware and/or software product for which a royalty is payable to the Licensing Administrator hereunder.

1.26    **MPEG-2 Standard** - shall mean the MPEG-2 video standard as defined in ISO documents IS 13818-1 (including annexes C, D, F, J and K), IS 13818-2 (including annexes A, B, C and D, but excluding scalable extensions), and IS 13818-4 (only as it is needed to clarify IS 13818-2).

1.27    **MPEG-2 Transport or Program Stream Product** - shall mean any instrumentality or combination of instrumentalities for use alone or with other instrumentalities, which is primarily designed in whole or in part for generating and/or processing video information to provide an MPEG-2 transport stream or an MPEG-2 program stream as defined by the MPEG-2 Standard, and which is Sold. The term MPEG-2 Transport or Program Stream Product shall not be construed to include one or more MPEG-2 Encoding Products.

1.28    **MPEG-2 Video Event** - shall mean video information having a normal playing time of any length up to and including 133 minutes encoded into a format in compliance with the MPEG-2 Standard that comprises video programming, including by way of example and without limitation, one or more Movies, television shows, video games, video advertisements, music videos and short subject video clips, or any compilation of any of the foregoing.



**EXHIBIT 2 PAGE 48**

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

1.29    **Patent** - shall mean any issued patent or issued utility model of any country, or any allowed patent application or allowed utility model application, published for opposition in any country.

1.30    **Sale (Sold)** - shall mean any sale, rental, lease, license or other form of distribution of an MPEG-2 Royalty Product to an end user, either directly or through a chain of distribution.  For purposes of this Agreement, a Sale under this Section 1.30 shall be deemed to take place in the country where an end user takes delivery of the MPEG-2 Royalty Product which is the subject of the "Sale," irrespective of the manner in which the "Sale" takes place.

1.31    **White Book Standard** - shall mean the document entitled VIDEO CD Specification version 2.0, published by Philips Consumer Electronics B.V., and dated April, 1995.

2.    **LICENSING ADMINISTRATOR GRANT**

2.1    **MPEG-2 Intermediate Products.**  Subject to Paragraph 7.16.1 hereof and to the other terms and conditions of this Agreement, the Licensing Administrator hereby grants to Licensee a royalty-free, worldwide, nonexclusive, nontransferable sublicense under all MPEG-2 Essential Patent(s) in the MPEG-2 Patent Portfolio, to make, have made, use only by Licensee solely for internal development and testing purposes, and sell, offer for sale or otherwise distribute, MPEG-2 Intermediate Products.  NO LICENSE IS GRANTED HEREIN, BY IMPLICATION OR OTHERWISE, TO CUSTOMERS OF LICENSEE TO USE MPEG-2 INTERMEDIATE PRODUCTS MANUFACTURED OR SOLD BY LICENSEE.

2.2    **MPEG-2 Decoding Products, MPEG-2 Decoding Software, and MPEG-2 Bundled Decoding Software.**  Subject to the terms and conditions of this Agreement, the Licensing Administrator hereby grants to Licensee a royalty-bearing worldwide, nonexclusive, nontransferable sublicense under all MPEG-2 Essential Patent(s) in the MPEG-2 Patent Portfolio to make, have made, use, and sell, offer for sale or otherwise distribute MPEG-2 Decoding Products, MPEG-2 Decoding Software, and MPEG-2 Bundled Decoding Software.

2.3    **MPEG-2 Encoding Products, MPEG-2 Distribution Encoding Products, MPEG-2 Encoding Software, and MPEG-2 Bundled Encoding Software.**  Subject to Paragraph 7.16.2 hereof and to the other terms and conditions of this



EXHIBIT 2 PAGE 49

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

Agreement, the Licensing Administrator hereby grants to Licensee a royalty-bearing worldwide, nonexclusive, nontransferable sublicense under all MPEG-2 Essential Patent(s) in the MPEG-2 Patent Portfolio to make, have made, use for purposes other than encoding an MPEG-2 Video Event for recording on an MPEG-2 Packaged Medium, and sell, offer for sale or otherwise distribute MPEG-2 Encoding Products, MPEG-2 Distribution Encoding Products, MPEG-2 Encoding Software, and MPEG-2 Bundled Encoding Software. NO LICENSE IS GRANTED HEREIN, BY IMPLICATION OR OTHERWISE, TO CUSTOMERS OF LICENSEE TO USE MPEG-2 ENCODING PRODUCTS, MPEG-2 DISTRIBUTION ENCODING PRODUCTS, MPEG-2 ENCODING SOFTWARE, AND/OR MPEG-2 BUNDLED ENCODING SOFTWARE FOR ENCODING OR HAVING ENCODED ONE OR MORE MPEG-2 VIDEO EVENTS FOR RECORDING ON AN MPEG-2 PACKAGED MEDIUM FOR ANY USE OR DISTRIBUTION OTHER THAN PERSONAL USE OF LICENSEE'S CUSTOMER.

2.4    **MPEG-2 Packaged Medium.**   Subject to the terms and conditions of this Agreement, the Licensing Administrator hereby grants to Licensee a royalty-bearing worldwide, nonexclusive, nontransferable sublicense under all MPEG-2 Essential Patent(s) in the MPEG-2 Patent Portfolio to use MPEG-2 Encoding Products, MPEG-2 Distribution Encoding Products, MPEG-2 Encoding Software, and/or MPEG-2 Bundled Encoding Software, for encoding or having encoded one or more MPEG-2 Video Events for recording on an MPEG-2 Packaged Medium, and to sell, offer for sale or otherwise distribute MPEG-2 Packaged Medium.

2.5    **MPEG-2 Transport or Program Stream Products.**   Subject to the terms and conditions of this Agreement, the Licensing Administrator hereby grants to Licensee a royalty-bearing worldwide, nonexclusive, nontransferable sublicense under all MPEG-2 Essential Patent(s) in the MPEG-2 Patent Portfolio to make, have made, use except for the purpose of generating a program stream or transport stream for recording on an MPEG-2 Packaged Medium, and sell, offer for sale or otherwise distribute MPEG-2 Transport or Program Stream Products.

2.6    No license or immunity is granted by either party hereto to the other party hereto, either directly or by implication, estoppel or otherwise, other than as expressly provided in Sections 2.1 through 2.5, 2.9, 7.3 and 7.4 of this Agreement.

2.7    Except as provided in Section 2.9 of this Agreement, the sublicenses granted in Sections 2.1 to 2.5 of this Agreement do not include the right of the Licensee to grant any further sublicenses.



**EXHIBIT 2 PAGE 50**

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

2.8     IT IS UNDERSTOOD AND AGREED THAT ANY LICENSE GRANTED HEREIN SHALL NOT INCLUDE ANY RIGHT TO MAKE, HAVE MADE, USE, OR SELL ANY PRODUCT OR PROCESS CAPABLE OF COMPLYING SOLELY WITH THE MPEG-1 STANDARD AND NO OTHER PORTION OF THE MPEG-2 STANDARD, INCLUDING BUT NOT LIMITED TO A VIDEO-CD WHICH COMPLIES WITH THE WHITE BOOK STANDARD.

2.9     **Extension of Sublicense to Affiliates.** The sublicenses granted herein by the Licensing Administrator shall include the right of Licensee to grant further sublicenses to its Affiliates, subject to the condition that any and all Affiliates of Licensee receiving such further sublicenses be identified in an attachment to this sublicense entitled "Licensed Affiliates." Each sublicensed Affiliate shall be bound by the terms and conditions of this sublicense as if it were named herein in the place of the Licensee; provided, however that Licensee shall pay and account to the Licensing Administrator for royalties hereunder payable as a result of the activities of any and all sublicensed Affiliates. Any sublicense granted to an Affiliate shall terminate automatically and without notice on the date such Affiliate ceases to be an Affiliate.

2.9.1     **Notice to Licensing Administrator of Sublicense Termination.** In the event that a sublicense to an Affiliate of Licensee is terminated either as a result of the Affiliate ceasing to be an Affiliate, or as a result of a termination of the sublicense of the Affiliate by Licensee, Licensee shall notify the Licensing Administrator of the termination within ten (10) Days of such termination, and the attachment entitled "Licensed Affiliates" shall be modified to reflect such termination of an Affiliate.

2.9.2     **Notice to Licensing Administrator of New Sublicense.** In the event that Licensee grants a new further sublicense to either a new Affiliate or an existing Affiliate not previously sublicensed, such new further sublicense shall be effective immediately upon the grant thereof; provided that Licensee notifies the Licensing Administrator within ten (10) Days of the grant of such new further sublicense, and the attachment entitled "Licensed Affiliates" is modified to include the new sublicensed Affiliate.

3.     **ROYALTY AND PAYMENTS**

3.1     **Royalty.** Licensee shall pay to the Licensing Administrator for the benefit of Licensors a running royalty throughout the term of this Agreement as follows:



**EXHIBIT 2 PAGE 51**

**MPEG-2 PATENT PORTFOLIO
LICENSE (cont'd.)**

3.1.1 **MPEG-2 Decoding Product, MPEG-2 Decoding Software, MPEG-2 Bundled Decoding Software.** The royalty for the sublicense granted pursuant to Section 2.2 hereof shall be four United States Dollars (U.S. $4.00) prior to January 1, 2002, and two and one half United States Dollars (U.S. $2.50) thereafter upon the Sale of each end product Manufactured or Sold in a country in which one or more MPEG-2 Patent Portfolio Patent(s) that would be infringed absent a license thereunder, is in force, where the end product is:

3.1.1.1 An MPEG-2 Decoding Product;

3.1.1.2 A copy of MPEG-2 Decoding Software; or

3.1.1.3 A copy of MPEG-2 Bundled Decoding Software.

3.1.2 **MPEG-2 Encoding Product, MPEG-2 Encoding Software, and MPEG-2 Bundled Encoding Software.** The royalty for the sublicense granted pursuant to Section 2.3 hereof shall be four United States Dollars (U.S. $4.00) prior to January 1, 2002, and two and one half United States Dollars (U.S. $2.50) thereafter upon the Sale of each end product Manufactured or Sold in a country in which one or more MPEG-2 Patent Portfolio Patent(s) that would be infringed absent a license thereunder, is in force, where the end product is:

3.1.2.1 An MPEG-2 Encoding Product;

3.1.2.2 A copy of MPEG-2 Encoding Software; or

3.1.2.3 A copy of MPEG-2 Bundled Encoding Software.

3.1.3 **MPEG-2 Distribution Encoding Product.** The royalty for the sublicense granted pursuant to Section 2.3 hereof shall be L times four United States Dollars (L x U.S. $4.00) prior to January 1, 2002, and L times two and one half United States Dollars (L x U.S. $2.50) thereafter upon the Sale of each MPEG-2 Distribution Encoding Product Manufactured or Sold as an end product in a country where one or more MPEG-2 Patent Portfolio Patent(s) that would be infringed absent a license thereunder, is in force, where L is the number of Channels of the MPEG-2 Distribution Encoding Product for providing video information encoded in a format in compliance with the MPEG-2 Standard.



EXHIBIT 2 PAGE 52

**MPEG-2 PATENT PORTFOLIO
LICENSE (cont'd.)**

3.1.4   **Consumer Product.** The royalty for the sublicense granted pursuant to Sections 2.2 and 2.3 hereof for a single self-contained end product having both MPEG-2 encoding and decoding capabilities shall be limited to six United States Dollars (U.S. $6.00) prior to January 1, 2002, and two and one half United States Dollars (U.S. $2.50) thereafter upon the Sale of each such end product Manufactured or Sold as a Consumer Product in a country where one or more MPEG-2 Patent Portfolio Patent(s) that would be infringed absent a license thereunder, is in force, where the Consumer Product:

    3.1.4.1   Incorporates both an MPEG-2 Encoding Product and an MPEG-2 Decoding Product;

    3.1.4.2   Is a copy of software that is both MPEG-2 Encoding Software and MPEG-2 Decoding Software; or

    3.1.4.3   Is a copy of software that is both MPEG-2 Bundled Encoding Software and MPEG-2 Bundled Decoding Software.

3.1.5   **MPEG-2 Transport or Program Stream Product.** The royalty for the sublicense granted pursuant to Section 2.5 hereof shall be N times four United States Dollars (N x U.S. $4.00) upon the Sale of each MPEG-2 Transport or Program Stream Product Manufactured or Sold as an end product in a country in which one or more MPEG-2 Patent Portfolio Patent(s) that would be infringed absent a license thereunder, is in force, where N is the greater of the number of input or output transport or program streams of the MPEG-2 Distribution Transport or Program Stream Product.

3.1.6   **MPEG-2 Packaged Medium.** The royalty for the sublicense granted pursuant to Section 2.4 hereof upon the Sale of each copy of MPEG-2 Packaged Medium (manufactured or sold in a country in which one or more MPEG-2 Patent Portfolio Patent(s) that would be infringed absent a license thereunder is in force) containing one or more MPEG-2 Video Events encoded using an MPEG-2 Encoding Product, an MPEG-2 Distribution Encoding Product, MPEG-2 Encoding Software and/or MPEG-2 Bundled Encoding Software prior to September 1, 2001, shall be four United States Cents (U.S. $0.04) for the first MPEG-2 Video Event on any MPEG-2 Packaged Medium, plus one United States Cent (U.S. $0.01) for each additional 30 minutes of video playing time or portion thereof on the same MPEG-2 Packaged Medium. Notwithstanding the above, however, the royalty (i) shall not exceed four



**EXHIBIT 2 PAGE 53**

**MPEG-2 PATENT PORTFOLIO
LICENSE (cont'd.)**

United States Cents (U.S. $0.04) for a single Movie; (ii) shall not exceed an additional two United States Cents (U.S. $0.02) for the second Movie contained on the same MPEG-2 Packaged Medium as the first Movie; and (iii) shall be one United States Cent (U.S. $0.01) for each MPEG-2 Packaged Medium having a normal playing time up to and including 12 minutes, but not more than 12 minutes, of video programming on the same MPEG-2 Packaged Medium which is encoded into a format in compliance with the MPEG-2 Standard.

3.1.7 **MPEG-2 Packaged Medium.** For the period commencing as of September 1, 2001 and ending on February 28, 2003, the royalty for the sublicense granted pursuant to Section 2.4 hereof upon the Sale of each copy of MPEG-2 Packaged Medium (manufactured or sold in a country in which one or more MPEG-2 Patent Portfolio Patent(s) that would be infringed absent a license thereunder, is in force) containing one or more MPEG-2 Video Events encoded using an MPEG-2 Encoding Product, an MPEG-2 Distribution Encoding Product, MPEG-2 Encoding Software and/or MPEG-2 Bundled Encoding Software, shall be three and one half United States Cents (U.S. $0.035) for the first MPEG-2 Video Event on any MPEG-2 Packaged Medium, plus one United States Cent (U.S. $0.01) for each additional 30 minutes of video playing time or portion thereof on the same MPEG-2 Packaged Medium. Notwithstanding the above, however, the royalty (i) shall not exceed three and one half United States Cents (U.S. $0.035) for a single Movie; (ii) shall not exceed an additional two United States Cents (U.S. $0.02) for the second Movie contained on the same MPEG-2 Packaged Medium as the first Movie; and (iii) shall be one United States Cent (U.S. $0.01) for each MPEG-2 Packaged Medium having a normal playing time up to and including 12 minutes, but not more than 12 minutes, of video programming on the same MPEG-2 Packaged Medium which is encoded into a format in compliance with the MPEG-2 Standard.

3.1.8 **MPEG-2 Packaged Medium.** For the period commencing as of March 1, 2003 through the term of the License, the royalty for the sublicense granted pursuant to Section 2.4 hereof upon the Sale of each copy of MPEG-2 Packaged Medium (manufactured or sold in a country in which one or more MPEG-2 Patent Portfolio Patent(s) that would be infringed absent a license thereunder, is in force) containing one or more MPEG-2 Video Events encoded using an MPEG-2 Encoding Product, an MPEG-2 Distribution Encoding Product, MPEG-2 Encoding Software and/or MPEG-2 Bundled Encoding Software, shall be three United States Cents (U.S. $0.03) for the first MPEG-2 Video Event on any MPEG-2

v1/1/02



**EXHIBIT 2 PAGE 54**

**MPEG-2 PATENT PORTFOLIO LICENSE (cont'd.)**

Packaged Medium, plus one United States Cent (U.S. $0.01) for each additional 30 minutes of video playing time or portion thereof on the same MPEG-2 Packaged Medium. Notwithstanding the above, however, the royalty (i) shall not exceed three United States Cents (U.S. $0.03) for a single Movie; (ii) shall not exceed an additional two United States Cents (U.S. $0.02) for the second Movie contained on the same MPEG-2 Packaged Medium as the first Movie; and (iii) shall be one United States Cent (U.S. $0.01) for each MPEG-2 Packaged Medium having a normal playing time up to and including 12 minutes, but not more than 12 minutes, of video programming on the same MPEG-2 Packaged Medium which is encoded into a format in compliance with the MPEG-2 Standard.

3.1.9   Subject to Paragraph 3.1.4 of this Agreement, the royalties set forth in this Section 3.1 are additive as to each MPEG-2 Royalty Product to the extent that individual royalties are applicable thereto.

**3.2   The Payment of Running Royalties Upon the Sale of MPEG-2 Decoding Products, MPEG-2 Decoding Software, MPEG-2 Bundled Decoding Software, MPEG-2 Encoding Products, MPEG-2 Encoding Software or any Combination of the Above Sold in a Single Self-Contained Product (for purposes of this Section 3.2, "Product(s)").**

3.2.1   Royalties pursuant to this Article 3 are payable upon the Sale of:

3.2.1.1   Products which allow the end user to decode and/or encode (consistent with the limitations set forth in Section 2.3) MPEG-2 compliant bit streams; provided, however that no royalty shall be payable upon the Sale or distribution of such Products when the Product is incorporated with and used with an MPEG-2 Royalty Product on which a royalty already has been paid to the Licensing Administrator pursuant to Article 3 hereof.

3.2.1.2   Products in which the MPEG-2 functionality of the Product is encrypted, disabled or otherwise unusable only:

3.2.1.2.1   upon the distribution of a key or other instrumentality allowing the Product to be used to decode and/or encode MPEG-2 compliant bit streams; or



**EXHIBIT 2 PAGE 55**

**MPEG-2 PATENT PORTFOLIO
LICENSE (cont'd.)**

    3.2.1.2.2 if the encryption, disablement or other method employed to prevent use is generally breached royalties for all such Products sold shall become payable pursuant to Article 3.

    3.2.1.2.3 if Licensee fails to take reasonable steps to insure that the MPEG-2 functionality is encrypted, disabled or otherwise unusable, royalties for all such Products Sold shall become payable pursuant to Article 3.

    3.2.1.3   MPEG-2 Decoding Software updates and/or MPEG-2 Encoding Software updates; provided, however, that no royalty shall be due if such update (i) is Sold or distributed for use in connection with an MPEG-2 Royalty Product upon which a royalty has been paid to the Licensing Administrator in accordance with Article 3 and (ii) the update which is Sold or distributed overwrites or otherwise renders not usable the pre-existing MPEG-2 capability on the MPEG-2 Royalty Product which is upgraded.

**3.3**    **Payment Schedule.**

    **3.3.1**    Except as provided in Section 3.4 hereof, royalties payable pursuant to Section 3.1 of this Agreement that accrue after the latest signature date specified on the final page of this Agreement shall be payable by Licensee to the Licensing Administrator semiannually as previously agreed between Licensee and the Licensing Administrator in the term prior to this Agreement, or if there was no prior term, as measured from such signature date to the last business day of each six month period thereafter for MPEG-2 Royalty Products Manufactured or Sold during the immediately preceding semiannual period ending on the last business day of the second month preceding the month when royalties are payable. Such royalties shall be paid to the Licensing Administrator and shall be accompanied by a statement pursuant to Section 3.9 of this Agreement, which statement shall be deemed to be true and correct unless shown otherwise in an audit in accordance with Section 3.10 of this Agreement.

    **3.3.2**    **Back Royalties.** Any royalties pursuant to the above schedule which accrued during the period from June 1, 1994 to the latest signature date specified above shall be payable within thirty (30) Days of such signature date, together with accrued interest of 10% per annum and shall



**EXHIBIT 2 PAGE 56**

**MPEG-2 PATENT PORTFOLIO
LICENSE (cont'd.)**

be accompanied by a royalty statement in accordance with Section 3.9 of this Agreement.

3.4   **Payments Upon Termination or Expiration.**  Within thirty (30) Days after the effective date of termination or expiration of this Agreement, Licensee shall pay the Licensing Administrator any and all amounts that are due pursuant to this Agreement as of the effective date of such termination or expiration, together with a royalty statement for such payment in accordance with Section 3.9 of this Agreement.

3.5   **Form of Payment.**  Any payment made under the provisions of this Agreement shall be made by check drawn on a bank(s) reasonably acceptable to the Licensing Administrator, by cashier's check drawn on immediately available funds, or by other means of payment acceptable to the Licensing Administrator.

   3.5.1   The amounts payable hereunder shall be paid to the Licensing Administrator by the Licensee in United States Dollars.

3.6   **Taxes.**  In addition to the royalties set forth in Section 3.1 of this Agreement, Licensee shall pay or reimburse the Licensing Administrator for any and all taxes, such as sales, excise, value added, use taxes, and similar taxes of the Licensee, based on payments to be made hereunder in a jurisdiction(s) where such taxes are required.  The royalties set forth in Section 3.1 of this Agreement shall be subject to withholding of any taxes of the Licensor required by applicable law.

   3.6.1   At the Licensee's request, the Licensing Administrator shall file any certificate or other document which may cause any tax that is so payable by the Licensee to be avoided or reduced.

   3.6.2   The Licensee shall not be required to pay or reimburse the Licensing Administrator for taxes based upon the net worth, capital, net income, or franchise of the Licensing Administrator, nor taxes imposed upon the Licensing Administrator solely by reason of the Licensing Administrator's doing business in or being incorporated in the jurisdiction imposing such taxes.

   3.6.3   The Licensee shall reasonably cooperate with the Licensing Administrator in respect of mitigating any withholding taxes, including providing such information as may be required by the Licensing Administrator for purposes of obtaining refunds of any taxes withheld.



**EXHIBIT 2 PAGE 57**

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

3.6.4    The Licensing Administrator shall reasonably cooperate and provide such information as may be required by the Licensee for any purpose or reason relating to taxation.

3.6.5    If the Licensee in good faith contests any tax that is so payable or reimbursable by the Licensee, the Licensing Administrator shall reasonably cooperate in such contest at the Licensee's expense.

3.6.6    The Licensing Administrator shall pass on to the Licensee any tax refunds received by the Licensing Administrator with respect to the Licensee's previous payment or reimbursement of applicable taxes hereunder, if any.

3.7    **Late Payments.**   Any payment required hereunder that is made late (including unpaid portions of amounts due) shall bear interest, compounded monthly, at the lesser of 10% per annum or the highest interest rate permitted to be charged by the Licensing Administrator under applicable law.

3.7.1    Any payment received more than fourteen (14) Days after becoming due as set forth in Section 3.3 of this Agreement shall be deemed late for purposes of this Agreement.

3.7.2    Any interest charged or paid in excess of the maximum rate permitted by applicable law shall be deemed the result of a mistake and interest paid in excess of the maximum rate shall be promptly credited or refunded (at Licensee's option) to Licensee.

3.8    **Dishonored Checks.**   If a payment due under this Agreement is made by Licensee's check and the check is dishonored, the payment may at the Licensing Administrator's option be deemed not to have been made. The Licensing Administrator may at its option, by written notice to Licensee, require subsequent payments to be made by cashier's check in immediately available funds.

3.9    **Statements.**   Licensee shall provide the Licensing Administrator with a statement for each period as defined in Sections 3.3.1, 3.3.2 and 3.4 showing in reasonable detail and separately identifying for each MPEG-2 Royalty Product both (i) the quantity Manufactured in each country and (ii) the quantity Sold in each country of any and all MPEG-2 Royalty Products Sold during such period by Licensee and its Affiliates, and a calculation of the royalties, if any, which are payable by virtue of such Manufacture and Sale of MPEG-2 Royalty Products during the period when the payment, if any, accrued.



**EXHIBIT 2 PAGE 58**

**MPEG-2 PATENT PORTFOLIO
LICENSE (cont'd.)**

3.9.1    Such statements shall be certified by an employee of Licensee authorized to make such certification.

3.9.2    The Licensing Administrator shall maintain all information in such statements of Licensee as Confidential Information in accordance with Article 5 of this Agreement, except to the extent that the information is needed by the Licensing Administrator to report to the Licensors the aggregate royalties paid by all sublicensees of the Licensing Administrator.  In no event shall the Licensing Administrator provide to any of the Licensors information on royalties paid on a licensee-by-licensee or country-by-country basis unless required by law.

**3.10    Audits.**

3.10.1    **Books and Records.**  Licensee shall keep and maintain accurate and detailed books and records adequate for the Licensing Administrator to ascertain the royalties payable hereunder.  Such books and records shall be maintained for three (3) years from the end of each period when royalties are payable.

3.10.2    **Audit Rights.** The Licensing Administrator shall have the right to audit or have audited the books and records of Licensee relating to payments hereunder for the sole purpose of verifying the amounts due and payable hereunder, not more than once per calendar year upon reasonable notice to the Licensee.  All such audits shall be conducted during reasonable business hours of the Licensee.

3.10.2.1    Any such audit shall be performed by an independent certified public accountant(s) or equivalent (Auditor) reasonably acceptable to Licensee in the country where the audit is to take place.    Licensee shall fully cooperate with Auditor in conducting such audit and shall permit Auditor to inspect and copy such portions of the Licensee's books and records that the Auditor deems appropriate and necessary in accordance with the professional standards applicable to the Auditor in the country where the Audit is to take place.

3.10.2.2    The Auditor (and each member or employee thereof participating in the audit) shall agree not to disclose any information learned by the Auditor in the audit to any Licensor, nor use any such information, except for providing

v1/1/02                              18



EXHIBIT 2 PAGE 59

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

the Licensing Administrator with a statement of payments due by Licensee.

**3.10.2.3** The cost of an audit in accordance with Paragraph 3.10.2 of this Agreement shall be at the expense of the Licensing Administrator; provided, however, the Licensee shall bear the cost of the audit if the audit reveals any underpayment which in the aggregate is greater than five percent (5%) of the amount actually due for the period being audited.

**3.10.2.4** Licensee shall pay any shortfalls uncovered in accordance with Paragraph 3.10 of this Agreement, plus interest as set forth in Section 3.7 herein, within thirty (30) Days after receiving notice from the Licensing Administrator of such shortfall.

**4.     REPRESENTATIONS AND WARRANTIES**

**4.1**     The Licensing Administrator represents and warrants that it has the authority, power and right to grant the rights and licenses to Licensee under this Agreement.

**4.2**     The Licensing Administrator makes no representation or warranty that the MPEG-2 Patent Portfolio Patent(s) sublicensed hereunder includes all MPEG-2 Essential Patent(s) throughout the world, or that the making, using or selling of products, or providing services covered by the claims of the MPEG-2 Patent Portfolio Patent(s) licensed hereunder will not infringe, directly, contributorily or by inducement under the laws of the United States or under equivalents thereof under the laws of a country other than the United States, any patent or other intellectual property right of a party other than the MPEG-2 Patent Portfolio Patent(s).

**4.3**     Licensee represents and warrants that it is entering into this Agreement for its own convenience in acquiring patent rights necessary for compliance with the MPEG-2 Standard from multiple licensors in a single transaction rather than entering into separate license agreements with individual licensors, and that Licensee is fully aware that the patents in the MPEG-2 Patent Portfolio may not include all present and future MPEG-2 Essential Patent(s), and that this Agreement may not provide Licensee with all the patent rights needed to perform the activities contemplated by Licensee in entering into this Agreement.  The Licensing Administrator and Licensee recognize that Licensee has the right to separately negotiate a license with any or all of the Licensors under any and all of



**EXHIBIT 2 PAGE 60**

**MPEG-2 PATENT PORTFOLIO
LICENSE (cont'd.)**

the MPEG-2 Patent Portfolio Patents under terms and conditions to be independently negotiated by each Licensor.

4.4     Licensee represents and warrants that it has not granted an exclusive license under an MPEG-2 Essential Patent owned by Licensee and has not assigned an MPEG-2 Essential Patent in anticipation of entering into this Agreement. Notwithstanding anything to the contrary in this Agreement, Licensors reserve the right to grant to Licensing Administrator an exclusive license under any MPEG-2 Patent Portfolio Patent with respect to any particular party.

4.5     Each party represents and warrants that it will comply with all applicable laws, regulations or ordinances pertaining to its performance hereunder.

4.6     Each party represents and warrants that this Agreement and the transactions contemplated hereby do not violate any agreements each party has with its agents, employees, or Affiliates or third parties.

4.7     Each party further represents and warrants that in executing this Agreement, it does not rely on any promises, inducements, or representations made by any party or third party with respect to this Agreement or any other business dealings with any party or third party, now or in the future.

4.8     Each party represents and warrants that it is not presently the subject of a voluntary or involuntary petition in bankruptcy or the equivalent thereof, does not presently contemplate filing any such voluntary petition, and does not presently have reason to believe that such an involuntary petition will be filed against it.

4.9     Other than the express warranties of this Article, there are NO OTHER WARRANTIES, EXPRESS OR IMPLIED.

## 5.     CONFIDENTIAL INFORMATION

5.1     For a period of five (5) years as measured from the first date of disclosure pursuant to this Agreement, the Licensing Administrator agrees to use reasonable care and discretion, at least commensurate with that degree of care it uses to protect similar information of its own, to avoid disclosure, publication, or dissemination of received Confidential Information, outside of those employees or consultants of the Licensing Administrator who have a need to know Confidential Information.



**EXHIBIT 2 PAGE 61**

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

5.2    Disclosure by the Licensing Administrator of Confidential Information under
Section 5.1 of this Agreement shall be permitted in the following circumstances;
provided, that the Licensing Administrator shall have first given reasonable
notice to Licensee that such disclosure is to be made:

5.2.1    In response to an order of a court or other governmental body;

5.2.2    Otherwise required by law; or

5.2.3    Necessary to establish rights under this Agreement.

5.3    Notwithstanding any other provisions of this Agreement, the obligations
specified in Section 5.1 of this Agreement will not apply to any information that:

5.3.1    Is or becomes publicly available without breach of this Agreement; or

5.3.2    Is released for disclosure by written consent of the Licensee.

6.    **TERM AND TERMINATION**

6.1    **Term and Certain Royalty Rates on Renewal.**  This Agreement shall expire on
December 31, 2010.  Upon expiration, Licensee shall have the right to renew this
sublicense for successive five year periods for the life of any MPEG-2 Patent
Portfolio Patent, subject to reasonable amendment of the royalty terms and rates
set forth in this sublicense.  Such reasonable amendment may take into account
prevailing market conditions, changes in technological environment, and
available commercial products at the time of each five year renewal.  In no event
shall the royalty rates upon each renewal of this sublicense increase, if at all, by
more than 25% of the royalty rates set forth in this sublicense immediately prior
to renewal.  The preceding sentence, however, shall not apply to the Licensing
Administrator's request at the time of renewal that royalty rates for MPEG-2
Packaged Media which ultimately are offered for rental to consumers be higher
than royalty rates for MPEG-2 Packaged Media set forth in this sublicense at the
time of renewal.  Such request for higher royalty rates shall only be made by the
Licensing Administrator, if at all, in the event that the majority of Licensees
which are unaffiliated with entities which own copyrights on Movies charge
different rates for replication of MPEG-2 Packaged Media depending on whether
such MPEG-2 Packaged Media is offered to consumers for sale or rental.

6.2    **Termination for Material Breach.**  The Licensing Administrator shall have the
right to terminate this Agreement upon breach of a material provision thereof by



**EXHIBIT 2 PAGE 62**

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

the Licensee.  Such termination for material breach shall become effective upon the Licensing Administrator sending written notice to the Licensee specifying the breach, and the failure of the Licensee to demonstrate, to the satisfaction of the Licensing Administrator, that Licensee has cured such breach within sixty (60) Days of the sending of such notice.  The following are examples of acts or omissions which constitute a material breach of this Agreement:

6.2.1   Failure of the Licensee to make payments and provide statements in accordance with Sections 3.2, 3.3 and 3.9 of this Agreement;

6.2.2   Failure of the Licensee to maintain adequate books and records in accordance with Paragraph 3.10.1 of this Agreement or to permit an audit in accordance with Paragraph 3.10.2 of this Agreement; or

6.2.3   Failure of the Licensee to grant licenses to MPEG-2 Essential Patent(s) licensable or sublicensable by Licensee in accordance with Sections 7.3 or 7.4 of this Agreement.

6.2.4   The foregoing list is by way of example and not limitation.

6.3   **Partial Termination in the Event of Litigation.**  The Licensing Administrator, upon the instruction of a Licensor, shall terminate Licensee's sublicense under any MPEG-2 Patent Portfolio Patent(s) licensed or sublicensed to the Licensing Administrator by such Licensor in the event that the Licensee has brought a lawsuit or other proceeding for infringement of an MPEG-2 Related Patent(s) and/or an MPEG-2 Essential Patent(s) against such Licensor, and Licensee has refused to grant the Licensor a license on fair and reasonable terms and conditions under the MPEG-2 Related Patent(s) and/or MPEG-2 Essential Patent(s) upon which the lawsuit or other proceeding is based.  For purposes of this Section 6.3 only, the Licensor's per patent share of royalties payable pursuant to Section 3.1 of this Agreement shall be presumed to be a fair and reasonable royalty rate for Licensee's Patent(s) considering the essential nature of Licensor's Patent(s) licensed hereunder.

6.4   **Voluntary Termination.**  Licensee may terminate this Agreement by providing thirty (30) Days written notice to the Licensing Administrator.

6.5   **Other Terminations.**  This Agreement may be terminated by the Licensing Administrator upon the occurrence of the following events:

6.5.1   If Licensee files a petition in bankruptcy or the equivalent thereof, or is the subject of an involuntary petition in bankruptcy that is not dismissed



**EXHIBIT 2 PAGE 63**

**MPEG-2 PATENT PORTFOLIO**
**LICENSE (cont'd.)**

within sixty (60) Days after the filing date thereof, or is or becomes insolvent, or admits of a general inability to pay its debts as they become due.

6.5.2   Upon the de facto or de jure nationalization or expropriation of Licensee by governmental or military action, whether or not with valid authority.

6.5.3   Upon any failure by Licensee to provide, within thirty (30) Days after written notice from the Licensing Administrator, satisfactory and adequate assurances that Licensee is able and willing to fully and effectively perform its obligations under this Agreement.

6.5.4   In the event that any of the events listed in Sections 6.5.1, 6.5.2 or 6.5.3 hereof occur, this Agreement may be terminated by the Licensing Administrator upon thirty (30) Days written notice to Licensee, without right to cure.

6.6   **Survival.** The following provisions of this Agreement shall survive expiration or termination of this Agreement:

6.6.1   The obligation of Licensee to pay all royalties accrued as of the effective date of expiration or termination pursuant to Section 3.4 hereof;

6.6.2   The obligation of Licensee to provide statements under Section 3.9 of this Agreement; and

6.6.3   The obligation of the Licensing Administrator to maintain confidentiality under Article 5 of this Agreement.

7.   **MISCELLANEOUS PROVISIONS**

7.1   **Assignment.**

7.1.1   In the event that the right of the Licensing Administrator to grant MPEG-2 Patent Portfolio Licenses is transferred to a successor Licensing Administrator, this Agreement shall be deemed assigned to the successor Licensing Administrator.

7.1.2   This Agreement may not be assigned by the Licensee, other than to a successor of the entire interest of an Affiliate or business division of Licensee manufacturing or selling Licensed Products, or providing a

v1/1/02                                          23



EXHIBIT 2 PAGE 64

**MPEG-2 PATENT PORTFOLIO
LICENSE (cont'd.)**

service in compliance with the MPEG-2 Standard, or to a purchaser of substantially all of the assets of Licensee or such Affiliate or business division thereof.

**7.2     Notice.**

**7.2.1**   All notices required or permitted under this Agreement shall be sent by either Certified Mail with return receipt requested, overnight delivery by commercial or other service which can verify delivery, fax to the number indicated herein, or by e-mail to the address indicated herein.   Such notice so sent shall be effective as of the date it is sent.  Notwithstanding anything to the contrary herein, amendments to Attachment 1 hereto, if any, shall be effective upon the posting of the new Attachment 1 on the website of the Licensing Administrator and such posting shall constitute notice pursuant to this Section.

**7.2.2**   All notices from the Licensing Administrator to Licensee shall be sent to:

Name:       Mr. Richard Lesser
Title:        CEO
Company:   Ahead Software AG
Address:    Im Stoeckmaedle 18 , Karlsbad,  76307 Germany


Tel:          011-49-724-891-1800
Fax:          011-49-724-891-1888
E-mail:      rlesser@nero.com

CC:


Name:
Title:
Company:
Address:


Tel:
Fax:
E-mail:



EXHIBIT 2 PAGE 65

**MPEG-2 PATENT PORTFOLIO
LICENSE (cont'd.)**

7.2.3   All notices from the Licensee to the Licensing Administrator or its successor shall be sent to:

Baryn S. Futa
Manager and Chief Executive Officer
MPEG LA, LLC
250 Steele Street
Denver, Colorado, U.S.A.  80206
Tel:  303-331-1880
Fax:  303-331-1879
E-mail:  bfuta@mpegla.com
Website:  www.mpegla.com

7.3   **Licensee Grant.**  Licensee agrees to grant a worldwide, nonexclusive license and/or sublicense under any and all MPEG-2 Essential Patent(s) that Licensee or its Affiliate(s), if any, has the right to license and/or sublicense, to any Licensor or any sublicensee of the Licensing Administrator desiring such a license and/or sublicense on fair and reasonable terms and conditions.  For purposes of this Section 7.3 only, the Licensors' per patent share of royalties payable pursuant to Section 3.1 of this Agreement shall be presumed to be a fair and reasonable royalty rate for the aforementioned license and/or sublicense to be granted by the Licensee.

7.3.1   Licensee's obligation to grant licenses and/or sublicenses pursuant to Section 7.3 of this Agreement shall be effective upon execution of this Agreement.

7.4   **Licensee's Option.**  In lieu of Section 7.3 Licensee shall have the option to hereby grant a worldwide, nonexclusive, nontransferable, except to a successor Licensing Administrator, license and/or sublicense under any and all of its MPEG2 Essential Patent(s) to the Licensing Administrator with the right by the Licensing Administrator to grant MPEG-2 Patent Portfolio Licenses that include the MPEG-2 Essential Patent(s) that Licensee or its Affiliate(s), if any, has the right to license or sublicense.  Licensee shall identify to the Licensors any and all of its patents and patents of its Affiliate(s), if any, which Licensee believes in good faith to be MPEG-2 Essential Patent(s).  Licensors shall determine whether each of the patent(s) identified by Licensee is an MPEG2 Essential Patent(s) according to an established procedure applicable to all new patents identified to the Licensors.  The terms and conditions of the license and/or sublicense granted by the Licensee to the Licensing Administrator under this Section 7.4 shall be identical to the terms and conditions of the license and/or sublicense granted by



**EXHIBIT 2 PAGE 66**

**MPEG-2 PATENT PORTFOLIO
LICENSE (cont'd.)**

each Licensor to the Licensing Administrator.  If Licensee elects the option set forth in this Section 7.4, it shall be required to enter into an agreement referred to as the "Agreement Among Licensors," which has been entered into by all Licensors.

**7.5     Licensee Covenants.**

7.5.1     Licensee hereby covenants to promptly notify the Licensing Administrator in the event that any allowed patent application(s) published for opposition, which is licensed or sublicensed to the Licensing Administrator pursuant to Section 7.4 of this Agreement as an MPEG-2 Essential Patent(s), does not issue as an MPEG-2 Essential Patent(s).

7.5.2     Licensee shall promptly identify to the Licensing Administrator each patent(s), except for MPEG-2 Patent Portfolio Patents of the Licensors, licensable or sublicensable by Licensee or its Affiliate(s), if any, which Licensee believes in good faith to be an MPEG-2 Essential Patent(s) within fourteen (14) Days of execution of this Agreement.

7.5.3     In the event that Licensee has granted an exclusive license to a third party under an MPEG-2 Essential Patent(s) prior to the date of execution of this Agreement, Licensee shall advise the Licensing Administrator of such an exclusive license and identify to the Licensing Administrator such third party.

**7.6     Licensing Administrator Covenants.**

7.6.1     The Licensing Administrator covenants that if during the term of this Agreement, it acquires rights to grant sublicenses under additional MPEG-2 Essential Patent(s), the MPEG-2 Patent Portfolio License herein will be supplemented to include such additional MPEG-2 Essential Patent(s).

7.6.2     The Licensing Administrator covenants that, with the exception of partial termination under Section 6.3 of this Agreement, any deletion from the MPEG-2 Patent Portfolio shall occur only upon a determination by the Licensors, or upon a final adjudication of a tribunal of competent jurisdiction from which no appeal is taken or allowed, that the deleted Patent(s) is invalid or unenforceable in the country which issued and published the Patent(s), and that any addition to the MPEG-2 Patent Portfolio shall occur only upon the determination by the Licensors that



**EXHIBIT 2 PAGE 67**

**MPEG-2 PATENT PORTFOLIO
LICENSE (cont'd.)**

the additional Patent(s) is an MPEG-2 Essential Patent(s) in the country which issued or published the Patent(s).

7.6.3    The Licensing Administrator further covenants that if any Patent(s) in the MPEG-2 Patent Portfolio is found not to be an MPEG-2 Essential Patent(s) in the country which issued or published the Patent(s), either by the Licensors or upon a final adjudication of a tribunal of competent jurisdiction from which no appeal is taken or allowed and such Patent(s) is to be deleted from the MPEG-2 Patent Portfolio, the Licensing Administrator shall give notice to Licensee of such deletion, and Licensee shall have the option to retain its sublicense under the deleted Patent(s) for the remainder of the term of this Agreement, including any renewal pursuant to Section 6.1 hereunder.

7.6.4    The Licensing Administrator covenants that it shall not delete from or add to the MPEG-2 Patent Portfolio for reasons other than stated in Paragraphs 7.6.1 and 7.6.2 and Section 6.3 herein.

7.6.5    The Licensing Administrator covenants that the royalties set forth in Section 3.1 of this Agreement shall not increase during the term of this Agreement, as set forth in Article 6 of this Agreement.

7.7    **Most Favorable Royalty Rates.**  Except as provided in Paragraph 7.7.1 of this Agreement, in the event that the Licensing Administrator grants an MPEG-2 Patent Portfolio License to another party with royalty rates more favorable than those set forth in Section 3.1 of this Agreement, whether or not such more favorable royalty rates are on terms and/or conditions that are different than those set forth herein, the Licensing Administrator shall send written notice to Licensee specifying the more favorable royalty rates and any terms and/or conditions that are different than those set forth herein within thirty (30) Days of the granting of the MPEG-2 Patent Portfolio License providing for such more favorable royalty rates.  Licensee shall be entitled to an amendment of this Agreement to the extent of providing for royalty rates as favorable as that available to such other party within thirty (30) Days of sending written notice to the Licensing Administrator requesting such amendment; provided, however, that this Agreement shall also be amended to include any additional benefits to the Licensing Administrator. Any amendment made pursuant to this Section 7.7 shall be effective as of the date it is made, and such more favorable royalty rates shall not be retroactively applicable in favor of the Licensee, and shall not be a basis for claiming any refund of royalties paid prior to such effective date.



EXHIBIT 2 PAGE 68

**MPEG-2 PATENT PORTFOLIO LICENSE (cont'd.)**

**7.7.1** Section 7.7 shall not apply to:

**7.7.1.1** Settlement of litigation;

**7.7.1.2** Determination by the Licensing Administrator of back royalties owed by a sublicensee;

**7.7.1.3** Compromise or settlement of royalty payments owed by a sublicensee in financial distress;

**7.7.1.4** Individual licenses or sublicenses granted by a Licensor to a third party;

**7.7.1.5** An order of a court or an administrative body; and

**7.7.1.6** An unauthorized act of the Licensing Administrator.

**7.8** **Freedom of Independent Development.** Nothing in this Agreement shall be construed as prohibiting or restricting Licensee from independently developing competitive video products or video services.

**7.9** **Relationship.** Nothing in this Agreement shall be construed to create a principal-agent relationship, partnership or joint venture between the parties, or give rise to any fiduciary duty from one party to the other party.

**7.10** **Severability.** If any provision of this Agreement is held by a court of competent jurisdiction to be unenforceable or contrary to law, the remaining provisions of the Agreement will remain in full force and effect.

**7.11** **No Waiver.** The failure of either party at any time to require performance by the other party of any provision of this Agreement shall not be construed as acquiescence or waiver of such failure to perform such provision. The failure of either party to take action upon the breach of any provision of this Agreement shall not be construed as acquiescence or waiver of any such breach.

**7.12** **Binding on Successors.** This Agreement shall be binding upon and inure to the benefit of the parties and their successors and assigns to the extent assignment is permitted by this Agreement.



**EXHIBIT 2 PAGE 69**

**MPEG-2 PATENT PORTFOLIO
LICENSE (cont'd.)**

7.13    **Article and Section Headings.**  The Article and Section headings contained in this Agreement are for reference purposes only and shall not in any way control the meaning or interpretation of this Agreement.

7.14    **Representation of Counsel; Mutual Negotiation.**  Each party has been represented by counsel of its choice in negotiating this Agreement.  This Agreement shall therefore be deemed to have been negotiated at arms length, with the advice and participation of counsel, and prepared at the joint request, direction, and instruction of the parties, and shall be interpreted in accordance with its terms without favor to any party.

7.15    **English Language.**  The parties have required that this Agreement and all documents relating thereto be drawn up in English.

7.16    **Notice to Customers.**

7.16.1    **MPEG-2 Intermediate Products Notice:**  Licensee agrees to provide to its customers or any other party that receives from it an MPEG-2 Intermediate Product licensed under Section 2.1 of this Agreement a notice which specifies that:  **"USE OF THIS PRODUCT IN ANY MANNER THAT COMPLIES WITH THE MPEG-2 STANDARD IS EXPRESSLY PROHIBITED WITHOUT A LICENSE UNDER APPLICABLE PATENTS IN THE MPEG-2 PATENT PORTFOLIO, WHICH LICENSE IS AVAILABLE FROM MPEG LA, L.L.C., 250 STEELE STREET, SUITE 300, DENVER, COLORADO 80206."**

Licensee understands that the license granted pursuant to Section 2.1 of this Agreement is conditioned on the Licensee providing the notice specified in this Section.

7.16.2    **MPEG-2 Packaged Media Notice:**  Licensee agrees to provide to its customers or any other party that receives from it an MPEG-2 Encoding Product, an MPEG-2 Distribution Encoding Product, MPEG-2 Encoding Software or MPEG-2 Bundled Encoding Software licensed under Section 2.3 of this Agreement a notice which specifies that:  **"ANY USE OF THIS PRODUCT OTHER THAN CONSUMER PERSONAL USE IN ANY MANNER THAT COMPLIES WITH THE MPEG-2 STANDARD FOR ENCODING VIDEO INFORMATION FOR PACKAGED MEDIA IS EXPRESSLY PROHIBITED WITHOUT A LICENSE UNDER APPLICABLE PATENTS IN THE MPEG-2 PATENT PORTFOLIO, WHICH LICENSE IS AVAILABLE**



**EXHIBIT 2 PAGE 70**

**MPEG-2 PATENT PORTFOLIO
LICENSE (cont'd.)**

**FROM MPEG LA, L.L.C., 250 STEELE STREET, SUITE 300,
DENVER, COLORADO 80206."**

Licensee understands that the license granted pursuant to Section 2.3 of
this Agreement is conditioned on the Licensee providing the notice
specified in this Section.

**7.17    Bankruptcy.**

7.17.1  In the event that the Licensing Administrator should file a petition under
the federal bankruptcy laws, or that an involuntary petition shall be filed
against the Licensing Administrator, the parties intend that Licensee shall
be protected in the continued enjoyment of its rights as licensee under the
MPEG-2 Patent Portfolio Patents sublicensed hereunder to the maximum
feasible extent including, without limitation, if it so elects, the protection
conferred upon licensees under 11 U.S.C. Section 365(n).  The Licensing
Administrator agrees that it will give Licensee notice of the filing of any
voluntary or involuntary petition under the federal bankruptcy laws.

7.17.2  The MPEG-2 Patent Portfolio Patents sublicensed hereunder shall be
deemed to be "intellectual property" as the term is defined in 11 U.S.C.
Section 101(52).  All written agreements entered into in connection with
the parties' performances hereunder from time to time shall be
considered agreements "supplementary" to this Agreement for purposes
of said Section 365(n).

**7.18    Choice of Law.**  The validity, construction and performance of this Agreement
shall be governed by the substantive law of the State of New York, United States
of America, without regard to the conflict of law rules in the jurisdiction where a
claim arising from this Agreement is brought.

**7.19    No Third Party Beneficiaries.**  Nothing in this Agreement shall be construed to
give rise to any obligation on either party hereto for the benefit of a third party
other than the Licensors or to confer any rights on any third party other than the
Licensors.

**7.20    Entire Agreement.**

7.20.1  The provisions of this Agreement, including its attachments and any
amendments, constitute the entire agreement between the parties, and
supersede any and all prior communications and understandings, oral or
written, between the parties relating to the subject matter hereof.



**EXHIBIT 2 PAGE 71**

**MPEG-2 PATENT PORTFOLIO
LICENSE (cont'd.)**

7.20.2 Except for supplementation of or deletion from the MPEG-2 Patent Portfolio by the Licensing Administrator, no amendment of this Agreement shall be effective unless such amendment is in writing and specifically references this agreement, and is signed by all parties hereto. The Licensing Administrator shall promptly notify Licensee of any supplementation of or deletion from the MPEG-2 Patent Portfolio.

7.21 **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

8. **USE OF MPEG LA, L.L.C. NAME AND LOGO**

Subject to the written approval of the Licensing Administrator, which approval shall not be unreasonably withheld:   (1) Licensee shall have the right to indicate on or in connection with its MPEG-2 Royalty Products licensed hereunder that such products are licensed by the Licensing Administrator, and (2) Licensee shall have the right to use an MPEG LA, L.L.C. logo on or in connection with its MPEG-2 Royalty Products licensed hereunder.

Date: Dec. 20th, 2001

(Licensee)    Ahead Software AG

By: _____
        RICHARD LESSER

Date: JAN. 17, 2002

MPEG LA, L.L.C.

By: _____

        Baryn S. Futa,
        Manager and CEO



**EXHIBIT 2 PAGE 72**

# Exhibit 3



Meeting Access Login: _____

Password: _____

Login

Forgot Password? | Remember me ☑

Home | About | Media | Contact | Go to WebLA | Enter search request | Search

Current Pools    Pools in Formation    Want to Form a Pool?    Request a License    Discover the Benefits

## MPEG-2 Patent List

Intro | Patent List | Essentiality | Licensors | Licensees | Agreement | FAQ

This is the list of patents (Attachment 1) covered by the MPEG-2 Patent Portfolio License as of October 1, 2010.

MPEG-2 Attachment 1

### Current Patent Pools

MPEG-2

ATSC

AVC/H.264

VC-1

MPEG-4 Visual

MPEG-2 Systems

1394

MPEG-4 Systems

EXHIBIT 3 PAGE 72A

October 1, 2010                    MPEG-2 Attachment 1                    Page 1 of 40

<u>Alcatel Lucent</u>

*US 4,970,590[1]*
*DE 68924764[†]*
*FR 0374548[†]*
*GB 0374548[†]*
*IT 1228109[2]*
*JP 3,011,338[3]*
*SE 0374548[†]*


US 4,833,543[4]
DE 3785589.1[‡]
FR 0230338[‡]
GB 0230338[‡]
IT 22728 BE/93[‡]


US 5,453,790


*DE 69011422*,[§]*
*FR 0401638[§]*
*GB 0401638[§]*
*IT 1,230,235[5]*
*SE 0401638[§]*

---

[1] Expired December 20, 2009
[†] Expired December 1, 2009
[2] Expired December 21, 2008
[3] Expired December 21, 2009
[4] Expired December 23, 2006
[‡] Expired January 20, 2007
[*] Italics patent numbers denote MPEG-2/MPEG-2 Systems patents.
[§] Expired May 28, 2010
[5] Expired June 6, 2009

EXHIBIT 3 PAGE 73

October 1, 2010                MPEG-2 Attachment 1                Page 2 of 40

<u>British Telecommunications plc</u>

US 5,291,284
GB 0448590[†]
JP 2,046,808[†]

<u>Canon Inc.</u>

US 4,982,270[6]
JP 2,674,059[7]

<u>CIF Licensing, LLC</u>

US 5,068,724[8]
AT 182243
AU 627421-B2
BE 0467040
CA 2044118-6
CH 0467040
DE 69131438.1
DK 0467040
ES 0467040
FR 0467040
GB 0467040
GR 0467040
HK 1013759
IE 81694
IT 0467040
LI 0467040
NL 0467040
NO 179890-C
SE 0467040
TW NI-52990

---

[†] Expired December 12, 2009
[6] Expired February 2, 2009
[7] Expired February 9, 2008
[8] Expired June 14, 2010

EXHIBIT 3 PAGE 74

October 1, 2010                    MPEG-2 Attachment 1                    Page 3 of 40

US 5,091,782[9]
AT 139402-T1
AU 627684-B2
BE 0451545
CA 2,038,043-C
CH 0451545
DE 69120139-T2
DK 0451545 T3
ES 2088440-T3
FR 0451545
GB 0451545
GR 3020736
HK 1008410
IE 74861
IT 0451545
JP 2,795,420
KR 188423
LI 0451545
NL 0451545
NO 178419-C
NO 178420-C
SE 0451545
TW NI-50643

US 5,093,720[10]

---

[9] Expired April 8, 2010
[10] Expired August 19, 2010

EXHIBIT 3 PAGE 75

October 1, 2010                MPEG-2 Attachment 1                Page 4 of 40

<u>France Télécom, société anonyme</u>

US 4,796,087[11]
DE 3767919[†]
FI 86241[12]
FR 2599577[13]
GB 0248711[†]
IT 0248711[†]
SE 0248711[†]

<u>Fujitsu Limited</u>

US 5,235,618[§]
CA 2,029,320[§]
DE 0431319[§]
FR 0431319[§]
GB 0431319[§]
JP 2,787,599[14]

<u>GE Technology Development, Inc.</u>

US 4,706,260[15]

US 4,813,056[16]
DE 3855203 T2[‡]
FR 0395709[‡]
GB 0395709[‡]
HK 1,004,307[‡]
JP 2,790,509[‡]
SG 63561[‡]

---

[11] Expired May 31, 2007
[†] Expired May 26, 2007
[12] Expired May 28, 2007
[13] Expired May 29, 2006
[§] Expires November 5, 2010
[14] Expired November 6, 2009
[15] Expired November 6, 2006
[16] Expired December 7, 2007
[‡] Expired December 1, 2008

EXHIBIT 3 PAGE 76

US 5,426,464

*US 5,486,864*
*CN 1,060,003*
*DE 69421444*
*ES 2,140,477*
*FR 0624983*
*GB 0624983*
*IT 0624983*
*JP 3,657,017*
*KR 291492*
*MX 188411*
*MY 118172-A*
*MY 141626-A*
*RU 2,115,261*
*SG 82528*
*TH 20936*
*TR 28291*
*TW NI-092150*

EXHIBIT 3 PAGE 77

October 1, 2010                MPEG-2 Attachment 1                Page 6 of 40

US 5,491,516
AT 167015
BR PI 9405710-9
CA 2,153,886
CN 94191176.4
DE 69410781.6
ES 2,117,252
FI 113929
FR 0679316
GB 0679316
IN 183230
IT 50123 BE 98
JP 3,510,628
KR 282981
MX 187475
MY 109889-A
PH 1-1993-47458
PT 0679316
RU 2,115,258
SE 0679316
SG 94680
SG 110033
TH 24931
TR 27398
TW NI-66422
VN 526

US 5,600,376
IN 181018

EXHIBIT 3 PAGE 78

*US 5,796,743*

*CN 94112956.X*

*DE P69331606.3-08*

*ES 732 028*

*FR 732 028*

*GB 732 028*

*IT 732 028*

*JP 3,811,183*

*JP 4,317,925*

*KR 283710*

*MX 201309*

*MY 112121*

*PT 732 028*

*TH 18963*

*TW NI-070615*

*CN 01117193.6[†]*

*HK 1,044,090[†]*

*JP 3,657,200[†]*

*MY 128994[†]*

*SG 94359[†]*

*SG 118194[†]*

<u>General Instrument Corporation</u>

US 4,394,774[17]

US 4,698,672[18]

<u>Hewlett-Packard Company</u>

*US 5,867,501*

---

[†] This patent is a counterpart of US Patent No. 5,565,923 owned by and separately listed under Thomson Licensing.

[17] Expired December 15, 1998

[18] Expired October 26, 2006

EXHIBIT 3 PAGE 79

October 1, 2010                MPEG-2 Attachment 1                Page 8 of 40

<u>Hitachi, Ltd.</u>

JP 2,666,793[19]

*JP 2,907,072[20]*

JP 3,085,289[†]

JP 3,173,508[†]

JP 3,191,935[‡]

JP 3,265,287[21]

JP 3,303,869[‡]

<u>KDDI Corporation</u>

JP 1,835,550[22]

JP 3,201,079

---

[19] Expired December 27, 2004
[20] Expired February 5, 2008
[†] Expires October 1, 2010
[‡] Expires November 30, 2010
[21] Expired August 29, 2010
[22] Expired March 14, 2006

EXHIBIT 3 PAGE 80

<u>Koninklijke Philips Electronics N.V.</u>

US 4,849,812[23]

CN 1013425-B[24]

DE 3871998-T2[§]

FR 0282135-B[§]

GB 0282135-B[§]

IT 0282135-B[§]

JP 2,534,534-B2[25]

KR 9700364-B1

TW 29492-B[26]


US 4,901,075[†]

AT 260748-B[†]

CN 1011459B[27]

DE 3750206-C0[†]

FR 0260748-B[†]

GB 0260748-B[†]

IT 0260748-B[†]

JP 2,711,665[28]

KR 118698

NL 0260748-B[†]

SE 0260748-B[†]

TW 35350-B[29]

---

[23] Expired February 23, 2008
[24] Expired March 7, 2008
[§] Expired March 4, 2008
[25] Expired March 3, 2008
[26] Expired June 26, 2007
[†] Expired September 10, 2007
[27] Expired September 12, 2007
[28] Expired September 14, 2007
[29] Expired September 22, 2007

EXHIBIT 3 PAGE 81

October 1, 2010                    MPEG-2 Attachment 1                    Page 10 of 40

US 5,021,879[30]
DE 3855114-B[§]
FR 0290085-B[§]
GB 0290085-B[§]
JP 2,630,809-B[31]

US 5,027,206[32]
AT 131335[†]
AU 634173-B[‖]
BE 0359334-B[†]
CH 0359334-B[†]
CN 1018695-B*
DE 68925011-B[†]
ES 0359334-B[†]
FI 92127*
FR 0359334[†]
GB 0359334-B[†]
GR 0359334-B[†]
HK 96-1695-B[†]
IT 0359334-B[†]
JP 2,961,131[‖]
KR 153275
LI 0359334-B[†]
LU 0359334[†]
NL 0359334[†]
SE 0359334[†]
SG 9692026[†]

---

[30] Expired June 3, 2008
[§] Expired April 27, 2010
[31] Expired May 6, 2008
[32] Expired September 12, 2009
[†] Expired September 11, 2009
[‖] Expired September 14, 2009
* Expired September 13, 2009

EXHIBIT 3 PAGE 82

October 1, 2010                    MPEG-2 Attachment 1                    Page 11 of 40

US 5,128,758[33]
CA 2,018,031[34]
JP 2,791,822[35]
MX 172405-B[36]

US 5,179,442[37]
CA 2,304,917[38]

*US 5,333,135*
*CA 2,114,182*
*DE 69415698*
*FR 0609936*
*GB 0609936*
*KR 290326*
*MX 185421*

*US 5,606,539*
*AT 157830-B*
*BE 0460751-B*
*DE 69127504-B*
*DK 0460751-B*
*FR 0460751-B*
*GB 0460751-B*
*IT 0460751-B*
*JP 3,162,110*
*KR 239837*
*NL 0460751-B*
*SE 0460751-B*

*US 5,608,697*

---

[33] Expired July 6, 2009
[34] Expired June 1, 2010
[35] Expired June 2, 2010
[36] Expired June 4, 2010
[37] Expired January 11, 2010
[38] Expired June 1, 2010

EXHIBIT 3 PAGE 83

October 1, 2010                    MPEG-2 Attachment 1                    Page 12 of 40

US 5,699,476[39]
AU 641726
CA 2,036,585
DE 69109346.6
DK 0443676
FI 101442
FR 0443676
GB 0443676
HK 96-615
IT 0443676
JP 3,174,586
NL 0443676
SE 0443676
SG 9690467.7

US 5,740,310
CA 2,043,670
*JP 3,280,999*

*US 5,844,867*

*US 6,181,712*
*JP 3,762,430*
*KR 378,718*

*US 6,792,001*
*DE 69531223.5*
*FR 0700610*
*GB 0700610*

LG Electronics Inc.

US Re 37,057

US Re 37,568

KR 114,338

---

[39] Expires on October 18, 2010

EXHIBIT 3 PAGE 84

Mitsubishi Electric Corporation

US 4,954,892[40]
CA 2,000,156-C[41]
DE 68913508-T2[†]
FR 0382892[†]
GB 0382892[†]
HK 1008133[†]
IT 0382892[†]
JP 2,100,607[42]
KR 58,957[43]
SE 0382892[†]

US 5,072,295[‡]
AU 625476-B2[§]
CA 2,023,543-C[44]
DE 69027820-T2[§]
FI 98421-B*
FR 0414193[§]
GB 0414193[§]
HK 1008129[§]
IT 0414193[§]
JP 2,128,624[45]
KR 77,808[§]
NL 0414193[§]
NO 306749*
SE 0414193[§]
SG 45452[‡]

---

[40] Expired October 3, 2009
[41] Expired October 4, 2009
[†] Expired October 5, 2009
[42] Expired February 14, 2009
[43] Expired December 20, 2009
[‡] Expired August 19, 2010
[§] Expired August 20, 2010
[44] Expired August 17, 2010
* Expired August 21, 2010
[45] Expired August 21, 2009

EXHIBIT 3 PAGE 85

*US 5,268,846*
*CA 2,061,128*
*DE 69232184.5*
*FR 0508925*
*GB 0508925*
*IT MI2001B025860*
*JP 2,037,728*

US 5,949,489
BE 0984635
CA 2,234,391
CH 0984635
DE 69232993
DK 984635
ES 0984635
FI 117535
FR 0984635
GB 0984635
HK 1025864
IT 72763 BE 2002
JP 2,924,431
JP 3,127,956
LI 0984635
NL 0984635
SE 0984635

**EXHIBIT 3 PAGE 86**

US 5,963,258
BE 0984636
CA 2,234,387
CH 0984636
DE 69233167
DK 984636
ES 0984636
FI 117267
FR 0984636
GB 0984636
HK 1025863
IT 70264 BE 2003
LI 0984636
NL 0984636
SE 0984636
SG 65597

US 5,970,175
NO 310,849

US 5,990,960

US 6,002,439
BE 1309202
CH 1309202
DE 69233505
DK 1309202
ES 1309202
FI 117419
FR 1309202
GB 1309202
IT 1309202
LI 1309202
NL 1309202
SE 1309202

EXHIBIT 3 PAGE 87

US 6,097,759
BE 1091589
CA 2,327,489
CH 1091589
DE 69233466
DK 1091589
ES 2235756
FI 117417
FR 1091589
GB 1091589
HK 1035289
IT 1091589
LI 1091589
NL 1091589
NO 310,850
SE 1091589

US 6,188,794
BE 0825780
CH 0825780
DE 69232077
DK 0825780
ES 2163074
FI 111591
FR 0825780
GB 0825780
HK 1009223
IT 0825780
LI 0825780
NL 0825780
SE 0825780

US 6,307,973

EXHIBIT 3 PAGE 88

October 1, 2010                    MPEG-2 Attachment 1                    Page 17 of 40

US 7,362,805
US 7,376,184
US 7,756,202
DE 69334288.9
FR 1971130
GB 1971130
NL 1971130

JP 1,869,940[46]

JP 2,510,456[47]

JP 2,577,745[48]

*JP 2,814,819*
*JP 3,019,826*

JP 2,924,430
CA 2,065,803
NO 307200
SG 64870

*JP 3,019,827*

---

[46] Expired March 8, 2005
[47] Expired March 8, 2005
[48] Expired August 19, 2007

EXHIBIT 3 PAGE 89

October 1, 2010                 MPEG-2 Attachment 1                 Page 18 of 40

Multimedia Patent Trust

US 4,958,226[49]
CA 2,024,135[50]
DE 69021500.2[§]
FR 0425089[§]
GB 0425089[§]
JP 3,314,929[51]

US 5,227,878
DE 69233620.6
FR 0542474
GB 0542474
IT 0542474
JP 3,104,942
NL 0542474

US 5,500,678

US 5,563,593

Nippon Telegraph and Telephone Corporation

JP 1,939,084[52]

JP 2,562,499[53]

---

[49] Expired September 26, 2009
[50] Expired August 28, 2010
[§] Expired September 19, 2010
[51] Expired September 27, 2010
[52] Expired August 5, 2005
[53] Expired May 29, 2009

EXHIBIT 3 PAGE 90

Panasonic Corporation*

US Re 35,910[§]
AU 612543-B2[54]
CA 2,016,523-C[§]
CH 0397402[†]
DE 69027710[†]
ES 2091790[†]
FR 0397402[†]
GB 0397402[†]
IT 0397402[†]
JP 1,949,701[55]
JP 2,695,244[56]
KR 63,477[57]
LI 0397402[†]
NL 0397402[†]
SE 0397402[†]


US Re 36,015


US Re 36,507


US Re 39,276
US Re 39,278
US Re 39,280
BE 0541389
DE 69225863.9
FR 0541389
GB 0541389
NL 0541389
SE 0541389

---

\* Name change from Matsushita Electric Industrial Co., Ltd., effective October 1, 2008.
[§]  Expired May 10, 2010
[54] Expired April 30, 2010
[†]  Expired May 3, 2010
[55] Expired June 26, 2009
[56] Expired June 29, 2009
[57] Expired May 11, 2010

EXHIBIT 3 PAGE 91

October 1, 2010                 MPEG-2 Attachment 1                 Page 20 of 40

US 5,223,949

US 5,412,430
FR 0526163
GB 0526163
JP 2,699,703
NL 0526163

US 5,784,107
DE 69330903
FR 599,529
GB 599,529
IT 599,529
JP 2,684,941
NL 599,529

JP 2,524,044

JP 2,794,899[58]

JP 2,828,095[59]

JP 2,882,161

JP 2,899,478

JP 2,938,677

JP 3,186,685
AU 637,289
CA 2,082,280
KR 92,086

JP 3,265,290

JP 3,548,731

---

[58] Expired May 8, 2010
[59] Expired June 29, 2009

EXHIBIT 3 PAGE 92

JP 3,809,117

JP 3,809,119

JP 3,809,120

JP 3,809,121

Robert Bosch GmbH

DE 3769306[†]
FR 0279053[†]
GB 0279053[†]
IT 0279053[†]
NL 0279053[†]

Samsung Electronics Co., Ltd.

US 5,461,421
JP 3,159,853
KR 0166722

US 5,467,086
JP 2,665,127
KR 166716

US 5,654,706
DE 69321781
FR 0580454
GB 0580454
HK 1008711
JP 3,369,422
JP 3,442,028
KR 95,631

---

[†] Expired December 11, 2007

EXHIBIT 3 PAGE 93

US 6,680,975
US 7,609,760
US 7,616,687

US 7,292,657
US 7,684,490
US 7,724,821
US 7,724,822
US 7,724,823
US 7,724,824
US 7,724,828
US 7,724,829
US 7,742,522
US 7,742,527
US 7,764,735

*KR 100,718*

KR 132,895

KR 166,715

Sanyo Electric Co., Ltd.

JP 2,812,446

Scientific-Atlanta, LLC*

*US 5,418,782*
*AU 683134*
*CA 2,180,363*
*JP 2,940,638*
*MX 190,776*

---

\* Name change from Scientific-Atlanta, Inc., effective January 1, 2009.

EXHIBIT 3 PAGE 94

October 1, 2010                    MPEG-2 Attachment 1                    Page 23 of 40

*US 5,420,866*
*AU 687844*
*CA 2,186,368*
*JP 2,940,639*

*US 5,457,701*
*AU 680680*
*CA 2,180,342*
*JP 2,937,301*

<u>Sharp Corporation</u>

JP 2,951,861[60]

<u>Sony Corporation</u>

US Re 37,222[†]
AU 669,983[61]
DE 69031107[†]
DE 69033782[†]
FR 0424026[†]
FR 0713340[†]
GB 0424026[†]
GB 0713340[†]
JP 3,159,310[62]

US 4,864,393[63]
DE 3854171-T2[64]
GB 2205710-B2[65]
KR 141,705

---

[60] Expired March 10, 2009
[†] Expires October 11, 2010
[61] Expires October 12, 2010
[62] Expired October 14, 2009
[63] Expired May 30, 2008
[64] Expired May 19, 2008
[65] Expired December 4, 2007

EXHIBIT 3 PAGE 95

October 1, 2010                MPEG-2 Attachment 1                Page 24 of 40

US 5,191,436
DE 69127224
DE 69132783
FR 0456433
FR 0730376
GB 0456433
GB 0730376
HK 1,014,415
HK 1,023,032
JP 2,874,745[†]
JP 2,877,225[†]
JP 2,969,782[†]
KR 221,889

*US 5,291,486*
*GB 2289194-B2*
*GB 2289195-B2*
*JP 3,009,073*
*SG 97743*

US 5,298,991
DE 69229153
FR 0527011
GB 0527011
HK 1013570

US 5,343,248
JP 2,977,104

US 5,428,396

_____

[†] Expired May 9, 2010

EXHIBIT 3 PAGE 96

October 1, 2010              MPEG-2 Attachment 1              Page 25 of 40

US 5,461,420
AU 672812
CN 1,043,945
CN 1,143,545
JP 3,465,660
JP 3,531,594
KR 297,654

EXHIBIT 3 PAGE 97

US 5,481,553
AT 185663
AT 0903944
AU 673244-B2
BE 0638218
BE 0903944
BF 10108
BJ 10108
BR 9404321-1
CA 2,134,444
CF 10108
CG 10108
CH 0638218
CH 0903944
CI 10108
CM 10108
CN 1,076,935
DE 69421135
DE 69433272
DK 0638218
DK 0903944
EG 20330
ES 2,137,358
ES 0903944
FR 0638218
FR 0903944
GA 10108
GB 0638218
GB 0903944
GN 10108
GR 3,032,133
GR 20040400044
GW 10108
HK 1,013,575
HU 217744
IE 0638218
IE 0903944
IL 108787

EXHIBIT 3 PAGE 98

IN 188,824
IT 0638218
IT 0903944
JP 3,593,988
JP 3,610,578
KR 287490
LI 0638218
LI 0903944
LU 0638218
LU 0903944
MC 0638218
MC 0903944
ML 10108
MR 10108
MX 197,778
MY 110794
NE 10108
NL 0638218
NL 0903944
NZ 261907-B
PL 173287
PT 0638218
PT 0903944
RU 2,119,727
SE 0638218
SE 0903944
SN 10108
TD 10108
TG 10108
TR 28436-B
TW 66605-B

EXHIBIT 3 PAGE 99

US 5,510,840
AT 0573665
DE 69227185
FR 0573665
GB 0573665
IT 0573665
JP 3,331,351
JP 3,449,370
KR 260,475
NL 0573665

US 5,539,466
AT 0598904
AT 209422
AT 224627
AU 662548-B2
CA 2,092,295
DE 69229229
DE 69232357.0
DE 69232784.3
FR 0598904
FR 0898426
FR 0907289
GB 0598904
GB 1047270
GB 1049335
HK 1,032,871
HK 1,033,059
IT 0598904
IT 48140 BE 2002
IT 52345 BE 2002
JP 3,381,167
KR 233,764
KR 272,812

EXHIBIT 3 PAGE 100

US 5,543,847
JP 3,356,413
JP 3,358,835
KR 265,193

US 5,559,557
AU 669209-B2
CN 1,056,716
DE 69328472
ES 2145059
FR 0614592
GB 0614592
HK 1,013,573
IT 50048 BE/2000
JP 3,348,310
JP 3,348,356
KR 289,586
NL 0614592

US 5,663,763
AU 667970
CA 2,108,704
CN 1,054,486
DE 69324993.5
FR 0595562
GB 0595562
IT 0595562
KR 335,707
NL 0595562

EXHIBIT 3 PAGE 101

October 1, 2010                   MPEG-2 Attachment 1                   Page 30 of 40

US 5,666,461
AT 191598
AU 670288
CN 1,053,780
DE 69328277
ES 2145031
FR 0577365
GB 0577365
IT 48907 BE/2000
JP 3,257,052
KR 345,968
MY 109,945
NL 0577365
TW 70,497

US 5,701,164
AT 204691
AU 673,250
BE 0651574
CA 2,118,118
CH 0651574
CN 94190140.8
DE 69428019
DK 0651574
ES 2159553
FR 0651574
GB 0651574
GR 3037281
IE 0651574
IT 50176 BE/2000
KR 308,099
LI 0651574
LU 0651574
MC 0651574
NL 0651574
PT 0651574
SE 0651574

EXHIBIT 3 PAGE 102

US 5,946,042
AU 700,535
JP 3,614,159

US 5,982,437

US 6,040,863
JP 3,614,160

US 6,160,849

JP 2,712,645[66]
CA 2,027,659[67]
KR 233,419[68]

JP 3,257,643

JP 3,496,926

The Trustees of Columbia University in the City of New York

US Re 35,093[69]
CA 2,096,431-C
DE 69129595
DE 69130329
FR 0564597
FR 0630157
GB 0564597
GB 0630157
JP 2,746,749

Thomson Licensing

US 4,800,432[70]

---

[66] Expired October 14, 2009
[67] Expires October 15, 2010
[68] Expires October 19, 2010
[69] Expires December 2, 2010

EXHIBIT 3 PAGE 103

US 4,969,055[71]
AT 46238 E[†]
BE 0197126[†]
CA 1,285,064[72]
CH 0197126[†]
DE 357290[73]
DK 166597[†]
FI 82166[†]
FR 0197126[†]
GB 0197126[†]
HK 42/91[†]
IT 23955 BE 89[†]
LI 0197126[†]
LU 0197126[†]
NL 0197126[†]
NO 169419[†]
SE 0197126[†]
SG 9091016-7[†]

*US 5,289,276*
*CA 2,136,616*
*CN 1051429C*
*FI 112147*
*JP 3,267,620*
*KR 289559*
*MX 181083*
*SG 93764*

---

[70] Expired October 23, 2006
[71] Expired November 5, 2007
[†] Expired October 1, 2005
[72] Expired June 18, 2008
[73] Lapsed effective July 4, 2001

EXHIBIT 3 PAGE 104

October 1, 2010                    MPEG-2 Attachment 1                    Page 33 of 40

*US 5,365,272*
*CA 2,387,254*
*DE 69332916*
*ES 0844792*
*FI 117266*
*FI 117844*
*FR 0844792*
*GB 0844792*
*IT 0844792*
*JP 3,507,766*
*PT 0844792*
*SG 133401*

EXHIBIT 3 PAGE 105

October 1, 2010                    MPEG-2 Attachment 1                    Page 34 of 40

*US 5,381,181*
*BR PI 9401963-0*
*CN 1087559C*
*CN 1236620C*
*CN 1253007C*
*CN 100488255*
*DE 69426711*
*ES 2154275*
*FR 0624982*
*GB 0624982*
*HK 1063403*
*HK 1063404*
*IT 0624982*
*JP 3,645,286*
*JP 4,201,743*
*JP 4,208,089*
*JP 4,358,691*
*JP 4,379,824*
*JP 4,379,826*
*JP 4,492,972*
*JP 4,553,273*
*KR 338222*
*MX 188237*
*MY 111265-A*
*RU 2,117,411*
*SG 73957*
*TR 29198*
*TW NI-083282*

EXHIBIT 3 PAGE 106

October 1, 2010                MPEG-2 Attachment 1                Page 35 of 40

US 5,422,676

AT 140356 E

BE 0608231

CA 2,108,778

CA 2,328,581

CH 0608231

DE 59206755

ES 2090628 T3

FR 0608231

GB 0608231

HK 2088/96

IT 25254 BE 96

JP 3,093,266

KR 333229

LI 0608231

LU 0608231

NL 0608231

SG 50678

US 5,442,400

EXHIBIT 3 PAGE 107

*US 5,459,789*
*BR PI 9501751-8*
*CA 2,145,904*
*CN 1,106,745*
*CN 1,222,168*
*CN 100493168*
*DE 69516752*
*ES 2145173 T3*
*FR 0679030*
*GB 0679030*
*IT 49759 BE 2000*
*JP 3,561,326*
*KR 330267*
*KR 357506*
*MX 186399*
*MY 112768-A*
*PH 1-1995-50216*
*RU 2,154,353*
*SG 30349*
*TH 17310*
*TR 28866*
*TW NI-68881*
*VN 600[74]*


*US 5,483,287*
*CA 2306971*
*CN 1055594*
*DE 69333982*
*ES 1,263,234*
*FR 1,263,234*
*GB 1,263,234*
*IT 1,263,234*
*JP 3,572,067*
*KR 284396*
*PT 1,263,234*
*SG 134972*

---

[74] Expired April 22, 2009

EXHIBIT 3 PAGE 108

October 1, 2010                    MPEG-2 Attachment 1                    Page 37 of 40

*US 5,565,923*
*CN 100515091*
*MX 198312*
*RU 2,198,469*

*US 5,784,110*
*CN 1099808C*
*CN 1196331*
*JP 4,357,594*
*KR 327684*
*MY 118734-A*
*TW NI-070435*

US 7,020,204[75]

*US 7,334,248*
*CA 2,387,154*
*CN 100377594*
*HK 1059522*
*JP 4,122,370*
*JP 4,316,008*
*JP 4,404,271*
*JP 4,420,298*
*JP 4,458,438*
*JP 4,475,475*
*JP 4,475,476*
*JP 4,535,344*
*KR 400800*

DE 3851068[†]
FR 0276985[†]
GB 0276985[†]
HK 821/96[†]
IT 0276985[†]
SG 9690226-7[†]

---

[75] Expired January 29, 2010
[†] Expired January 26, 2008

EXHIBIT 3 PAGE 109

October 1, 2010                    MPEG-2 Attachment 1                    Page 38 of 40

JP 3,040,410[‡]
JP 3,469,232[‡]
KR 135,635

JP 3,258,984[‡]

JP 3,761,525[76]

<u>Toshiba Corporation</u>

US 5,317,397
JP 2,883,585

US 5,424,779
JP 2,755,851

US 5,467,136
JP 2,758,378

US 5,742,344
JP 2,883,592

US 5,986,713

---

[‡] Expired December 30, 2008
[76] Expired December 1, 2008

EXHIBIT 3 PAGE 110

Victor Company of Japan, Limited

US Re 34,965[†]
DE 69024235[‡]
DE 69030819[‡]
FR 0379217-B[‡]
FR 0572046-B[‡]
GB 0379217-B[‡]
GB 0572046-B[‡]
HK 1001182[‡]
HK 1001183[‡]
JP 2,072,546[77]
JP 2,530,217[78]

US Re 35,158[†]
DE 69031045[§]
FR 0584840-B[§]
GB 0584840-B[§]
HK 1000538[§]
JP 2,137,325[79]
NL 0584840-B[§]

US Re 36,822
JP 2,962,012

US 5,103,307

---

[†] Expired January 17, 2010
[‡] Expired January 19, 2010
[77] Expired February 14, 2009
[78] Expired January 20, 2009
[§] Expired April 27, 2010
[79] Expired April 27, 2009

EXHIBIT 3 PAGE 111

October 1, 2010                     MPEG-2 Attachment 1                     Page 40 of 40

US 5,175,618
DE 69123705
DE 69131257
FR 0484140-B
FR 0683615
GB 0484140-B
GB 0683615
HK 1000752
HK 1000794
JP 2,830,881
JP 2,921,755
KR 94554

*JP 2,722,933*

JP 2,808,860[80]

---

[80] Expired August 24, 2010

EXHIBIT 3 PAGE 112

**October 1, 2010**                                                    **Page 1 of 1**

**Addendum of Patents Removed From Attachment 1**

<u>General Instrument</u>

| | | |
|---|---|---|
| DE | P3789273.8 | removed as of October 1, 1999 |
| FR | 0266049 | removed as of October 1, 1999 |
| GB | 0266049 | removed as of October 1, 1999 |
| IT | 0266049 | removed as of October 1, 1999 |

<u>Sony Corporation</u>

| | | |
|---|---|---|
| GB | 2289196 | removed as of October 1, 1999 |
| GB | 2259229 | removed as of October 1, 1999 |

<u>Victor Company of Japan, Limited</u>

| | | |
|---|---|---|
| DE | 69012405 | removed as of October 1, 1999 |
| FR | 0395440-B | removed as of October 1, 1999 |
| GB | 0395440-B | removed as of October 1, 1999 |
| NL | 0395440-B | removed as of October 1, 1999 |

**EXHIBIT 3 PAGE 113**

# Exhibit 4

**MPEG-2 PATENT PORTFOLIO LICENSE**

This Agreement is made this _____ day of _____, 20____ by and between MPEG LA, LLC, a limited liability company of Delaware, having a principal place of business in Greenwood Village, Colorado, U.S.A. (hereinafter "Licensing Administrator"); and _____, having a principal place of business at _____ _____(hereinafter "Licensee").

**WHEREAS,** ISO/IEC JTC 1 and The International Telecommunications Union have jointly adopted an international standard relating to video data compression and data transport, formally known as ISO/IEC 13818-1 and 13818-2, and referred to in this Agreement as the "MPEG-2 Standard" (as more fully defined herein below);

**WHEREAS,** Alcatel Lucent, a corporation of France, having a principal place of business in Paris, France; British Telecommunications plc, a corporation of United Kingdom, having a principal place of business in London, United Kingdom; Canon Inc., a corporation of Japan, having a principal place of business in Tokyo, Japan; CIF Licensing, LLC, a limited liability corporation of Delaware, U.S.A., having a principal place of business in Princeton, New Jersey, U.S.A.; France Télécom, société anonyme, a corporation of France, having a principal place of business in Paris, France; Fujitsu Limited, a corporation of Japan, having a principal place of business in Kawasaki, Japan; GE Technology Development, Inc., a corporation of Delaware, U.S.A., having a principal place of business in Princeton, New Jersey, U.S.A; General Electric Capital Corporation, a corporation of Delaware, U.S.A., having a principal place of business in Fairfield, Connecticut, U.S.A.; General Instrument Corporation, a corporation of Delaware, U.S.A., having a principal place of business in Horsham, Pennsylvania, U.S.A.; Hitachi, Ltd., a corporation of Japan, having a principal place of business in Tokyo, Japan; KDDI Corporation, a corporation of Japan, having a principal place of business in Tokyo, Japan; Koninklijke Philips Electronics N.V. ("PENV"), a corporation of The Netherlands, having a principal place of business in Eindhoven, The Netherlands, and U.S. Philips Corporation ("USPC"), a corporation of Delaware, U.S.A., having a principal place of business in Tarrytown, N.Y., U.S.A (PENV and USPC being hereinafter referred to, individually or collectively, as "Philips"); LG Electronics Inc., a corporation of Korea, having a principal place of business in Seoul, Korea; Mitsubishi Electric Corporation, a corporation of Japan, having a principal place of business in Tokyo, Japan; Nippon Telegraph and Telephone Corporation, a corporation of Japan, having a principal place of business in Tokyo, Japan; Panasonic Corporation, a corporation of Japan, having a principal place of business in Osaka, Japan; Robert Bosch GmbH, a corporation of Germany, having a principal place of business in Stuttgart, Germany; Samsung Electronics Co., Ltd., a corporation of Korea, having a principal place of business in Seoul, Korea; SANYO Electric Co., Ltd., a corporation of Japan, having a principal place of business in Osaka, Japan; Scientific-Atlanta, LLC, a limited liability company of Georgia, U.S.A., having a principal place of business in Lawrenceville, Georgia, U.S.A.; Sharp Corporation, a corporation of Japan, having a principal place of business in Osaka, Japan; Sony Corporation, a corporation of Japan, having a principal place of business in Tokyo, Japan; The Trustees of Columbia University in the City of New York, a not-for-profit corporation of New York, U.S.A., having a principal place of business in New York City, New York, U.S.A.; Thomson Licensing, a corporation of France,

v7/01/09

EXHIBIT 4 PAGE 114

having a principal place of business in Boulogne-Billancourt, France; Toshiba Corporation, a corporation of Japan, having a principal place of business in Tokyo, Japan; and Victor Company of Japan, Limited, a corporation of Japan, having a principal place of business in Yokohama, Japan (hereinafter collectively the "Licensors" or individually "Licensor," as more fully defined in this Agreement), each own and have the right to license, or have the right to sublicense one or more patents, utility models and/or allowed patent or utility model applications published for opposition which claim apparatus and/or methods necessary for compliance with the MPEG-2 Standard (hereinafter referred to as "MPEG-2 Essential Patent(s)");

**WHEREAS,** each Licensor believes that the MPEG-2 Standard represents a significant advance in the field of digital video data compression for transmission and storage, which will make available innovative new products and services to the public, and for this reason desires to encourage widespread adoption of the MPEG-2 Standard by video product and video service industries throughout the world;

**WHEREAS,** each Licensor hereby commits on behalf of itself and its Affiliates to make available licenses and/or sublicenses under any and all MPEG-2 Essential Patents licensable or sublicensable by the Licensor and its Affiliates to any individual, company or other entity desiring such a license and/or sublicense on fair, reasonable and nondiscriminatory terms and conditions;

**WHEREAS,** each Licensor has granted the Licensing Administrator a worldwide, nonexclusive license and/or sublicense under all MPEG-2 Essential Patents licensable or sublicensable by the Licensor to allow the Licensing Administrator to grant worldwide, non-exclusive sublicenses under all such MPEG-2 Essential Patent(s) under the terms hereof;

**WHEREAS,** the Licensors desire to make available through the Licensing Administrator license rights under their and their Affiliates' respective MPEG-2 Essential Patents in a single sublicense for the convenience of any individual, company or other entity desirous of acquiring such rights, thereby avoiding the need of such individual, company or other entity to obtain a separate license from each of the Licensors under its MPEG-2 Essential Patent(s);

**WHEREAS,** the Licensing Administrator desires to grant MPEG-2 Patent Portfolio Licenses to all individuals, companies and other entities desiring such a license under the terms and conditions set forth herein;

**WHEREAS,** nothing in this Agreement precludes the respective Licensors from licensing or sublicensing rights under individual MPEG-2 Essential Patent(s) to make, use, sell, or offer to sell products or processes including but not limited to the rights licensed in the MPEG-2 Patent Portfolio License;

**WHEREAS,** Licensee understands that this MPEG-2 Patent Portfolio License is offered for the convenience of Licensee and that Licensee is free to contact any Licensor to negotiate a license for any Patent offered herein on terms and conditions different from those set forth herein which may be mutually acceptable to such Licensee and Licensor;

**EXHIBIT 4 PAGE 115**

**MPEG-2 PATENT PORTFOLIO LICENSE (cont'd.)**

**WHEREAS,** Licensee desires for its own convenience to obtain rights under the MPEG-2 Essential Patent(s) of all the Licensors in a single sublicense from the Licensing Administrator under the terms hereof which terms shall be deemed fair and reasonable for a portfolio license given, among other things, its efficiencies; and

**WHEREAS,** each Licensor has elected, in its sole discretion, to offer its and its Affiliates' MPEG-2 Essential Patents to be sublicensed by the Licensing Administrator in this MPEG-2 Patent Portfolio License under the terms specified herein as an alternative to negotiating individual licenses under whatever Patent(s) Licensee desires.

**NOW, THEREFORE,** the Licensing Administrator AND Licensee AGREE AS FOLLOWS:

**0.      EFFECTIVE DATE**

> **0.1**      This License Agreement shall be deemed effective as of June 1, 1994.

**1.      DEFINITIONS**

The definitions set forth in this Article shall apply to the following terms when used with initial capital letters in this Agreement, its attachments, and amendments hereto.

> **1.1.**      **Affiliate** – shall mean a legal entity which now or hereinafter directly or indirectly controls, is controlled by, or is under common control with a party. For purposes of Section 1.1, control shall mean direct or beneficial ownership of more than 50% of the outstanding shares representing the right to vote for directors or other managing officers of such legal entity, or the power to directly or indirectly instruct, appoint, or remove the party or parties who have the right to make decisions for such entity.

> **1.2.**      **Agreement** – shall mean this sublicense between the Licensing Administrator and Licensee, including exhibits, attachments, amendments and modifications hereto.

> **1.3.**      **Confidential Information** – shall mean any information given to the Licensing Administrator pursuant to Article 5 of this Agreement which is designated "confidential" by Licensee.

> **1.4.**      **Consumer Product** – shall mean a single, self-contained MPEG-2 Royalty Product Sold to an End User which has both MPEG-2 encoding and decoding capabilities primarily for personal, family, or household use, including without limitation a DVD player/recorder, a Blu-ray Disc player/recorder, a digital camcorder, a digital video recorder or personal video recorder, encoder/decoder software, and a personal computer having a manufacturer's suggested retail price of less than U.S. $15,000 or the equivalent in the currency of another country. For purposes of this Agreement, an MPEG-2 Packaged Medium shall not be considered a Consumer Product.

**EXHIBIT 4 PAGE 116**

**MPEG-2 PATENT PORTFOLIO LICENSE (cont'd.)**

1.5.   **Days** – shall mean calendar days unless otherwise specifically stated in this Agreement.

1.6.   **End User** – shall mean any person or entity which orders, sends, purchases, retrieves, receives or is specifically sent an MPEG-2 Royalty Product only for the End User's personal or commercial use, whether alone or in combination with any other product and not for re-Sale.

1.7.   **Licensors (individually Licensor)** – shall mean Alcatel Lucent; British Telecommunications plc; Canon Inc.; CIF Licensing, LLC; France Télécom, société anonyme; Fujitsu Limited; GE Technology Development, Inc.; General Instrument Corporation; Hitachi Ltd.; KDDI Corporation; Philips; LG Electronics Inc.; Mitsubishi Electric Corporation; Nippon Telegraph and Telephone Corporation; Panasonic Corporation; Robert Bosch GmbH; Samsung Electronics Co., Ltd.; SANYO Electric Co., Ltd.; Scientific-Atlanta, LLC; Sharp Corporation; Sony Corporation; The Trustees of Columbia University in the City of New York; Thomson Licensing; Toshiba Corporation; and Victor Company of Japan, Limited subject to additions and deletions from time to time, identified in Attachment 1 hereto.

1.8.   **Manufacture (Manufactured)** – shall mean fabrication, assembly, or otherwise making of substantially the entire finished MPEG-2 Royalty Product in the form in which it is Sold to an End User.

1.9.   **Movie** – shall mean a single motion picture as well as related video materials typically packaged with the motion picture including, without limitation, previews of other motion pictures, information about the making of the motion picture or the artists appearing therein.  Movie shall not include a second motion picture regardless of whether such second motion picture is related to the first.

1.10.   **MPEG-1 Standard** – shall mean the MPEG-1 video standard as defined in ISO document IS 11172.

1.11.   **MPEG-2 Decoding Product** – shall mean any instrumentality or combination of instrumentalities, including by way of example and without limitation: a DVD player or Blu-ray Disc player; decoding software; a digital television receiver; cable broadcast, terrestrial broadcast, satellite broadcast or IPTV television "set top box" or receiving equipment; a computer, a computer accelerator card or a computer tuner card; a digital camcorder; video telecommunications equipment; video packaged media playback equipment; and video game equipment; which is capable of or primarily designed in whole or in part for decoding video information in accordance with the MPEG-2 Standard, and which is Sold to an End User.

1.12.   **MPEG-2 Encoding Product** – shall mean any instrumentality or combination of instrumentalities, including by way of example and without limitation: encoding

EXHIBIT 4 PAGE 117

**MPEG-2 PATENT PORTFOLIO LICENSE (cont'd.)**

software, an encoder, a DVD recorder, a Blu-ray Disc recorder, a digital video recorder or personal video recorder television signal transmitting equipment, a computer card, a digital camcorder, video telecommunications equipment and consumer video recording equipment, which is capable of or primarily designed in whole or in part for encoding video information into a format in compliance with the MPEG-2 Standard, and which is Sold to an End User.

1.13.  **MPEG-2 Essential Patent** – shall mean a Patent which is necessarily infringed in connection with the use or implementation of the MPEG-2 Standard under the laws of the country which issued or published the Patent.

1.14.  **MPEG-2 Packaged Medium (Media)** – shall mean any storage medium, including by way of example and without limitation magnetic tape, magnetic disc and optical disc, storing one or more MPEG-2 Video Events.

1.15.  **MPEG-2 Patent Portfolio** – shall mean the portfolio of MPEG-2 Essential Patent(s) identified in Attachment 1 hereto, which portfolio may be supplemented or reduced from time to time in accordance with the provisions of this Agreement.

1.16.  **MPEG-2 Patent Portfolio Patent** – shall mean an MPEG-2 Essential Patent under which a Licensor has the right to grant a license or sublicense to a third party with the right of such third party to grant sublicenses, and which is included in the MPEG-2 Patent Portfolio.

1.17.  **MPEG-2 Related Patent** – shall mean any Patent which is not an MPEG-2 Essential Patent but which has one or more claims directed to an apparatus or a method that may be used in the implementation of a product or a service designed in whole or in part to exploit the MPEG-2 Standard under the laws of the country which issued or published the Patent.

1.18.  **MPEG-2 Royalty Product** – shall mean a hardware and/or software product which may be licensed under Article 2.

1.19.  **MPEG-2 Standard** – shall mean the MPEG-2 video standard as defined in ISO documents IS 13818-1 (including annexes C, D, F, J and K), IS 13818-2 (including annexes A, B, C and D, but excluding scalable extensions), and IS 13818-4 (only as it is needed to clarify IS 13818-2). The definition of MPEG-2 Standard shall be considered amended for all purposes upon the posting of a new definition to the website of the Licensing Administrator, www.mpegla.com ("Amended Definition"); provided, however, that no Amended Definition shall reduce the scope of any definition of the MPEG-2 Standard immediately prior to the posting of the Amended Definition. The Notice Provisions of this Agreement shall not apply to any Amended Definition.

1.20.  **MPEG-2 Video Event** – shall mean video information having a normal playing time of any length up to and including 133 minutes encoded into a format in

v7/01/09                                        5

EXHIBIT 4 PAGE 118

**MPEG-2 PATENT PORTFOLIO LICENSE (cont'd.)**

compliance with the MPEG-2 Standard that comprises video programming, including by way of example and without limitation, one or more Movies, television shows, video games, video advertisements, music videos and short subject video clips, or any compilation of any of the foregoing.

1.21. **Patent(s)** – shall mean any issued patent (including reexaminations, reissues, continuations, divisions and continuations-in-part), enforceable invention certificates, or issued utility model of any country, or any enforceable allowed patent application or enforceable allowed utility model application, published for opposition in any country.

1.22. **Sale (Sold)** – shall mean any sale, rental, lease, license or other form of distribution by Licensee of an MPEG-2 Royalty Product, either directly or through a chain of distribution, to an End User. A Sale shall be deemed to take place in the country in which title to the MPEG-2 Royalty Product passes to End User from Licensee or, at the election of the Licensing Administrator, in the country in which the MPEG-2 Royalty Product is received by the End User, except that if there is no MPEG-2 Essential Patent in such country, then a Sale shall be deemed to take place in the country in which the MPEG-2 Royalty Product is used.

2. **LICENSING ADMINISTRATOR GRANT**

2.1. **MPEG-2 Decoding Products.** Upon the Licensee's payment of applicable royalties due under Article 3 and subject to other terms and conditions of this Agreement, the Licensing Administrator hereby grants to Licensee a royalty-bearing worldwide, nonexclusive, nontransferable sublicense under all MPEG-2 Patent Portfolio Patents to make, have made, use, and Sell or offer for Sale MPEG-2 Decoding Products (i) that bear the brand name that Licensee owns or otherwise has the right to use at Licensee's discretion or (ii) Sold without a brand-name if the decision to do so is at the discretion of Licensee. NO LICENSE IS GRANTED UNDER THIS SECTION 2.1 UNLESS AND UNTIL ROYALTIES APPLICABLE UNDER ARTICLE 3 OF THIS AGREEMENT ARE PAID BY LICENSEE.

2.2. **MPEG-2 Encoding Products.** Upon the Licensee's payment of applicable royalties due under Article 3 and upon compliance with Paragraph 7.16.1 hereof and subject to other terms and conditions of this Agreement, the Licensing Administrator hereby grants to Licensee a royalty-bearing worldwide, nonexclusive, nontransferable sublicense under all MPEG-2 Patent Portfolio Patents to make, have made, use for purposes other than encoding an MPEG-2 Video Event for recording on an MPEG-2 Packaged Medium, and Sell or offer for Sale MPEG-2 Encoding Products (i) that bear the brand name that Licensee owns or otherwise has the right to use at Licensee's discretion or (ii) Sold without a brand-name if the decision to do so is at the discretion of Licensee. NO LICENSE IS GRANTED UNDER THIS SECTION 2.2 UNLESS AND UNTIL

**EXHIBIT 4 PAGE 119**

**MPEG-2 PATENT PORTFOLIO LICENSE (cont'd.)**

ROYALTIES APPLICABLE UNDER ARTICLE 3 OF THIS AGREEMENT ARE PAID BY LICENSEE AND, NOTWITHSTANDING ANY SUCH PAYMENT, NO LICENSE IS GRANTED HEREIN, BY IMPLICATION OR OTHERWISE, TO CUSTOMERS OF LICENSEE TO USE MPEG-2 ENCODING PRODUCTS, FOR ENCODING OR HAVING ENCODED ONE OR MORE MPEG-2 VIDEO EVENTS FOR RECORDING ON AN MPEG-2 PACKAGED MEDIUM FOR ANY USE OR DISTRIBUTION OTHER THAN PERSONAL USE OF LICENSEE'S CUSTOMER.

2.3.    **MPEG-2 Packaged Medium.** Upon the Licensee's payment of applicable royalties due under Article 3 and subject to other terms and conditions of this Agreement, the Licensing Administrator hereby grants to Licensee a royalty-bearing worldwide, nonexclusive, nontransferable sublicense under all MPEG-2 Patent Portfolio Patents to use MPEG-2 Encoding Products as limited below, for encoding or having encoded one or more MPEG-2 Video Event(s) for recording on an MPEG-2 Packaged Medium, and to Sell or offer for Sale MPEG-2 Packaged Medium. NO LICENSE IS GRANTED UNDER THIS SECTION 2.3 UNLESS AND UNTIL ROYALTIES APPLICABLE UNDER ARTICLE 3 OF THIS AGREEMENT ARE PAID BY LICENSEE.

2.4.    **No License or Immunity Unless Expressly Granted.** No license or immunity is granted by either party hereto to the other party hereto, either directly or by implication, estoppel or otherwise, other than as expressly provided in Sections 2.1 through 2.3, 2.6, 7.3 and 7.4.

2.5.    **Sublicenses**. Except as provided in Section 2.6, the sublicenses granted in Sections 2.1 through 2.3 do not include the right of the Licensee to grant any further sublicenses.

2.6.    **Extension of Sublicense to Affiliates.**   The sublicenses granted herein by the Licensing Administrator shall include the right of Licensee to grant further sublicenses to its Affiliates, subject to the condition that any and all Affiliates of Licensee receiving such further sublicenses be identified in an attachment to this sublicense entitled "Licensed Affiliates."   Each sublicensed Affiliate shall be bound by the terms and conditions of this sublicense as if it were named herein in the place of the Licensee; provided, however that Licensee shall pay and account to the Licensing Administrator for royalties hereunder payable as a result of the activities of any and all sublicensed Affiliates.   Any sublicense granted to an Affiliate shall terminate automatically and without notice on the date such Affiliate ceases to be an Affiliate.

2.6.1.   **Notice to Licensing Administrator of Sublicense Termination.**  In the event that a sublicense to an Affiliate of Licensee is terminated either as a result of the Affiliate ceasing to be an Affiliate, or as a result of a termination of the sublicense of the Affiliate by Licensee, Licensee shall notify the Licensing Administrator of the termination within ten (10) Days

**EXHIBIT 4 PAGE 120**

**MPEG-2 PATENT PORTFOLIO LICENSE (cont'd.)**

of such termination, and the attachment entitled "Licensed Affiliates" shall be modified to reflect such termination of an Affiliate.

**2.6.2. Notice to Licensing Administrator of New Sublicense.** In the event that Licensee grants a new further sublicense to either a new Affiliate or an existing Affiliate not previously sublicensed, such new further sublicense shall be effective immediately upon the grant thereof; provided that Licensee notifies the Licensing Administrator within ten (10) Days of the grant of such new further sublicense, and the attachment entitled "Licensed Affiliates" is modified to include the new sublicensed Affiliate.

**2.7. Scope of License Grant.** NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, ALL LICENSES GRANTED UNDER THIS AGREEMENT ARE LIMITED TO A FIELD OF USE TO COMPLY WITH THE MPEG-2 STANDARD. NO OTHER LICENSES FOR ANY OTHER PURPOSE OR USE ARE GRANTED HEREIN NOR ARE ANY LICENSES GRANTED TO ANY PORTION OR SEGMENT OF ANY PRODUCT EXCEPT THOSE PORTIONS OR SEGMENTS OF SUCH PRODUCTS THAT COMPLY WITH THE MPEG-2 STANDARD. THE LICENSES GRANTED UNDER THIS AGREEMENT FOR MPEG-2 ESSENTIAL PATENTS DO NOT EXTEND TO STRUCTURES, FEATURES, FUNCTIONS, OR PROCESSES NOT USED TO PRACTICE THE MPEG-2 STANDARD. IN PARTICULAR, AND WITHOUT LIMITATION, THERE IS NO LICENSE GRANTED UNDER THIS AGREEMENT FOR ANY VIDEO ENCODER OR DECODER FOR OTHER VIDEO COMPRESSION STANDARDS (E.G., AVC, VC-1). FURTHER, IT IS UNDERSTOOD AND AGREED THAT ANY LICENSE GRANTED HEREIN SHALL NOT INCLUDE ANY RIGHT TO MAKE, HAVE MADE, USE, OR SELL ANY PRODUCT OR PROCESS CAPABLE OF COMPLYING SOLELY WITH THE MPEG-1 STANDARD AND NO OTHER PORTION OF THE MPEG-2 STANDARD.

**3. ROYALTY AND PAYMENTS**

**3.1. Royalty.** Licensee shall pay to the Licensing Administrator a running royalty throughout the term of this Agreement on all MPEG-2 Royalty Products licensable by this Agreement that are Sold by Licensee or as otherwise required by this Agreement as follows:

**3.1.1. MPEG-2 Decoding Product.** The royalty for the sublicense granted pursuant to Section 2.1 shall be four United States Dollars (U.S. $4.00) for MPEG-2 Decoding Products Sold prior to January 1, 2002, and two and one half United States Dollars (U.S. $2.50) for MPEG-2 Decoding Products Sold between January 1, 2002 and December 31, 2009 or the execution date of this Agreement (whichever is later), and two United States Dollars ($2.00) for MPEG-2 Decoding Products Sold thereafter

**EXHIBIT 4 PAGE 121**

**MPEG-2 PATENT PORTFOLIO LICENSE (cont'd.)**

upon the Sale of each such product Manufactured or Sold in a country in which one or more MPEG-2 Patent Portfolio Patent(s) is in force.

**3.1.2.  MPEG-2 Encoding Product.**  The royalty for the sublicense granted pursuant to Section 2.2 shall be four United States Dollars (U.S. $4.00) for MPEG-2 Encoding Products Sold prior to January 1, 2002, and two and one half United States Dollars (U.S. $2.50) for MPEG-2 Encoding Products Sold between January 1, 2002 and December 31, 2009 or the execution date of this Agreement (whichever is later), and two United States Dollars ($2.00) for MPEG-2 Encoding Products Sold thereafter upon the Sale of each such product Manufactured or Sold in a country in which one or more MPEG-2 Patent Portfolio Patent(s) is in force.

**3.1.3.  Consumer Product.**  The royalty for the sublicenses granted pursuant to Sections 2.1 and 2.2 for a Consumer Product shall be six United States Dollars (U.S. $6.00) for Sales of such products prior to January 1, 2002, and two and one half United States Dollars (U.S. $2.50) for Sales of such products between January 1, 2002 and December 31, 2009 or the execution date of this Agreement (whichever is later), and two United States Dollars ($2.00) for Sales of such products thereafter upon the Sale of each such product Manufactured or Sold as a Consumer Product in a country where one or more MPEG-2 Patent Portfolio Patent(s) is in force.

**3.1.4.  MPEG-2 Packaged Medium.**  Subject to Sections 3.1.5 through 3.1.7, the royalty for the sublicense granted pursuant to Section 2.3 for each copy of MPEG-2 Packaged Medium (Manufactured or Sold in a country in which one or more MPEG-2 Patent Portfolio Patent(s) is in force) containing one or more MPEG-2 Video Event(s) encoded using an MPEG-2 Encoding Product shall be as follows:

**3.1.4.1.**  For the period prior to September 1, 2001, four United States Cents (U.S. $0.04) for the first MPEG-2 Video Event on any MPEG-2 Packaged Medium;

**3.1.4.2.**  For the period from September 1, 2001 through February 28, 2003, three and one half United States Cents (U.S. $0.035) for the first MPEG-2 Video Event on any MPEG-2 Packaged Medium;

**3.1.4.3.**  For the period from March 1, 2003 through December 31, 2009 or the execution date of this Agreement (whichever is later), three United States Cents (U.S. $0.03) for the first MPEG-2 Video Event on any MPEG-2 Packaged Medium; but for Licensees that executed the MPEG-2 Packaged Medium Amendment, the royalty rates as provided in the MPEG-2 Packaged Medium Amendment apply from January 1, 2007

**EXHIBIT 4 PAGE 122**

**MPEG-2 PATENT PORTFOLIO LICENSE (cont'd.)**

through December 31, 2009 or the execution date of this Agreement (whichever is later);

**3.1.4.4.**  For Licensees that execute this Agreement before January 1, 2011, the applicable royalty rates from January 1, 2010 or the execution date of the Agreement (whichever is later) to December 31, 2010, one and seventy six one hundredths United States Cents (U.S. $0.0176) for the first MPEG-2 Video Event on any MPEG-2 Packaged Medium;

**3.1.4.5.**  The applicable royalty rates from January 1, 2011 or the execution date of this Agreement (whichever is later) through the term of the Agreement, one and six tenths United States Cents (U.S. $0.016) for the first MPEG-2 Video Event on any MPEG-2 Packaged Medium; and

**3.1.4.6.**  Notwithstanding the above, for the term of this Agreement, the applicable royalty rate for each MPEG-2 Packaged Medium having a normal playing time up to and including twelve (12) minutes, but not more than twelve (12) minutes of video programming, shall be one United States Cent (U.S. $0.01).

**3.1.5.**  **MPEG-2 Video Event Additive Royalty.**  From the Effective Day of the Agreement through its term, the royalty rate for each MPEG-2 Packaged Medium containing an MPEG-2 Video Event shall be the applicable royalty rate set forth in the relevant subsection of Section 3.1.4, plus one United States Cent (U.S. $0.01) for each additional thirty (30) minutes of video playing time or portion thereof on the same MPEG-2 Packaged Medium.

**3.1.6.**  **Movie Royalty Exception.**  The applicable royalty rate for a Movie shall not exceed the MPEG-2 Video Event royalty rate pursuant to the applicable subsection of Section 3.1.4 for each copy of such Movie, and for the second Movie contained on the same MPEG-2 Packaged Medium as such Movie, the royalty rate shall not exceed an additional two United States Cents (U.S. $0.02).

**3.1.7.**  **Alternative Computation Option.**  From September 1, 2005 forward, Licensee may elect a simplified option for reporting and paying for all its MPEG-2 Packaged Medium royalties under which Licensee pays the MPEG-2 Video Event royalty rate pursuant to the applicable subsection of Section 3.1.4 for each and every MPEG-2 Packaged Medium regardless of its specific content or playing time (except where the playing time is 12 minutes or less in which case the royalty would continue to be $0.01).

**EXHIBIT 4 PAGE 123**

**MPEG-2 PATENT PORTFOLIO LICENSE (cont'd.)**

3.1.8. **Royalties Are Additive**.  Subject to Section 3.1.3, the royalties set forth in this Section 3.1 are additive as to each MPEG-2 Royalty Product to the extent that individual royalties are applicable.

3.1.9. **Election of Remedies.**  Licensee understands that no product is licensed under this Agreement unless applicable royalties under Article 3 have been paid by Licensee for such product and that this Agreement requires Licensee to pay applicable royalties for all MPEG-2 Royalty Products licensable under this Agreement that are Sold by Licensee and as otherwise provided herein.  In the event that Licensee breaches its obligations to pay royalties under Article 3 for licensable MPEG-2 Royalty Products Sold by Licensee, the Licensing Administrator may elect to sue for breach of contract or the Licensors may elect to sue for infringement of applicable patents.  Licensee will not object to either choice of remedy.

3.2. **The Payment of Royalties**.  Royalties pursuant to this Article 3 for each MPEG-2 Decoding Product(s), MPEG-2 Encoding Product(s), or any Consumer Product (for purposes of this Section 3.2 "Product(s)") are payable upon the Sale of:

3.2.1. Products which allow the End User to decode and/or encode (consistent with the limitations set forth in Section 2.3) MPEG-2 compliant bit streams; provided, however, that no royalty shall be payable upon the Sale or distribution of Product(s) incorporated in a single self-contained device with an MPEG-2 Royalty Product with which such Product(s) cannot be used simultaneously and on which all royalties have been paid to the Licensing Administrator pursuant to Article 3.

3.2.2. Products in which the MPEG-2 functionality of the Product is encrypted, disabled or otherwise unusable only:

3.2.2.1. Upon the distribution of a key or other instrumentality allowing the Product to be used to decode and/or encode MPEG-2 compliant bit streams; or

3.2.2.2. If the encryption, disablement or other method employed to prevent use is generally breached; or

3.2.2.3. If Licensee fails to take reasonable steps to insure that the MPEG-2 functionality is encrypted, disabled or otherwise unusable, royalties for all such Products Sold shall become payable pursuant to Article 3.

3.2.3. MPEG-2 Decoding Product updates and/or MPEG-2 Encoding Product updates; provided, however, that no royalty shall be due if such update (i) is Sold or distributed for use in connection with an MPEG-2 Royalty

**EXHIBIT 4 PAGE 124**

**MPEG-2 PATENT PORTFOLIO LICENSE (cont'd.)**

Product upon which a royalty has been paid to the Licensing Administrator in accordance with Article 3, and (ii) the update which is Sold or distributed overwrites or otherwise renders not usable the pre-existing MPEG-2 capability on the MPEG-2 Royalty Product which is upgraded.

3.3.   **Payment Schedule.**

3.3.1.   Except as provided in Section 3.4, royalties payable pursuant to Section 3.1 that accrue after the latest signature date of this Agreement shall be paid by Licensee to the Licensing Administrator semiannually either: (i) as previously agreed between Licensee and the Licensing Administrator in connection with a prior MPEG-2 Patent Portfolio License, or if there was no such agreement, (ii) as measured from the date of the Licensing Administrator's signature on this Agreement to the last business day of each six month period thereafter with the royalty payment to be made within two calendar months of such last business day. Such payment shall be preceded by a statement pursuant to Section 3.9, which statement shall be deemed to be true and correct unless shown otherwise in an audit in accordance with Section 3.10.

3.3.2.   **Back Royalties.** Any royalties pursuant to the above schedule which accrued during the period from June 1, 1994 to the latest signature date specified above shall be payable within thirty (30) Days of such signature date, together with accrued interest of 10% per annum and shall be preceded by a royalty statement in accordance with Section 3.9.

3.4.   **Payments Upon Termination or Expiration.** Within thirty (30) Days after the effective date of termination or expiration of this Agreement, Licensee shall pay the Licensing Administrator (i) any and all amounts that are due pursuant to this Agreement as of the effective date of such termination or expiration, preceded by a royalty statement for such payment in accordance with Section 3.9, and (ii) all amounts at the applicable royalties specified in Section 3.1 for all MPEG-2 Royalty Products in the possession of the Licensee as if such MPEG-2 Royalty Product had been Sold as of the effective date of such termination or expiration.

3.5.   **Form of Payment.** Any payment made under the provisions of this Agreement shall be made by wire transfer or by other means of payment acceptable to the Licensing Administrator.

3.5.1.   The amounts payable hereunder shall be paid to the Licensing Administrator by the Licensee in United States Dollars.

3.6.   **Taxes.** In addition to the royalties set forth in Section 3.1, Licensee shall pay or reimburse the Licensing Administrator for any and all taxes, such as sales, excise, value added, use taxes, consumption taxes, and similar taxes of the Licensee,

v7/01/09                                      12

**EXHIBIT 4 PAGE 125**

**MPEG-2 PATENT PORTFOLIO LICENSE (cont'd.)**

based on payments to be made hereunder in a jurisdiction(s) where such taxes are required.  The royalties set forth in Section 3.1 shall be subject to withholding of any taxes of the Licensor required by applicable law.  Withholding taxes, although withheld from royalty payments and remitted to the tax authority as required by law, are deemed paid by Licensors because the Licensors are the beneficial owners of all royalties.

3.6.1.  At the Licensing Administrator's request, the Licensee shall file any necessary tax forms required or desirable in order to apply for the application of rates under tax treaties. Nothing in this Section 3.6.1 shall require Licensee to take any action inconsistent with any applicable law or government regulation.

3.6.2.  The Licensee shall not be required to pay or reimburse the Licensing Administrator for taxes based upon the net worth, capital, net income, or franchise of the Licensing Administrator, nor for taxes imposed upon the Licensing Administrator solely by reason of the Licensing Administrator's doing business in or being incorporated in the jurisdiction imposing such taxes.

3.6.3.  The Licensee shall reasonably cooperate with the Licensing Administrator in respect to mitigation of any withholding taxes, including providing such information as may be required by the Licensing Administrator for purposes of obtaining refunds of any taxes withheld.

3.6.4.  The Licensing Administrator shall reasonably cooperate and provide such information as may be required by the Licensee for any purpose or reason relating to taxation.

3.6.5.  If the Licensee in good faith contests any tax that is payable or reimbursable by the Licensee, the Licensing Administrator shall reasonably cooperate in such contest at the Licensee's expense.

3.6.6.  The Licensing Administrator shall pass on to the Licensee any tax refunds received by the Licensing Administrator with respect to the Licensee's previous payment or reimbursement of applicable taxes, if any.

3.7.  **Late Payments.**  Any payment required hereunder that is received by the Licensing Administrator after the date it is due pursuant to the terms of Article 3 (including unpaid portions of amounts due) shall bear interest, compounded monthly, at the lesser of 10% per annum or the highest interest rate permitted to be charged by the Licensing Administrator under applicable law.

3.7.1.  Any interest charged or paid in excess of the maximum rate permitted by applicable law shall be deemed the result of a mistake and interest paid in

**EXHIBIT 4 PAGE 126**

**MPEG-2 PATENT PORTFOLIO LICENSE (cont'd.)**

excess of the maximum rate shall be promptly credited or refunded (at Licensee's option) to Licensee.

**3.7.2. When Payments are Deemed Made.** No payment shall be deemed made under this Agreement until the funds in the appropriate amount and as specified in this Agreement are actually received by the Licensing Administrator.

**3.8. Dishonored Checks.** If a payment due under this Agreement is permitted to be paid by check by the Licensing Administrator and the Licensee's check is dishonored, the payment may at the Licensing Administrator's option be deemed not to have been made. The Licensing Administrator may at its option, by written notice to Licensee, require subsequent payments to be made by wire transfer or cashier's check in immediately available funds.

**3.9. Statements.** Licensee shall provide the Licensing Administrator with a statement for each period as defined in Sections 3.3.1, 3.3.2 and 3.4. Such statement shall be provided in electronic form to the Licensing Administrator at least thirty (30) Days before a royalty payment, if any, associated with such statement is due. For the convenience of Licensee, the Licensing Administrator may, in its sole discretion, agree to other forms or reports.

**3.9.1.** A statement shall show in reasonable detail and separately identify for each MPEG-2 Royalty Product both the quantity and country of Manufacture and the quantity and country of Sale of any and all MPEG-2 Royalty Products Sold by Licensee and its Affiliates during such reporting period, and a calculation of the royalties, if any, which are payable by virtue of such Manufacture and Sale of MPEG-2 Royalty Products during the period when the payment, if any, accrued.

**3.9.2.** All such statements shall be certified by an employee of Licensee authorized to make such certification.

**3.9.3.** The Licensing Administrator shall maintain all information in such statements of Licensee as Confidential Information in accordance with Article 5 of this Agreement, except to the extent that the information is needed by the Licensing Administrator to either (i) enforce any rights under this Agreement, or (ii) report to the Licensors the aggregate royalties paid by all sublicensees of the Licensing Administrator. In no event shall the Licensing Administrator provide to any of the Licensors information on royalties paid on a licensee-by-licensee basis unless required by law, court order, or rule or regulation.

**EXHIBIT 4 PAGE 127**

**MPEG-2 PATENT PORTFOLIO LICENSE (cont'd.)**

3.10. **Audits.**

3.10.1. **Books and Records.** Licensee shall keep and maintain accurate and detailed books and records adequate for the Licensing Administrator to ascertain the royalties payable hereunder. Books and records pertaining to a particular royalty reporting period shall be maintained for at least three (3) years from the date on which a royalty is paid or becomes due in respect of such period.

3.10.2. **Audit Rights.** The Licensing Administrator shall have the right to audit or have audited the books and records of Licensee relating to payments made or due hereunder for any and all period(s) of MPEG-2 Patent Portfolio coverage from the Effective Date for the sole purpose of verifying the amounts due and payable hereunder, not more than once per calendar year (unless audit reveals a shortfall as provided in this Section in which case there shall be no such limitation) upon reasonable notice to the Licensee. If reasonably practicable, all such audits shall be conducted during reasonable business hours of the Licensee.

3.10.2.1. Any such audit shall be performed by an independent certified public accountant(s), consultant(s), or equivalent ("Auditor") authorized to practice in the country where the audit is to take place. Licensee shall fully cooperate with Auditor in conducting such audit and shall permit Auditor to inspect and copy such portions of the Licensee's books and records that the Auditor deems appropriate and necessary in accordance with the professional standards applicable to the Auditor in the country where the Audit is to take place ("Necessary Records"). It shall be a material breach of this Agreement for the Licensee to fail to provide to Auditor such Necessary Records.

3.10.2.2. The Licensing Administrator shall have the Auditor (and each member or employee thereof participating in the audit) agree not to disclose any information learned by the Auditor in the audit to any Licensor, nor use any such information, except (i) for providing the Licensing Administrator with a statement of payments due by Licensee in sufficient detail consistent with Section 3.9; or (ii) in connection with the Licensing Administrator's enforcement of rights under this Agreement. Such agreement shall constitute the complete nondisclosure obligation of the Auditor.

3.10.2.3. The cost of an audit in accordance with Section 3.10.2 shall be at the expense of the Licensing Administrator; provided, however, the Licensee shall pay the full cost of the audit if the

EXHIBIT 4 PAGE 128

MPEG-2 PATENT PORTFOLIO LICENSE (cont'd.)

audit reveals any underpayment which in the aggregate is greater than five percent (5%) of the amount actually due for the period being audited.  Any payments due by the Licensee under Section 3.10 shall be due within thirty (30) days of notice from Licensing Administrator.

3.10.2.4.   Within thirty (30) Days after receiving notice from the Licensing Administrator of any shortfalls uncovered, Licensee shall pay (i) any shortfalls plus interest as set forth in Section 3.7, as measured from the date when such shortfall should have been paid and (ii) the cost of the audit if required under Section 3.10.2.3.

## 4.   REPRESENTATIONS AND WARRANTIES

4.1.   The Licensing Administrator represents and warrants that it has the authority, power and right to grant the rights and licenses to Licensee under this Agreement.

4.2.   The Licensing Administrator makes no representation or warranty that the MPEG-2 Patent Portfolio Patent(s) sublicensed hereunder includes all MPEG-2 Essential Patent(s) throughout the world, or that the making, using or selling of products, or providing services covered by the claims of the MPEG-2 Patent Portfolio Patent(s) licensed hereunder will not infringe, directly, contributorily, by inducement or otherwise, any patent or other intellectual property right of a person or entity other than the MPEG-2 Patent Portfolio Patents of the Licensors.

4.3.   The Licensing Administrator makes no representation or warranty about the infringement (direct, contributory, by inducement or otherwise) of any Patent by any MPEG-2 Royalty Product(s) licensed under this Agreement.

4.4.   Licensee represents and warrants that (a) Licensee is entering into this Agreement for its own convenience in acquiring patent rights necessary for compliance with the MPEG-2 Standard from multiple licensors in a single transaction rather than electing its option to negotiate separate license agreements with individual Licensors, (b) Licensee is fully aware that the patents in the MPEG-2 Patent Portfolio may not include all present and future MPEG-2 Essential Patent(s), and that this Agreement may not provide Licensee with all the patent rights or other rights needed to perform the activities contemplated by Licensee in entering into this Agreement; and (c) Licensee understands that the terms of this Agreement require the payment of the same specified royalty regardless of whether one or more MPEG-2 Patent Portfolio Patents are infringed. The Licensing Administrator and Licensee recognize that Licensee has the right to separately negotiate a license with any or all of the Licensors under any and all of the MPEG-2 Patent Portfolio Patents under terms and conditions to be independently negotiated by each Licensor, and that this Agreement has been entered into freely and at the option of the Licensee.

EXHIBIT 4 PAGE 129

**MPEG-2 PATENT PORTFOLIO LICENSE (cont'd.)**

4.5.    Licensee represents and warrants that it has not granted an exclusive license under an MPEG-2 Essential Patent owned by Licensee and has not assigned an MPEG-2 Essential Patent in anticipation of entering into this Agreement.  Notwithstanding anything to the contrary in this Agreement, Licensors reserve the right to grant to Licensing Administrator an exclusive license under any MPEG-2 Patent Portfolio Patent with respect to any particular party.

4.6.    Licensee represents that it understands it is not required by this Agreement to use all MPEG-2 Patent Portfolio Patents licensed herein, and that the respective royalty rates specified in this Agreement represent the value to Licensee of making, selling and/or offering for Sale an MPEG-2 Royalty Product that is licensed under this Agreement and not the value of using any particular MPEG-2 Patent Portfolio Patent or package of MPEG-2 Patent Portfolio Patents.  Licensee further represents that in using the MPEG-2 Standard in any product it is using one or more MPEG-2 Essential Patent(s).

4.7.    Licensee represents that it understands that nothing in this Agreement prevents Licensee from using, licensing or in any other way dealing in or with any other technology, whether or not such technology is deemed to be competitive with the MPEG-2 Standard, including the MPEG-2 Patent Portfolio Patent(s) licensed in this Agreement.

4.8.    Licensee represents that it understands that the royalty rates specified in this Agreement are payable under the terms of this Agreement for the life of this Agreement and that nothing shall compel the Licensors or the Licensing Administrator to reduce the royalties specified in this Agreement during the term of this Agreement.

4.9.    Each party represents and warrants that it will comply with all applicable laws, regulations or ordinances pertaining to its performance hereunder.

4.10.    Each party represents and warrants that this Agreement and the transactions contemplated hereby do not violate any agreements to which it is subject as a party or otherwise.

4.11.    Each party further represents and warrants that in executing this Agreement, it does not rely on any promises, inducements, or representations made by any party or third party with respect to this Agreement or any other business dealings with any party or third party, now or in the future.

4.12.    Each party represents and warrants that it is not presently the subject of a voluntary or involuntary petition in bankruptcy or the equivalent thereof, does not presently contemplate filing any such voluntary petition, and does not presently have reason to believe that such an involuntary petition will be filed against it.

EXHIBIT 4 PAGE 130

**MPEG-2 PATENT PORTFOLIO LICENSE (cont'd.)**

4.13.   Licensee and the Licensing Administrator recognize that the royalties payable shall neither increase nor decrease because of an increase or decrease in the number of MPEG-2 Patent Portfolio Patents licensed or because of an increase or decrease in the prices of its MPEG-2 Royalty Products.

4.14.   Other than the express warranties of this Article 4, there are NO OTHER WARRANTIES, EXPRESS OR IMPLIED.

5.   **CONFIDENTIAL INFORMATION**

5.1.   For a period of five (5) years as measured from the first date of disclosure pursuant to this Agreement, the Licensing Administrator agrees to use reasonable care and discretion, at least commensurate with that degree of care it uses to protect similar information of its own, to avoid disclosure, publication, or dissemination of received Confidential Information, outside of those employees, officers,  or consultants of the Licensing Administrator who have a need to know Confidential Information.

5.2.   Disclosure by the Licensing Administrator of Confidential Information under Section 5.1 of this Agreement shall be permitted in the following circumstances; provided that (except with respect to Section 5.2.3) the Licensing Administrator shall have first given reasonable notice as practicable to Licensee that such disclosure is to be made:

5.2.1.   In response to an order of a court, legal process or other governmental body;

5.2.2.   Otherwise required by law;

5.2.3.   Necessary to establish rights under this Agreement; or

5.2.4.   If necessary in a proceeding before a governmental tax authority.

5.3.   Notwithstanding any other provisions of this Agreement, the obligations specified in Section 5.1 of this Agreement will not apply to any information that:

5.3.1.   Is or becomes publicly available without breach of this Agreement; or

5.3.2.   Is released for disclosure by written consent of the Licensee.

6.   **TERM AND TERMINATION**

6.1.   **Term.**   This Agreement shall expire on the expiration of all MPEG-2 Patent Portfolio Patents.

6.2.   **Termination for Material Breach.**   The Licensing Administrator shall have the right to terminate this Agreement upon breach of a material provision thereof by

**EXHIBIT 4 PAGE 131**

MPEG-2 PATENT PORTFOLIO LICENSE (cont'd.)

the Licensee. Subject to Sections 6.5.6 and 6.5.7, such termination for material breach shall become effective upon the Licensing Administrator sending written notice to the Licensee specifying the breach, and the failure of the Licensee to demonstrate, to the satisfaction of the Licensing Administrator, that Licensee has cured such breach within thirty (30) Days of the sending of such notice. A material breach as that term is used herein shall include, but is not limited to:

6.2.1. Failure of the Licensee to make payments and provide statements in accordance with this Agreement;

6.2.2. Failure of the Licensee to maintain adequate books and records or to permit an audit in accordance with Section 3.10; or

6.2.3. Failure of the Licensee to grant licenses to MPEG-2 Essential Patent(s) licensable or sublicensable by Licensee in accordance with Sections 7.3 or 7.4.

6.3.    **Partial Termination in the Event of Litigation.** The Licensing Administrator, upon the instruction of a Licensor, shall terminate Licensee's sublicense under any MPEG-2 Patent Portfolio Patent(s) licensed or sublicensed to the Licensing Administrator by such Licensor in the event that the Licensee has brought a lawsuit or other proceeding for infringement of an MPEG-2 Related Patent(s) and/or an MPEG-2 Essential Patent(s) against such Licensor, and Licensee has refused to grant the Licensor a license on fair and reasonable terms and conditions under the MPEG-2 Related Patent(s) and/or MPEG-2 Essential Patent(s) upon which the lawsuit or other proceeding is based. As part of the consideration for the licenses granted in this Agreement and for purposes of this Section 6.3 only, the Licensor's per Patent share of royalties payable pursuant to Section 3.1 shall be presumed to be a fair and reasonable royalty rate for Licensee's Patent(s), but Licensors who are Licensees are exempted from this presumption as a result of, among other things, the costs incurred in connection with this licensing program.

6.3.1. In the event Licensee exercises any of its have made rights under Article 2 with any party not otherwise licensed under the rights extended by the Licensee pursuant to the Licensee's have made rights ("Unlicensed Other Party") and (i) such Unlicensed Other Party brings a lawsuit or other proceeding for infringement of any MPEG-2 Essential Patent or MPEG-2 Related Patent against a Licensor, (ii) such Unlicensed Other Party refuses to grant the Licensor a license on reasonable and non-discriminatory terms and conditions under the MPEG-2 Essential Patent(s) and/or MPEG-2 Related Patent(s) upon which the lawsuit or other proceeding is based, and (iii) Licensor requests that Licensing Administrator revoke the Licensee's have made rights pursuant to Section 6.3.1, then the Licensing Administrator shall revoke Licensee's have made rights under any MPEG-2 Patent Portfolio Patent(s) licensed or sublicensed to the Licensing Administrator by such Licensor with respect to such Unlicensed Other

EXHIBIT 4 PAGE 132

MPEG-2 PATENT PORTFOLIO LICENSE (cont'd.)

Party, and any MPEG-2 Royalty Product(s) which is made by such Unlicensed Other Party shall not be licensed under the have made rights provided in this Agreement as they relate to such Licensor's MPEG-2 Essential Patents in any respect whatsoever.  For purposes of Section 6.3.1, the Licensor's per patent share of royalties payable pursuant to Section 3.1 shall be presumed to be a fair, reasonable and non-discriminatory royalty rate for the Unlicensed Other Party's Patent(s) considering the essential nature of the Licensor's Patent(s) licensed hereunder).

6.4.  **Voluntary Termination.**  Licensee may not terminate this Agreement prior to December 31, 2015.  Following that date, a Licensee may terminate this Agreement by providing thirty (30) Days' written notice.

6.5.  **Other Terminations.**  In addition to other provisions set forth in this Agreement, this Agreement may be terminated by the Licensing Administrator upon the occurrence of the following events:

6.5.1.  If Licensee files a petition in bankruptcy or the equivalent thereof, or is the subject of an involuntary petition in bankruptcy that is not dismissed within sixty (60) Days after the filing date thereof, or is or becomes insolvent, or admits of a general inability to pay its debts as they become due.

6.5.2.  Upon the de facto or de jure nationalization or expropriation of Licensee by governmental or military action, whether or not with valid authority.

6.5.3.  Upon any failure by Licensee to provide, within thirty (30) Days after written notice from the Licensing Administrator, satisfactory and adequate assurances that Licensee is able and willing to fully and effectively perform its obligations under this Agreement.

6.5.4.  Upon Licensee's failure during the term of this Agreement to pay royalties and/or provide statements as required by this Agreement.

6.5.5.  Upon determination of a court of competent jurisdiction that an Affiliate of Licensee has infringed a Patent licensed under this Agreement.

6.5.6.  If Licensee in any judicial or administrative proceeding or the equivalent thereof (i) asserts that any MPEG-2 Essential Patent is not enforceable or is invalid and/or (ii) asserts a position that is in conflict with any of the representations, warranties, or covenants made by Licensee in this Agreement, regardless of whether such representations and/or warranties are set forth in the whereas clauses of this Agreement or in Article 4 or in Sections 7.5 and 7.14.  Termination pursuant to this Section 6.5.6 shall be

**EXHIBIT 4 PAGE 133**

**MPEG-2 PATENT PORTFOLIO LICENSE (cont'd.)**

effective as of the date written notice is sent to Licensee by Licensing Administrator.

**6.5.7.** In the event that any of the events listed in Sections 6.5.1, 6.5.2, 6.5.3, 6.5.4, or 6.5.5 hereof occur, this Agreement may be terminated by the Licensing Administrator upon thirty (30) Days' written notice to Licensee, without any right of Licensee to cure.

**6.6.** **Survival.** The following provisions of this Agreement shall survive expiration or termination of this Agreement:

**6.6.1.** The obligation of Licensee to pay all royalties accrued pursuant to Article 3 as of the effective date of expiration or termination;

**6.6.2.** The obligation of Licensee to provide statements under Section 3.9 and to allow for an audit pursuant to Section 3.10;

**6.6.3.** The obligation of the Licensing Administrator to maintain confidentiality under Article 5; and

**6.6.4.** The obligations of Licensee pursuant to Sections 7.3 and 7.4.

**7.** **MISCELLANEOUS PROVISIONS**

**7.1.** **Assignment.**

**7.1.1.** In the event that the right of the Licensing Administrator to grant MPEG-2 Patent Portfolio Licenses is transferred to a successor Licensing Administrator, this Agreement shall be deemed assigned to the successor Licensing Administrator.

**7.1.2.** This Agreement may not be assigned by the Licensee to any other person or entity under any circumstances. This Agreement shall terminate upon the sale by Licensee of (i) all or substantially all of its assets, (ii) all or substantially all of its assets used in the activities contemplated by this Agreement, or (iii) its capital shares (or similar indicia of ownership) or upon similar transaction. This provision does not exempt a Licensee's successor(s) in interest from liability for any unpaid royalties regardless of whether the Agreement is executed by such Licensee's successor(s) in interest.

EXHIBIT 4 PAGE 134

**MPEG-2 PATENT PORTFOLIO LICENSE (cont'd.)**

### 7.2. Notice.

7.2.1. All notices required or permitted under this Agreement (except Section 1.19) to Licensee or Licensing Administrator shall be sent by either Certified Mail with return receipt requested, overnight delivery by commercial or other service which can verify delivery, fax to the number indicated herein, or by e-mail to the address indicated herein, which may be updated by Licensee from time to time. Such notice so sent shall be effective as of the date it is sent. Notwithstanding anything to the contrary herein, amendments to Attachment 1 hereto, if any, shall be effective upon the posting of the new Attachment 1 on the website of the Licensing Administrator and such posting shall constitute notice pursuant to this Section.

7.2.2. All notices from the Licensing Administrator to Licensee shall be sent to:

Name: _____
Title: _____
Company: _____
Address: _____
_____
_____
Tel: _____
Fax: _____
E-mail: _____

CC:

Name: _____
Title: _____
Company: _____
Address: _____
_____
_____
Tel: _____
Fax: _____
E-mail: _____

**EXHIBIT 4 PAGE 135**

**MPEG-2 PATENT PORTFOLIO LICENSE (cont'd.)**

       **7.2.3.**  All notices from the Licensee to the Licensing Administrator or its successor shall be sent to:

          Contract Administrator
          MPEG LA, LLC
          6312 S. Fiddler's Green Circle, Suite 400E
          Greenwood Village, CO  80111 U.S.A.
          Tel:  303-331-1880
          Fax:  303-331-1879
          E-mail:  Contractadministrator@mpegla.com
          Website:  www.mpegla.com

**7.3.**    **Licensee Grant.**  Upon full execution of this Agreement, and as part of the consideration for the licenses granted in this Agreement, Licensee agrees to grant a worldwide, nonexclusive license and/or sublicense under any and all MPEG-2 Essential Patent(s) that Licensee or its Affiliate(s), if any, has the right to license and/or sublicense, to any Licensor or any sublicensee of the Licensing Administrator desiring such a license and/or sublicense on fair and reasonable terms and conditions. As part of the consideration for the licenses granted in this Agreement and for purposes of this Section 7.3 only, the Licensors' per Patent share of royalties payable pursuant to Section 3.1 of this Agreement shall be presumed to be a fair and reasonable royalty rate for Licensee's Patent(s), taking into account any bona fide payment required to be made by Licensee to any unrelated third party upon the Licensee's sublicensing of such Patent(s), but Licensors who are Licensees are exempted from this presumption as a result of, among other things, the costs incurred in connection with this licensing program.

**7.4.**    **Licensee's Option.**  In lieu of Section 7.3, Licensee shall have the option to hereby grant a worldwide, nonexclusive, nontransferable (except to a successor Licensing Administrator) license and/or sublicense under any and all of its MPEG-2 Essential Patent(s) to the Licensing Administrator with the right by the Licensing Administrator to grant MPEG-2 Patent Portfolio Licenses that include the MPEG-2 Essential Patent(s) that Licensee or its Affiliate(s), if any, has the right to license or sublicense.  Licensee shall identify to the Licensing Administrator any and all of its patents and patents of its Affiliate(s), if any, which Licensee believes in good faith to be MPEG-2 Essential Patent(s). Whether each of the patent(s) identified by Licensee is an MPEG-2 Essential Patent(s) shall be determined according to an established procedure applicable to all new patents identified to the Licensing Administrator pursuant to the terms of an agreement referred to as the "Agreement Among Licensors." The terms and conditions of the license and/or sublicense granted by the Licensee to the Licensing Administrator under this Section 7.4 shall be identical to the terms and conditions of the license and/or sublicense granted by each Licensor to the Licensing Administrator.  If Licensee elects the option set forth in this

**EXHIBIT 4 PAGE 136**

MPEG-2 PATENT PORTFOLIO LICENSE (cont'd.)

Section 7.4, it shall be required to enter into the "Agreement Among Licensors," which has been entered into by all Licensors.

**7.5.    Licensee Covenants.**

7.5.1.   Licensee hereby covenants to notify promptly the Licensing Administrator in the event that any allowed Patent application(s) published for opposition, which is licensed or sublicensed to the Licensing Administrator pursuant to Section 7.4 of this Agreement as an MPEG-2 Essential Patent(s), does not issue as an MPEG-2 Essential Patent(s).

7.5.2.   Licensee shall promptly identify to the Licensing Administrator each Patent(s), except for MPEG-2 Patent Portfolio Patents of the Licensors, licensable or sublicensable by Licensee or its Affiliate(s), if any, which Licensee believes in good faith to be an MPEG-2 Essential Patent(s) within fourteen (14) Days of execution of this Agreement.

7.5.3.   In the event that Licensee or any of its Affiliates has granted an exclusive license to a third party under an MPEG-2 Essential Patent(s) prior to the date of Licensee's execution of this Agreement, Licensee shall advise the Licensing Administrator prior to the execution of this Agreement of such an exclusive license and identify to the Licensing Administrator such third party.

**7.6.    Licensing Administrator Covenants.**

7.6.1.   The Licensing Administrator covenants that if during the term of this Agreement, it acquires rights to grant sublicenses under additional MPEG-2 Essential Patent(s), the MPEG-2 Patent Portfolio License herein will be supplemented to include such additional MPEG-2 Essential Patent(s).

7.6.2.   The Licensing Administrator covenants that, with the exception of partial termination under Section 6.3, any deletion from the MPEG-2 Patent Portfolio shall occur only upon a determination in good faith by the Licensors, or upon a final adjudication of a tribunal of competent jurisdiction from which no appeal is taken or allowed, that the deleted Patent(s) is invalid or unenforceable in the country which issued or published the Patent(s), and that any addition to the MPEG-2 Patent Portfolio shall occur only upon the determination pursuant to established procedures that the additional Patent(s) is an MPEG-2 Essential Patent(s) in the country which issued or published the Patent(s).

7.6.3.   The Licensing Administrator covenants that if any Patent(s) in the MPEG-2 Patent Portfolio sublicensed by the Licensing Administrator to Licensee pursuant to the terms hereof is found not to be an MPEG-2 Essential Patent(s) in the country which issued or published the Patent(s), either by

**EXHIBIT 4 PAGE 137**

**MPEG-2 PATENT PORTFOLIO LICENSE (cont'd.)**

the Licensors or upon a final adjudication of a tribunal of competent jurisdiction from which no appeal is taken or allowed and such Patent(s) which is licensed to Licensee is to be deleted from the MPEG-2 Patent Portfolio, the Licensing Administrator shall give notice to Licensee of such deletion, and Licensee shall have the option to retain its sublicense under the deleted Patent(s) for the remainder of the term of this Agreement.

7.6.4.  The Licensing Administrator covenants that it shall not delete from or add to the MPEG-2 Patent Portfolio for reasons other than stated in Sections 7.6.1, 7.6.2, 7.6.3 and Section 6.3.

7.6.5.  The Licensing Administrator covenants that the royalties set forth in Section 3.1 shall not increase during the term of this Agreement, as set forth in Article 6.

7.7.  **Most Favorable Royalty Rates.**  Except as provided in Section 7.7.1, in the event that the Licensing Administrator grants an MPEG-2 Patent Portfolio License to another party with royalty rates more favorable than those set forth in Section 3.1 of this Agreement as they pertain to the specific products which are licensed thereunder, whether or not such more favorable royalty rates are on terms and/or conditions that are different than those set forth herein, the Licensing Administrator shall send written notice to Licensee specifying the more favorable royalty rates and any terms and/or conditions that are different than those set forth herein within thirty (30) Days of the granting of the MPEG-2 Patent Portfolio License providing for such more favorable royalty rates.  Licensee shall be entitled to an amendment of this Agreement to the extent of providing for royalty rates as favorable as that available to such other party within thirty (30) Days of sending written notice to the Licensing Administrator requesting such amendment; provided, however, that this Agreement shall also be amended to include any additional terms provided in connection with the more favorable royalty rate as specified by the Licensing Administrator.  Any amendment made pursuant to this Section 7.7 shall be effective as of the date it is made, and such more favorable royalty rates shall not be retroactively applicable in favor of the Licensee, and shall not be a basis for claiming any refund of royalties paid prior to such effective date.

7.7.1.  Section 7.7 shall not apply to:

7.7.1.1.  Settlement of litigation;

7.7.1.2.  Determination by the Licensing Administrator of back royalties owed by a sublicensee or prospective sublicensee;

7.7.1.3.  Compromise or settlement of royalty payments owed by a sublicensee in financial distress;

EXHIBIT 4 PAGE 138

**MPEG-2 PATENT PORTFOLIO LICENSE (cont'd.)**

    7.7.1.4.   Individual licenses or sublicenses granted by a Licensor to a third party;

    7.7.1.5.   An order of a court or an administrative body; and

    7.7.1.6.   An unauthorized act of the Licensing Administrator.

**7.8.**    **Freedom of Independent Development.** Nothing in this Agreement shall be construed as prohibiting or restricting Licensee from independently developing competitive video products or video services.

**7.9.**    **Relationship.** Nothing in this Agreement shall be construed to create a principal-agent relationship, partnership or joint venture between the parties, or give rise to any fiduciary duty from one party to the other party.

**7.10.**    **Severability.** If any provision of this Agreement is held by a court of competent jurisdiction to be unenforceable or contrary to law, the remaining provisions of this Agreement will remain in full force and effect to the extent that the interests of the parties in entering this Agreement can be realized.

**7.11.**    **No Waiver.** The failure of either party at any time to require performance by the other party of any provision of this Agreement shall not be construed as acquiescence or waiver of such failure to perform such provision. The failure of either party to take action upon the breach of any provision of this Agreement shall not be construed as acquiescence or waiver of any such breach.

**7.12.**    **Binding on Successors.** This Agreement shall be binding upon and inure to the benefit of the parties and their successors and assigns to the extent assignment is permitted by this Agreement.

**7.13.**    **Article and Section Headings.** The Article and Section headings contained in this Agreement are for reference purposes only and shall not in any way control the meaning or interpretation of this Agreement.

**7.14.**    **Representation of Counsel; Mutual Negotiation.** Each party had the opportunity to be represented by counsel of its choice in negotiating this Agreement. This Agreement shall therefore be deemed to have been negotiated at arms length, with the advice and participation of counsel, and prepared at the joint request, direction, and instruction of the parties, and shall be interpreted in accordance with its terms without favor to any party.

**7.15.**    **English Language.** The parties have required that this Agreement and all documents relating thereto be drawn up in English.

**EXHIBIT 4 PAGE 139**

**MPEG-2 PATENT PORTFOLIO LICENSE (cont'd.)**

7.16.  **Notice to Customers.**

7.16.1. **MPEG-2 Packaged Media Notice:**  Licensee agrees to provide to its customers or any other party that receives from it an MPEG-2 Encoding Product licensed under Section 2.2 of this Agreement a notice which specifies that:  **"ANY USE OF THIS PRODUCT IN ANY MANNER OTHER THAN PERSONAL USE THAT COMPLIES WITH THE MPEG-2 STANDARD FOR ENCODING VIDEO INFORMATION FOR PACKAGED MEDIA IS EXPRESSLY PROHIBITED WITHOUT A LICENSE UNDER APPLICABLE PATENTS IN THE MPEG-2 PATENT PORTFOLIO, WHICH LICENSE IS AVAILABLE FROM MPEG LA, LLC, 6312 S. Fiddlers Green Circle, Suite 400E, Greenwood Village, Colorado 80111 U.S.A."**

Licensee understands that the license granted pursuant to Section 2.2 of this Agreement is conditioned on the Licensee providing the notice specified in this Section.

7.17.  **Bankruptcy.**

7.17.1. In the event that the Licensing Administrator should file a petition under the United States federal bankruptcy laws, or that an involuntary petition shall be filed against the Licensing Administrator, the parties intend that Licensee shall be protected in the continued enjoyment of its rights as Licensee under the MPEG-2 Patent Portfolio Patents sublicensed hereunder to the maximum feasible extent including, without limitation, if it so elects, the protection conferred upon licensees under 11 U.S.C. Section 365(n).  The Licensing Administrator agrees that it will give Licensee notice of the filing of any voluntary or involuntary petition under the United States federal bankruptcy laws.

7.17.2. The MPEG-2 Patent Portfolio Patents sublicensed hereunder shall be deemed to be "intellectual property" as the term is defined in 11 U.S.C. Section 101(35A). All written agreements entered into in connection with the parties' performances hereunder from time to time shall be considered agreements "supplementary" to this Agreement for purposes of said Section 365(n).

7.18.  **Choice of Law and Consent to Jurisdiction.**  The validity, construction and performance of this Agreement shall be governed by the substantive law of the State of New York, United States of America, without regard to the conflict of law rules.  The parties to this Agreement hereby consent to the jurisdiction of the federal and state courts of the states of Colorado, Delaware, Maryland and/or New York ("Applicable Courts") in the event of any dispute arising under or in connection with this Agreement.  In the event either party files an action against

**EXHIBIT 4 PAGE 140**

**MPEG-2 PATENT PORTFOLIO LICENSE (cont'd.)**

the other in any Applicable Court, the other party hereby waives any right to assert lack of personal jurisdiction.

7.19.   **No Third Party Beneficiaries.**  Except as provided in this Section 7.19, nothing in this Agreement shall be construed to give rise to any obligation on either party hereto for the benefit of a third party other than the Licensors or to confer any rights on any third party other than the Licensors.  Notwithstanding anything to the contrary herein, any Licensee under an MPEG-2 Patent Portfolio License which is in full compliance with its obligations under such License shall be deemed a third party beneficiary of the obligations under Section 7.3 of any other Licensee.

7.20.   **Entire Agreement.**

7.20.1. The provisions of this Agreement, including its attachments and any amendments, constitute the entire agreement between the parties, and supersede any and all prior communications and understandings, oral or written, between the parties relating to the subject matter hereof.

7.20.2. Except for supplementation of or deletion from the MPEG-2 Patent Portfolio by the Licensing Administrator or amendments to the MPEG-2 Standard as provided in Article 1, no amendment of this Agreement shall be effective unless such amendment is in writing and specifically references this Agreement, and is signed by all parties hereto.  The Licensing Administrator shall promptly notify Licensee of any supplementation of or deletion from the MPEG-2 Patent Portfolio.

7.21.   **Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(Licensee)

Date: _____          By: _____

MPEG LA, LLC

Date: _____          By: _____
                                          Lawrence A. Horn
                                          President and CEO

v7/01/09                                    28

**EXHIBIT 4 PAGE 141**