1   Michael H. Steinberg (State Bar No. 134179)
    steinbergm@sullcrom.com
2   Orly Z. Elson (State Bar No. 240645)
    elsono@sullcrom.com
3   Damion D. D. Robinson (State Bar No. 262573)
    robinsond@sullcrom.com
4   SULLIVAN & CROMWELL LLP
    1888 Century Park East, Suite 2100
5   Los Angeles, California  90067-1725
    Telephone: (310) 712-6600
6   Facsimile: (310) 712-8800

7   *Attorneys for Defendant*
    *MPEG LA, L.L.C.*
8

9                 **UNITED STATES DISTRICT COURT**

10                **CENTRAL DISTRICT OF CALIFORNIA**

11                     **WESTERN DIVISION**

12

| | |
|---|---|
| 13   NERO AG, | Case No. 2:10-cv-03672-MRP (RZx) |
| 14                 Plaintiff, | [The Honorable Mariana R. Pfaelzer] |
| 15          v. | **DEFENDANT MPEG LA, L.L.C.'S** |
| 16   MPEG LA, L.L.C., | **MOTION TO DISMISS NERO AG'S** |
| 17   and DOES 1 through 10, inclusive, | **FIRST AMENDED COMPLAINT** |
| 18                 Defendants. | Hearing Date: November 22, 2010 |
| 19 | Time: 11:00 a.m. |
|  | Room: Courtroom 12 |
| 20 | |
| 21 | [Filed concurrently with Decl. of Michael |
|  | H. Steinberg; and [Proposed] Order] |
| 22 | |

23

24

25

26

27

28

SULLIVAN & CROMWELL LLP

1   TO NERO AG AND ITS COUNSEL OF RECORD:

2         PLEASE TAKE NOTICE that on November 22, 2010 at 11:00 a.m.,

3   or as soon thereafter as the matter may be heard, in Courtroom 12 of the United

4   States District Court for the Central District of California, located at 312 North

5   Spring Street, Los Angeles, California 90012, Defendant MPEG LA, L.L.C.

6   ("MPEG LA") through its undersigned counsel will, and hereby does, move to

7   dismiss with prejudice Nero AG's ("Nero") First Amended Complaint pursuant to

8   Rule 12(b)(6) of the Federal Rules of Civil Procedure.

9         The motion is based on this Notice of Motion and Motion, the

10   supporting Memorandum, the Declaration of Michael H. Steinberg submitted

11   concurrently herewith, and the complete files and records in this action, and such

12   additional material and arguments as may be considered at or in connection with

13   any hearing on the Motion.

14         As described in the Declaration of Michael H. Steinberg, submitted

15   concurrently herewith, counsel for MPEG LA contacted Nero's counsel, through a

16   detailed letter thoroughly identifying the substance of this motion, to discuss this

17   motion and a potential resolution pursuant to L.R. 7-3.  Nero's counsel has not

18   responded to that letter.

19                         Respectfully submitted,

20

21                     /s/  Michael H. Steinberg

22                     Michael H. Steinberg (SBN 134179)
                      Orly Z. Elson (SBN 240645)

23                     Damion D. D. Robinson (SBN 262573)
                    SULLIVAN & CROMWELL LLP

24                     1888 Century Park East

25                     Los Angeles, California 90067-1725
                      Telephone:    (310) 712-6640

26                     Facsimile:     (310) 712-8800

27

28                     *Attorneys for Defendant*
                    *MPEG LA, L.L.C.*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................. 1

II.   BACKGROUND .................................................................................... 5

III.  LEGAL STANDARD ............................................................................ 7

IV.   ARGUMENT ........................................................................................ 8

    A.   **Nero Has Done Nothing to Support its Flawed "Infeasibility" Argument with Factual Allegation.** ........................ 8

        1.   Nero Cannot Allege that it Made the Necessary Inquiry .......... 9

        2.   Nero's Complaint Demonstrates that Individual Licensing Is Perfectly Feasible ................................................. 10

        3.   Licensing a Pool of Patents for a Fixed Term Until the Last Patent Expires Does Not Violate the Sherman Act .......... 11

    B.   **Nero's Identification of Supposedly Nonessential Patents Is Yet Another Unsupported Hypothesis.** ........................................... 12

        1.   Nero's Attempt to Re-define "Essentiality" Fails ................... 13

        2.   The Patents Nero Identifies Undermine its Monopoly Extension Theory .................................................................... 15

        3.   The Patents Identified By Nero Are Essential ......................... 17

        4.   Expired Patents Cannot Save Nero's Claim ............................ 19

    C.   **Nero Has Still Failed to Identify Harm to Competition** ............... 21

        1.   Nero Has Not Alleged Foreclosure of Alternative Technologies .......................................................................... 22

        2.   Offering More Patents for Less Money Does Not Harm Competition ............................................................................ 23

    D.   **Dismissal With Prejudice is Warranted Because Nero Cannot Correct Fatal Deficiencies in Its Amended Complaint — Its Fourth Attempt at Articulating a Monopolization Claim.** ......................................................... 25

V.    CONCLUSION .................................................................................. 26

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbott Labs.* v. *Novopharm Ltd.*,
  104 F.3d 1305 (Fed. Cir. 1997) ........................................................................ 17

*Aronson* v. *Quick Point Pencil Co.*,
  440 U.S. 257 (1979) ........................................................................................... 12

*Ashcroft* v. *Iqbal*,
  129 S. Ct. 1937 (2009) ..................................................................................... 1, 7

*Atl. Richfield Co.* v. *USA Petrol. Co.*,
  495 U.S. 328 (1990) ........................................................................................... 21

*Automatic Radio Mfg. Co.* v. *Hazeltine Research, Inc.*,
  339 U.S. 827 (1950) ........................................................................................... 12

*Bell Atlantic Corp.* v. *Twombly*,
  550 U.S. 544 (2007) ...................................................................................*passim*

*Blough* v. *Holland Realty, Inc.*,
  574 F.3d 1084 (9th Cir. 2009) .......................................................................... 23

*Bonin* v. *Calderon*,
  59 F.3d 815 (9th Cir. 1995) .............................................................................. 25

*Broadcom Corp.* v. *ITC*,
  542 F.3d 894 (Fed. Cir. 2008) .......................................................................... 14

*Brown Shoe Co.* v. *United States*,
  370 U.S. 294 (1962) ........................................................................................... 21

*Buffalo Broad. Co.* v. *Am. Soc'y of Composers, Authors and Publishers*,
  744 F.2d 917 (2d. Cir. 1984) .....................................................................*passim*

*Carpet Seaming Tape Licensing Corp.* v. *Best Seam Inc.*,
  616 F.2d 1133 (9th Cir. 1980) .......................................................................... 15

*Columbia Broad. Sys., Inc.* v. *Am. Soc'y of Composers,*
  *Authors & Publishers*,
  620 F.2d 930 (2d Cir. 1980) ........................................................................ 8, 11

*Coto Settlement* v. *Eisenberg*,
  593 F.3d 1031 (9th Cir. 2010) .......................................................................... 16

MOTION TO DISMISS FIRST AMENDED COMPLAINT

*In re Ebay Seller Antitrust Litig.*,
   No. 07-1882, 2010 WL 760433 (N.D. Cal. Mar. 4, 2010) ................................. 22

*Forsyth* v. *Humana, Inc.*,
   114 F.3d 1467 (9th Cir. 1997) ....................................................................... 21, 23

*Fujitsu Ltd.* v. *Netgear Inc.*,
   __ F.3d __, 2010 WL 3619797 (Fed. Cir. Sept. 20, 2010) ............................... 14

*Globespanvirata, Inc.* v. *Texas Instr., Inc.*,
   No. 03-2854, 2006 WL 543155 (D.N.J. Mar. 3, 2006) ..................................... 24

*Matsushita Elec. Indus. Co., Ltd.* v. *Cinram Int'l, Inc.*,
   299 F. Supp. 2d 370 (D. Del. 2004) ............................................................*passim*

*McCullogh Tool Co.* v. *Well Surveys, Inc.*,
   343 F.2d 381 (10th Cir. 1965) ..................................................................... 11, 12

*Moss* v. *U.S. Secret Service*,
   572 F.3d 962 (9th Cir. 2009) ............................................................................. 8

*U.S. Philips Corp.* v. *ITC*,
   424 F.3d 1179 (Fed. Cir. 2005) ...................................................................*passim*

*Pool Water Prods.* v. *Olin Corp.*,
   258 F.3d 1024 (9th Cir. 2001) ......................................................................... 21

*Portney* v. *CIBA Vision Corp.*,
   593 F. Supp. 2d 1120 (C.D. Cal. 2008) ........................................................... 12

*Princo Corp.* v. *ITC*,
   563 F.3d 1301 (Fed. Cir. 2009) ...................................................................*passim*

*Rambus Inc.* v. *FTC*,
   522 F.3d 456 (D.C. Cir. 2008) ......................................................................... 17

*Sumitomo Mitsubishi Silicon Corp.* v. *MEMC Elec. Mats., Inc.*,
   No. 05-2133, 2007 WL 2318903 (N.D. Cal. Aug. 13, 2007) ........................... 11

*United Guar. Mortg. Indem. Co.* v. *Countrywide Fin. Corp.*,
   660 F. Supp. 2d 1163 (C.D. Cal. 2009) ........................................................... 25

*William O. Gilley Enters.* v. *Atl. Richfield Co.*,
   588 F.3d 659 (9th Cir. 2009) ........................................................................... 24

*Zila, Inc.* v. *Tinnell*,
   502 F.3d 1014 (9th Cir. 2007) ......................................................................... 12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

-iii-

1

## STATUTES & RULES

2    The Sherman Antitrust Act, Section 2, 15 U.S.C. § 2......................................*passim*

3    35 U.S.C. § 154............................................................................................ 16, 17

4    Fed. R. Civ. P. 8 .................................................................................................... 7

5    Fed. R. Civ. P. 12(b)(6) .................................................................................*passim*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **MEMORANDUM**

2       Defendant MPEG LA, L.L.C. ("MPEG LA") respectfully submits the

3    following memorandum in support of its Motion to Dismiss Nero AG's ("Nero")

4    First Amended Complaint (the "Amended Complaint"):

5    **I.   INTRODUCTION**

6       Nero's revised Section 2 monopolization claim is nothing but another

7    unproven hypothesis that cannot meet the standards of *Bell Atlantic Corp.* v.

8    *Twombly*, 550 U.S. 544 (2007), or *Ashcroft* v. *Iqbal*, 129 S. Ct. 1937 (2009).  As

9    before, "the chief problem with [Nero's] Complaint is that it does not contain any

10   actual factual allegations to support its inferences . . . ." (Order, dated Sept. 14,

11   2010 (Dkt. 23) ("Order") at 14.)  Rather than add *facts* to support those

12   "inferences," Nero's Amended Complaint offers even more detail-free conclusions

13   that do not help its cause and avoids even addressing the correct legal standards.[1]

14      This Court's Order provided substantial guidance on what was

15   necessary for Nero to plead its Section 2 monopolization claim.  *First*, the Court

16   instructed Nero that it must allege facts that demonstrate that it "lacks a 'realistic

17   opportunity' as a 'practical matter' to obtain individual licenses from individual

18   patent holders."  (Order at 12.)  As the Court recognized, "Nero ha[d] not

19   attempted to determine which patents it needs and to license them individually.

20   Nero's conclusion that it lacks a realistic opportunity to obtain the individual

21   licenses necessary to practice Nero's technology is a hypothesis."  (*Id.* at 11.)  And

22   yet, more than eight months since filing its first Section 2 claim, all that Nero has

23

24   [1]  In response to this Court's Order, Nero has dropped its claims related to the
25   MPEG-4 and AVC/H.264 pools (even though Nero claimed that these pools
     supposedly were chock full of "hundreds upon hundreds" of non-essential patents
     and were supposedly anticompetitive) and has apparently dropped its claim that
26   MPEG LA sets royalty payments for its patent pools at a "supracompetitive" level
     (without, of course, ever stating what the proper price should be).  Nevertheless,
27   Nero claims that MPEG LA has somehow improperly extended the original MPEG-
     2 patent pool (the "MPEG-2 Pool") — which was  reviewed and approved by the
28   Department of Justice ("DOJ") — through the addition of "hundreds and hundreds"
     of nonessential patents – of which Nero identifies just six alleged examples.

today is the same hypothesis.  Nero admits that it has still not attempted to license the patents individually and now relies on a legally irrelevant excuse — that it chose to enter another license with MPEG LA (the "New MPEG-2 License") — to avoid making this required showing.  (Am. Compl. ¶ 43.)

   *Second,* and as a separate and independent failing, the Court informed Nero that it must provide a factual basis for its claim that nonessential patents have been added to the MPEG-2 Pool — and, thus, to the MPEG-2 Patent Portfolio License (the "MPEG-2 License") — to extend its temporal scope, rather than rely on an "inference" that this must be so because the MPEG-2 Pool has grown so large.[2]  (Order at 12-13.)  Nero's renewed allegations merely offer the same non-specific conclusions that the patents are supposedly "nonessential" without explaining at all *why*.  When Nero does try to advance its nonessential assertion, Nero invents an entirely new definition of "essentiality."  No longer is "essentiality" a question about whether the patent is reasonably necessary to practice the *MPEG-2 standard (which is precisely what the MPEG-2 License is designed to do)* — but essentiality, according to Nero, is whether the patents are essential *to what Nero does*.  (*Compare* Am. Comp. ¶ 40 *with Princo Corp.* v. *ITC*, 563 F.3d 1301, 1310 (Fed. Cir. 2009) ("[A patent] can qualify as an essential [ ] patent if a license to practice [any of its claims] could be viewed as reasonably *necessary to practice the [relevant] standard.*") (emphasis added), *vacated on other grounds*, 583 F.3d 1380.  Nero's detour is designed to avoid the precise requirements of the Court's prior Order, undoubtedly because Nero has no support for its claim that the patents it identifies are nonessential *to the MPEG-2 standard*.  Nero simply makes no allegation to support this necessary element.

   After disregarding the correct legal standard to assert nonessentiality, Nero then ignores the very patents it claims are nonessential.  Out of 800 plus

---

[2] True and correct copies of the MPEG-2 License and the New MPEG-2 License are attached as Exhibits B and C respectively to the Steinberg Declaration.

SULLIVAN & CROMWELL LLP

1  patents in the MPEG-2 Pool (and around 130 U.S. patents ever in this pool), Nero

2  identifies just six U.S. patents as nonessential.  This list is puzzling to say the least.

3  Although Nero concedes that its "monopoly extension" claim does not challenge

4  the original 27 essential patents in the MPEG-2 Pool approved by the DOJ, it

5  includes three of these among its purportedly "nonessential patents."  (Am. Compl.

6  ¶ 55; Compl. ¶ 116; Order at 7 ("MPEG LA's initial monopoly derived from the

7  MPEG-2 . . . patent pool[ ] is not at issue.").)

8         Worse still, the patents that Nero identifies (Am. Compl. ¶ 40)

9  confirm that Nero has no facts to support its claim that these patents are

10  "nonessential" or its "inference" that MPEG LA has willfully extended the

11  temporal scope of the MPEG-2 Pool by adding nonessential patents:

12  • One of the supposed nonessential patents states directly that the methods

13     described in the patent "were substantially adopted as part of the MPEG-

14     2 Systems standard" (*see* Steinberg Decl., Ex. D (U.S. Patent No.

15     5,420,866) col. 5 ll. 19-20);

16  • Another of the supposed nonessential patents states expressly that "the

17     method of the present invention . . . has been adopted as part of [the

18     MPEG-2 standard" (*see* Steinberg Decl., Ex. E (U.S. Patent No. 5,

19     457,701) col. 4 ll. 41-42);

20  • A third of the supposed nonessential patents references the MPEG-2

21     "draft standard" in its background section, refers to the standard no fewer

22     than 14 times, expressly notes that is designed to remedy "problems" that

23     arise when "MPEG techniques are applied to non-interlaced video

24     signals" and goes on to describe how it was created to allow MPEG-2

25     syntax to properly apply to non-interlaced video (*see* Steinberg Decl., Ex.

26     F (U.S. Patent No. 5,461,420) col. 1 ll. 13-19, 48-53, col. 3 ll. 3-9, col. 14

27     l. 27 – col. 15 l. 54); and

28

1  • The three other supposed nonessential patents — owing to their early

2  filing dates — could not possibly have "extended" the temporal scope of

3  the MPEG-2 pool (and thus fail to support the predatory act that Nero

4  claims MPEG LA committed by adding "nonessential" patents).

5  None of these patents even begins to support Nero's inference that nonessential

6  patents are added to the MPEG-2 Pool to extend its life.  (Am. Comp. ¶ 41.)

7  The only other fact offered in support of Nero's "inference" of

8  monopoly extension is that some patents in the MPEG-2 Pool — Nero identifies

9  five examples, one of which is also listed as "nonessential" — are expired.  (*Id.* ¶

10  39.)  Nero, however,  ignores both the *prior* essentiality of those patents and the

11  fact that the terms of the MPEG-2 License provides *retrospective licenses for past*

12  *infringements* and therefore necessarily includes coverage for patents that may now

13  be expired.  Simply put, Nero has again failed to identify a single patent that could

14  possibly have been "added for the purpose of unlawfully extending the temporal

15  scope of the [MPEG-2 Pool]."  (Order at 13; Am. Compl. ¶ 40.)

16  Finally, as a third independent basis to dismiss, even if Nero had

17  provided the factual support that the Court demanded, it has still not identified how

18  MPEG LA's purported misconduct harmed *competition* — as opposed to Nero's

19  bottom line.  Foreclosure of alternative technology is at the core of an antitrust

20  claim based on patent pooling.  *U.S. Philips Corp.* v. *ITC*, 424 F.3d 1179, 1194-95

21  (Fed. Cir. 2005).  But Nero has again failed to plead facts showing that any such

22  technology exists.  And, it has abandoned any attempt to allege facts supporting a

23  theory that MPEG LA's pricing is "supracompetitive."

24  Nero's Amended Complaint is flawed at the inception because it is

25  ultimately contradictory.  On the one hand, Nero asserts that there are too many

26  patents in the pool, so it cannot determine which patents are essential and license

27  them individually.  (Am. Compl. ¶ 42.)  On the other, Nero claims it has identified

28  "nonessential" patents from the pool that are supposedly irrelevant to its product.

1  (*Id.* ¶ 40.)  The simple point is that MPEG-LA offers a convenient license which

2  allows firms to gain access to hundreds of patents in an economical fashion —

3  which is precisely why Nero renewed the MPEG-2 License rather than making

4  these essentiality determinations on its own.  Nero's own behavior — entering into

5  the license instead of individually negotiating for licenses it needs for its product

6  — shows nicely the pro-competitive nature of the MPEG-2 Pool.

7  **II.  BACKGROUND**

8  Because the Court is familiar with Nero's underlying allegations in

9  this case, (*see* Order at 1-6), MPEG LA only describes those allegations in Nero's

10  Amended Complaint that vary from its first (post-removal) Complaint.[3]

11  MPEG LA begins with what Nero has abandoned.  In its Amended

12  Complaint, Nero discards any allegations of monopolization with respect to MPEG

13  LA's MPEG-4 Visual and AVC/H.264 Patent Portfolio Licenses.  Nero now only

14  challenges the MPEG-2 License (and apparently the New MPEG-2 License that

15  Nero signed in December 2009) (collectively the "MPEG-2 Licenses").  Nero also

16  drops its allegations of "supracompetitive royalties" as well as its lengthy

17  discussion of "time-limited free trials," which formed a substantial basis of its

18  claim in the original Complaint.

19  Focusing on the MPEG-2 Licenses, Nero's only theory of "predatory

20  conduct" is that MPEG LA maintains a monopoly by including nonessential and

21  expired patents as part of the MPEG-2 Pool in order to artificially extend the terms

22  of the MPEG-2 Licenses.  (Am. Compl. ¶¶ 11, 40-45.)  To that end, Nero alleges

23  that six U.S. patents in the MPEG-2 Pool are nonessential because they license

24  technology that is "peripheral" *to Nero* and other companies similarly situated to

25  Nero, such as encryption, "hardware-implemented MPEG-2," and "telecine

26  processing schemes."  (*Id*. ¶ 40.)  Accordingly to Nero, the six patents nonessential

27

28  ---
[3]  Attached as Exhibit A to the Steinberg Declaration is a true-and-correct copy of a computer generated comparison of Nero's original and Amended Complaint.

1   to Nero and similarly situated companies are U.S. Patent Nos. 5,420,866 ("the '866
2   Patent"), 4,833,543 ("the '543 Patent"), 4,849,812 ("the '812 Patent"), 5,457,701
3   ("the '701 Patent"), 5,461,420 ("the '420 Patent"), and 5,453,790 ("the '790
4   Patent").  (*Id.*; *see also* Steinberg Decl., Exs. D-I.)  Nero's claim of nonessentiality
5   is based on its assertion that "[t]hose patents and others are not infringed by the
6   products offered by Nero and other similarly-situated (MPEG-2-compliant)
7   companies, and, as a result, these patents are not essential to complying with the
8   MPEG-2 standard."  (Am. Compl. ¶ 40.)  Nero contends (on information and
9   belief) that "such nonessential patents were added to the MPEG-2 pool only to
10  extend the ultimate expiration date of the pool and/or to make individual licensing
11  impracticable."  (*Id.*)

12          To this same end, Nero alleges that the MPEG-2 Pool contains
13  "hundreds of expired United States and Foreign Patents."  (*Id.* ¶ 39.)  Despite the
14  availability of that information on MPEG LA's website, Nero identifies only U.S.
15  Patent Nos. 4,970,590, 4,813,056, 4,796,087, 4,901,075, and 4,849,812 as
16  "examples."  (*Id.*)  Nero attaches as Exhibit 3 to its Amended Complaint a printout
17  of MPEG LA's website listing each of the patents in the MPEG-2 Pool by patent
18  owner and noting which are expired.  This list is provided to licensees as
19  Attachment 1 when they sign the MPEG-2 Licenses.  MPEG LA advises licensees
20  that updates to this list are made from time to time and can be found at MPEG
21  LA's website.  (MPEG-2 License § 7.2.1; New MPEG-2 License § 7.2.1.)

22          Contrary to Nero's suggestion, however, licensees do not pay
23  royalties on expired patents.  Expired patents are included on Attachment 1 and on
24  MPEG LA's website because the MPEG-2 Licenses contains provisions (a)
25  allowing reporting and payment of back royalties from June 1, 1994 before the
26  license takes effect, and (b) thereby providing a retroactive waiver of past
27  infringement on the payment of such royalties.  (MPEG-2 License §§ 3.1, 3.3.2;
28  New MPEG-2 License §§ 3.1, 3.3.2.)  Aside from the express back royalties

1    provision, both licenses make clear that the licensee is only paying for patents "in

2    force" – *i.e.,* not expired.  (MPEG-2 License § 3.1; New MPEG-2 License § 3.1.)

3    Nero ignores these provisions even though it is a party to both Licenses.

4          As before, Nero admits that it has not sought to individually license

5    any of the patents in the MPEG-2 pool.  Instead, Nero asserts that "MPEG LA in

6    the past has required a fee of $8,500" for it to make a patent essentiality

7    determination – *i.e.*, when a patent holder desires to add a patent to the pool.  (Am.

8    Compl. ¶ 42.)  Nero then surmises that a review of the entire pool "would cost in

9    excess of $7 million."  (*Id.*)  It also alleges that under the *New* MPEG-2 License,

10   there is a five-year period where a licensee cannot terminate on 30-days notice.

11   (*Id.* ¶ 43.)  A licensee can then terminate merely by giving notice.  (*Id.*)

12         The New MPEG-2 License was hardly mandatory.  All licensees,

13   including Nero, were provided the *option* of continuing to enjoy the benefit of their

14   existing MPEG-2 License, which did not contain any restrictions on the right to

15   terminate on 30-days notice and had a $2.50 royalty rate per royalty-incurring

16   product, or signing the new license with the restrictions on termination but a lower

17   royalty rate of $2.00 per royalty-incurring product.   (Am. Compl. ¶ 11(c).)  Nero

18   voluntarily signed the new MPEG-2 License.  (New MPEG-2 License § 4.4.)

19   **III.    LEGAL STANDARD**

20         To state a Sherman Act Section 2 claim, Nero must allege facts, which

21   taken as true, demonstrate that it is entitled to relief.  Fed. R. Civ. P. 8; *Twombly*,

22   550 U.S. at 555.  Nero's "[f]actual allegations must be enough to raise [its] right to

23   relief above the speculative level[.]"  *Id.*.  "[L]abels and conclusions[ ] and a

24   formulaic recitation of the elements of a cause of action will not do."  *Id.*

25         Instead, Nero's claim must include "enough facts to state a claim for

26   relief that is plausible on its face."  *Id.* at 570.  Nero's Amended Complaint must

27   contain well-pleaded allegations of fact, stripped of assertions and conclusions,

28   that make misconduct more plausible than "obvious alternative explanation[s.]"

-7-

1   *Iqbal*, 129 S. Ct. at 1951 (quoting *Twombly*, 550 U.S. at 567); *see also Moss* v.

2   *U.S. Secret Service*, 572 F.3d 962, 970 (9th Cir. 2009).

3   **IV.   ARGUMENT**

4          As the Court recognized, "the crux of Nero's Complaint is that MPEG

5   LA has added newer non-essential patents to its pools to make it infeasible for a

6   licensee to acquire the essential patents independently and thus, to preclude any

7   reasonably interchangeable substitutes and to preserve its market dominance."

8   (Order at 6.)  The Court, however, focused on two deficiencies in Nero's original

9   Complaint:  1) Nero's failure to show through facts — rather than speculate and

10  infer —that individual licensing is infeasible; and 2) Nero's failure to identify any

11  facts — again without speculation or inferences — demonstrating predatory

12  conduct cognizable under the Sherman Act (*i.e.*, the addition of nonessential

13  patents to the pools).  But Nero has done nothing to correct either of these

14  deficiencies, and its new allegations actually make matters worse.  Nor has Nero

15  identified (after four tries) any harm to the competitive process.  Accordingly, its

16  newest complaint should once again be dismissed, this time with prejudice.

17              **A.    Nero Has Done Nothing to Support its Flawed "Infeasibility"
18                      Argument with Factual Allegation.**

19         This Court previously acknowledged that the availability of individual

20  licensing is fatal to Nero's case.  "[T]he 'true issue' . . . is whether [Nero] lacked a

21  'realistic opportunity' as a 'practical matter' to obtain individual licenses from

22  individual owners as opposed to a single license from the pool." (Order at 11

23  (citing *Columbia Broad. Sys., Inc.* v. *Am. Soc'y of Composers, Authors &*

24  *Publishers*, 620 F.2d 930, 936 (2d Cir. 1980); *Matsushita Elec. Indus. Co., Ltd.* v.

25  *Cinram Int'l, Inc.*, 299 F. Supp. 2d 370, 377 (D. Del. 2004)).)  *See also Buffalo*

26  *Broad. Co.* v. *Am. Soc'y of Composers, Authors and Publishers*, 744 F.2d 917, 933

27  (2d. Cir. 1984) ("Since the blanket license restrains no one from bargaining over

28  the purchase and sale of music performance rights, it is not a restraint unless it

1   were proven that there were no realistically available alternatives.").  As the Court

2   noted, "Nero has not attempted to determine which patents it needs and to license

3   them individually.  Nero's conclusion that it lacks realistic opportunity to obtain

4   the individual licenses necessary to practice Nero's technology is a hypothesis . . . .

5   The burden of proving lack of realistic opportunity to license directly cannot be

6   met where a plaintiff never makes an inquiry or attempts to negotiate a single

7   individual license."  (Order at 11 (citing *Cinram*, 299 F. Supp. 2d at 377-78).)

8   **1. Nero Cannot Allege that it Made the Necessary Inquiry**

9   Far from disputing this conclusion in its Amended Complaint, Nero

10  embraces it, admitting that it signed the New MPEG-2 License apparently without

11  even considering individual licensing – *i.e.*, by determining which patents it needs

12  and whether it would be feasible to license them alone, or contacting individual

13  patent holders.  (Am. Comp. ¶¶ 42-45.)  Yet, as part of this New MPEG-2 License,

14  Nero once again warranted that (a) it "enter[ed] into [the New MPEG-2 License]

15  for its own convenience"; (b) it "ha[d] the right to separately negotiate a license

16  with any or all of the Licensors"; and (c) the agreement was "entered into freely

17  and at the option of [Nero]."  (New MPEG-2 License § 4.4; *see also* MPEG-2

18  License § 4.3.)  It is no wonder that Nero can offer no facts showing individual

19  licensing to be infeasible, since Nero apparently never considered this option.

20  Instead, Nero renews its "hypothesis" of economic infeasibility (Am.

21  Compl. ¶ 42), which the Court already rejected (Order at 11),  and adds to it the

22  deficient theory (lacking in any factual basis or sense) that Nero cannot

23  individually license the patents because Nero voluntarily elected — in exchange

24  for an even lower royalty rate — to restrict its previous 30-day termination rights

25  by signing the New MPEG-2 License.  (Am. Compl. ¶¶ 43-45; *compare* MPEG-2

26  License §§ 3.1, 6.4 *with* New MPEG-2 License §§ 3.1, 6.4.)  The fact that Nero, at

27  its election, chose to take a longer license to secure a lower rate says nothing about

28  the feasibility of doing its own analysis of the patents it needs.

## 2. Nero's Complaint Demonstrates that Individual Licensing Is Perfectly Feasible

To establish that individual licensing is infeasible, Nero must allege facts showing that the price for individual licenses, "in an objective sense, is higher than the value of the [patent] rights obtained." *Buffalo Broadcasting Co.*, 744 F.2d at 926. Even if the price of individual licenses is significantly more than that of the pool, this does not establish infeasibility. *Cinram*, 299 F. Supp. 2d at 379.

Nero does not even begin to allege that the costs of individual licensing exceed the value of the rights obtained. It does not attempt to value the intellectual property rights at issue. Nor does it identify the costs of individual licenses, except in a concededly speculative manner: asserting that, because MPEG LA supposedly charged $8,500 for essentiality determinations in the past, it would cost Nero $7 million to review all 800 patents in the pool. (Am. Compl. ¶ 42.) But Nero now claims that it can identify certain nonessential patents (*id.* at ¶ 40), although it offers no facts or analysis identifying how much it cost Nero to make this determination. Thus, Nero's admittedly hypothetical cost estimate is without factual support. (*Id.* ¶ 42; *see Twombly*, 550 U.S. at 555.)

Even if the Court takes this speculation as fact, however, it has already correctly rejected these administrative costs as a basis for infeasibility. (Order at 11 ("time and expense will not be considered insurmountable barriers to direct licensing.").) Instead, "Nero will have to undertake just such an inquiry to prove its allegations in this case." (*Id.* at 13.)

Nero's inquiry is entirely inadequate. Apparently after perusing MPEG LA's website, and the publicly available patents listed on that website, Nero has identified just six patents that it purportedly does not need and five that are expired. (Am. Compl. ¶¶ 39-40.) But that same website — which Nero selectively excerpts — cross-references the patent families in the MPEG-2 Pool to

the relevant section of the MPEG-2 standard.  (Steinberg Decl., Ex. J.[4])  That Nero did not conduct this inquiry before extending the MPEG-2 License or filing suit is astonishing.  This failure, and Nero's continued reliance on its hypothesis of "economic infeasibility," is dispositive.  (*See* Order at 12; *see also, e.g.*, *Cinram*, 299 F. Supp. 2d at 378-79; *Sumitomo Mitsubishi Silicon Corp.* v. *MEMC Elec. Mats., Inc.*, No. 05-2133, 2007 WL 2318903, at *15 (N.D. Cal. Aug. 13, 2007); *Columbia Broad. Sys.*, 620 F.2d at 937; *Buffalo Broad. Co.*, 744 F. 2d at 926.)

### 3. Licensing a Pool of Patents for a Fixed Term Until the Last Patent Expires Does Not Violate the Sherman Act

Because its conjectural administrative costs argument fails, Nero alleges that the New MPEG-2 License does not allow licensees to terminate upon 30-days notice until 2016.  (Am. Compl. ¶ 43.)  Nero admits that, with the new MPEG-2 License it voluntarily elected to enter into, it received a 20% discount on its royalties — or $0.50 per product.  (*Id.* ¶ 11.)  All that this allegation highlights, however, is that, when Nero had yet another opportunity to individually license the MPEG-2 Pool patents that it needs, it declined to do so (precisely because it was not in its economic interests to do so, owing to the low cost).

To plead infeasibility, Nero must allege facts showing "an element of coercion, such as where there has been a request by a prospective licensee for a license under less than all the  patents and a refusal by the licensor to grant such a license." *McCullogh Tool Co.* v. *Well Surveys, Inc.*, 343 F.2d 381, 408 (10th Cir. 1965).  Nero just does not have that fact.  Offering a discounted royalty in

---

[4]      As the Ninth Circuit recognized in *Knievel* v. *ESPN*, consideration of the entirety of a website submitted by the plaintiff and its "surrounding pages" is appropriate on a motion to dismiss because "a computer user necessarily views web pages in the context of the links through which the viewer accessed those pages." 393 F.3d 1068, 1076 (9th Cir. 2005).  Exhibit 3 to Nero's complaint is a printout of a portion of MPEG LA's website.  This section contains a link to the cross-reference chart attached as Exhibit J to the Steinberg Declaration under the heading "Essentiality."  Although Nero conveniently omits this portion of the site from its exhibit, a user would necessarily consider it in the context of the section that Nero does include.

1    exchange for an extension past expiration of certain patents is not "coercive."

2    *Aronson* v. *Quick Point Pencil Co.*, 440 U.S. 257, 264-65 (1979); *Automatic Radio*

3    *Mfg. Co.* v. *Hazeltine Research, Inc.*, 339 U.S. 827, 834 (1950).  The fact that

4    Nero, in its business judgment, decided to enter a contract with a five-year term in

5    exchange for a 20% discount does not create an antitrust violation.

6            Nor can Nero's claim prevail simply because some of the patents in

7    the MPEG-2 Pool will expire before the end of the licensing period.  "[A] license

8    agreement covering a package of patents, voluntarily entered into by the parties is

9    [not] unlawful by reason of the fact that the royalties payable thereunder are based

10   upon the licensee's overall operations and upon a package of patents, *some of*

11   *which have expired or will expire during the effective period of the agreement*."

12   *McCullough*, 343 F.2d at 409 (emphasis added).  Where an agreement expressly

13   provides that no royalties are paid on expired patents — as both MPEG-2 Licenses

14   do — the fact that a licensee pays royalties on the other patents in a pool does not

15   render the license anticompetitive.  *Portney* v. *CIBA Vision Corp.*, 593 F. Supp. 2d

16   1120, 1124 (C.D. Cal. 2008).  The Ninth Circuit has confirmed that requiring

17   payment of royalties until the last of the patents in the pool expires is perfectly

18   appropriate.  *Zila, Inc.* v. *Tinnell*, 502 F.3d 1014, 1026 (9th Cir. 2007).

19           Because all that Nero can muster to support its infeasibility theory is

20   the fact that it voluntarily entered a discounted license in exchange for a five-year

21   extension, this theory fails on its face.

22         **B.    Nero's Identification of Supposedly Nonessential Patents Is**
              **Yet Another Unsupported Hypothesis.**
23

24           As the Court previously observed, Nero wants it to "*infer* that MPEG

25   LA has added 'hundreds upon hundreds of non-essential patents to make the pool

26   unchallengeable and restrain individual licensing.'"  (Order at 13 (quoting Sept. 2,

27   2010 Hr'g Tr. at 35:20-36:08) (emphasis in original); *see also* Am. Compl. ¶ 11(b)

28   ("hundreds of the added patents are nonessential ones which only serve to benefit

-12-

1    MPEG LA.").)  To support such a bold hypothesis, the Court instructed Nero to

2    conduct an essentiality determination and to identify nonessential patents:

> 3    Nero contends that it would be prohibitively expensive for it to
>
> 4    identify the nonessential patents and so justifies its failure to name
>
> 5    even one example of one patent that is non-essential and added for the
>
> 6    purpose of unlawfully extending the temporal scope of the patent
>
> 7    pool.  But Nero will have to undertake just such an inquiry to prove its
>
> 8    allegations in this case.  It is not clear that Nero ever intends to
>
> 9    undertake such inquiry.

10    (Order at 12-13.)  Without conducting such an inquiry, the Court recognized

11    that "Nero offers not one factual allegation from which the Court could

12    conclude that [its theory] is plausible." (*Id*. at 12.)

13         All Nero has offered in its Amended Complaint are more

14    hypotheses and more strained inferences.  Rather than conduct the inquiry

15    the Court suggested or identify facts supporting its assertion that there is a

16    single nonessential patent in the MPEG-2 Pool, Nero attempts to redefine

17    essentiality.  It now claims that essentiality is determined by whether patents

18    are essential *to Nero*, instead of *to the MPEG-2 standard*.  (Am. Compl. ¶

19    40.)  This new hypothesis also misses the mark.

20         **1. Nero's Attempt to Re-define "Essentiality" Fails**

21         A fundamental flaw in Nero's Amended Complaint, and

22    dispositive to its claim, is its attempt to avoid the question of whether any

23    patents in the MPEG-2 Pool are nonessential *to the MPEG-2 standard*:

> 24    Many of the patents added to the MPEG-2 pool are not essential for
>
> 25    complying with the MPEG-2 standard because, for example and not
>
> 26    by way of limitation, they address . . . peripheral matters . . . .  Those
>
> 27    patents and others are not infringed by the products offered *by Nero*
>
> 28    *and other similarly-situated (MPEG-2 compliant) companies.*

-13-

1  (*Id.*)  No support exists for Nero's newly-minted theory that, to be essential, a

2  patent must be infringed by every product manufactured by every licensee.

3  Instead, the fact that a licensee chooses not to practice a particular part of the

4  standard, for whatever reason, is irrelevant to whether a patent is essential to the

5  standard as a whole.  *See Fujitsu Ltd.* v. *Netgear Inc.*, __ F.3d __, 2010 WL

6  3619797, at *4 (Fed. Cir. Sept. 20, 2010) (recognizing that  licensees need not

7  practice every aspect of a standard); *Broadcom Corp.* v. *ITC*, 542 F.3d 894, 899

8  (Fed. Cir. 2008) (recognizing that not every standard-compliant product will

9  incorporate every portion of standard or infringe all patents reading on standard).

10  Nero previously recognized this distinction itself, but has apparently changed its

11  mind in its Amended Complaint.  (*See, e.g.* Hr'g Tr. 32:10-33:11 ("Nero doesn't

12  need all -- even all the essential patents that are in the MPEG-2 pool.").)[5]

13            Nero's proffered definition would render patent pools *per se* illegal

14  unless they were based on an individualized determination of what each licensee

15  needed.  Nero, a software manufacturer, apparently wants to invalidate the MPEG-

16  2 Pool because it claims that its products do not infringe patents for "hardware-

17  implemented MPEG-2."  (Am. Compl. ¶ 40.)  Likewise, under Nero's definition, a

18  company that manufactures DVD discs could argue (wrongly) for invalidation of

19  the entire pool because it does not need the same patents as a company that

20  manufacturers DVD players.  But a licensee that does not need particular licenses

21  is to free to license the ones that it does need individually.  Nero's suggestion that

22  MPEG LA is required to conduct this inquiry on its behalf — and then revise the

23  license to the pool of patents that this one licensee needs — is without precedent

24

---

25  [5]      Nero's contention that the DOJ's Business Review Letter somehow adopted a
more stringent definition of essentiality also fails to advance its claim.  (Am. Compl.

26  ¶ 41.)  Even if a Business Review Letter could change the law of patent essentiality,
which it does not, the DOJ's language mirrors the standard set by the Federal Circuit

27  in and adopted by this Court.  (*Compare* Am. Compl., Ex. 1 at 3 n.4 ("any Patent
claiming an apparatus and/or method necessary for compliance with the MPEG-2

28  Standard . . . .") *with Princo*, 563 F.3d at 1310 ("a license to practice [any of its
claims] could be viewed as reasonably necessary to practice the . . . standard.").)

1   and defeats the economies of scale of a patent pool tied to a standard.  *See Buffalo*
2   *Broad. Co.*, 744 F.3d at 933 (recognizing that, because individual licensing was
3   available, "it is . . . irrelevant whether . . . the blanket license is not as useful or
4   'necessary' in the context of syndicated programming . . . as it is in other
5   contexts.").

6          Nero's definition of "essentiality" demonstrates the absurdity of what
7   Nero is seeking – *i.e.*, an individualized license without the need to conduct the
8   relevant inquiry on its own.  During oral argument the Court pointedly asked Nero
9   what it wanted MPEG LA to do in order to remedy its purported inability to
10  determine which patents are essential and which it actually needs.  (Hearing Tr.
11  35:11-19.)  Nero's Amended Complaint makes the answer to this question
12  abundantly clear:  Nero wants MPEG LA to determine, at its own expense, which
13  combination of patents each licensee needs and to license it only those patents,
14  presumably at a lower price.  This is not what the Sherman Act requires.  *See*
15  *Carpet Seaming Tape Licensing Corp.* v. *Best Seam Inc.*, 616 F.2d 1133, 1142 (9th
16  Cir. 1980).[6]

17            **2.  The Patents Nero Identifies Undermine its Monopoly**
18                **Extension Theory**

19         Despite its insistence before the Court that it would be
20  prohibitively expensive to identify the nonessential patents in the MPEG-2
21  Pool, (Hr'g Tr. 33:13-24), Nero quickly identified six patents that it
22  contends are "nonessential."  (Am. Compl. ¶ 40.)  According to Nero, these
23  "nonessential patents were added to the MPEG-2 pool only to extend the

24  _____
25  [6]     In the alternative — and even more offensively — Nero reaffirms that it
    wants costly antitrust discovery to get a head start on this determination.  (*See* Am.
    Compl. ¶ 42.)  As the Court expressly recognized, however, Nero is not entitled to
26  discovery *until it conducts a reasonable inquiry on its own.*  (*See* Hearing Tr. 35:20-
    22 ("We want an opportunity to take discovery to find out if, in fact, MPEG LA has
27  done the same thing in MPEG-4 Visual and AVC that it pretty apparently has done
    with respect to MPEG-2"); Order at 13 ("The Court emphasizes that Nero *does not*
28  *need* Court-ordered discovery to determine whether any of the patents in the pools at
    issue contain non-essential or expired patents.") (emphasis in original).)

1   ultimate expiration date of the pool and/or to make individual licensing

2   impracticable." (*Id.*)  But these patents actually contradict Nero's inference.

3            Half of these patents were not "added" to the pool at all.  The

4   '701, '812 and '866 patents were *part of the original MPEG-2 Pool.*[7]  As the

5   Court recognized,  Nero nowhere challenges the original patents as non-

6   essential.  (*See* Order at 7 ("[t]he legitimacy of MPEG LA's initial

7   monopoly derived from the MPEG-2, MPEG-4 Visual and AVC patent

8   pools is not at issue.").)  Instead, the entire premise of Nero's theory is that

9   later-added, nonessential patents, have unlawfully expanded the pool.  The

10  "fact" that the MPEG-2 pool had grown from the initial 27 patents was the

11  basis for Nero's inference, and its argument to the Court, that MPEG LA

12  somehow improperly extended its monopoly. (Hr'g Tr. 30:1-7.)

13           Putting aside these original patents, Nero has only identified

14  three later-added patents out of the 773-plus that it vaguely suggests are

15  nonessential: the '420, '543, '790 Patents.  (Am. Compl. ¶ 40.)  But these

16  three patents will all expire before certain of the original 27 patents in the

17  MPEG 2 Pool, as is obvious from the face of the patents.  Two of the

18  original patents in the MPEG-2 pool — the '866 and '701 Patents — have

19  the latest expiration date of any of the patents identified by Nero.  Because

20  applications for the '701 and '866 patents were filed in 1994, they will not

21  expire until at least 2014.  *See* 35 U.S.C. § 154(c)(1).  The three

22  subsequently-added and purportedly nonessential patents will all be expired

23  *by 2013*: the '543 Patent was filed in 1986 and expired in 2006; the '420

24

_____

[7]       Attached as Exhibit K to the Steinberg Declaration is a true and correct copy
25  of the list of 27 original U.S. patents in the MPEG-2 Pool, identified to the DOJ.
    Nero has made MPEG LA's submissions to the DOJ, "integral" to its claim by
26  relying on them for its "inference" that MPEG LA has added hundreds of
    nonessential patents to the MPEG-2 Pool.  (*See* Am. Compl. ¶¶ 40-43, Ex. 1.)
27  Accordingly, the Court can properly consider the list on this motion.  *See Coto
    Settlement* v. *Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) (relying on agreement
28  even though it was not expressly referenced in the complaint because the allegations
    in complaint made agreement "integral") (collecting cases).

1   Patent and the '790 Patent were filed in 1993 and expire in 2013.  Thus, it is

2   simply not possible that the '420, '543 or '790 Patents were added to extend

3   the duration of the MPEG-2 Pool, because they expire before the original

4   patents in that pool.[8]

5        Still  having failed to identify a nonessential patent that could

6   possibly have extended the duration of the MPEG-2 Pool, Nero is left with

7   only its inference.

8            **3.  The Patents Identified By Nero Are Essential**

9        As this Court and others have recognized, a patent is essential if

10  it is "reasonably" or even "arguably" necessary to practice the standard,

11  even though in fact it is not truly essential.  (Order at 9-10; *Princo Corp.*,

12  563 F.3d at 1310 ("[A patent] can qualify as an essential . . . patent if a

13  license to practice [any of its claims] could be viewed as reasonably

14  necessary to practice the [relevant] standard.").)  To avoid the risk that an

15  individual patent holder extract a windfall royalty and, thus, undermine the

16  benefits of the standard, *see*, *e.g.*, *Rambus Inc.* v. *FTC*, 522 F.3d 456 (D.C.

17  Cir. 2008), courts have defined essentiality broadly to allow for some level

18  of over-inclusiveness.  As the Federal Circuit recognized:

19        [O]ne of the major potential efficiencies of package licensing in the

20        context of innovative technology is the avoidance of 'uncertainty that

21  _____

22  [8]     This error could easily have been avoided had Nero gone to the trouble of
    calculating the expiration dates of these patents.  Instead of doing this, however,
23  Nero relies on another inference:  because, in 1994 patents had a term of 17 years,
    and because the MPEG-2 standard was adopted in 1994, all of the original
    patents "logically have either expired or will expire shortly."  (Am. Compl. ¶ 39.)
24  Nero's inference is based on a misreading of applicable law.  In 1994 the
    applicable statute was modified to provide a term of "20 years from the date on
25  which the application for the patent was filed . . . ." 35 U.S.C. § 154(a)(2).  This
    modification had an express retroactive application for any patent filed before June
26  8, 1995 – *i.e.*, every patent that Nero identifies.  *See* 35 U.S.C. § 154(c)(1); *Abbott
    Labs.* v. *Novopharm Ltd.*, 104 F.3d 1305, 1308 (Fed. Cir. 1997).  For such patents
27  the term is "the greater of the 20-year term as provided in subsection (a), or 17 years
    from grant . . . ." *Id.*  Accordingly, contrary to Nero's conjecture, the original
28  patents filed in 1994 will not expire until at least 2014.

-17-

1    could only be resolved through expensive litigation.' . . .  Prohibiting

2    the inclusion in a package license of a patent that is arguably essential,

3    merely because it ultimately proved not to be essential would

4    undercut, even eliminate, this potential procompetitive efficiency.

5  *Princo*, 563 F.3d at 1310 (quoting *Philips*, 424 F.3d at 1192-93.)  "It is . . . not

6  anticompetitive for a patent pool to include numerous ***potentially*** blocking patents .

7  . . which may or may not be essential but which are more efficient to license as part

8  of the pool than to risk the expense of future litigation."  (Order at 10 (citing

9  *Philips*, 424 F.3d at 1187-90).

10          Although Nero asserts the legal conclusion that the patents it identifies

11  are nonessential, it fails to offer any allegations of *fact* to support this conclusion.

12  And, indeed, the patents themselves make clear that they are essential.

13          Three of the patents disclose on their face that they are essential

14  to the MPEG-2 Standard.  Both the '701 and '866 Patents expressly state

15  that that they read on the MPEG-2 standard and have been adopted as part of

16  that standard.  (*See* '701 Patent at Col. 4: L. 37-50 ("Recently, Applicants . .

17  . proposed the method of the present invention . . . to the [ISO] for inclusion

18  in the MPEG-2 Systems standard, and the method of the proposed invention

19  . . . has been adopted as part of that standard."); '866 Patent col. 5 ll. 17-22

20  ("Applicant . . . proposed the method of the present invention for inclusion

21  in the MPEG-2 Systems standard, and the methods of the present invention .

22  . . were substantially adopted as part of the MPEG-2 Systems standard.").)

23  The '420 Patent also refers to the MPEG-2 standard and purports to resolve

24  problems with early drafts of that standard.  ('420 Patent at col. 1 ll. 13-52;

25  col. 14 l. 27 – col. 15: l. 54.)  Nero offers no facts to show how a reasonable

26  patent administrator could possibly have determined that these patents —

27  which state on their face that they are necessary to the MPEG-2 standard —

28

1    were somehow nonessential.  At the very least, these patents are

2    "reasonably" necessary to practice the standard.

3         The same is true of the other three patents that Nero claims,

4    without explanation, to be nonessential.  Nero must allege some *facts*

5    supporting its conclusion that these patents are nonessential.  *See Twombly*,

6    550 U.S. at 555.  The need for such allegations is particularly acute here

7    because, on the very webpage Nero attaches to its Amended Complaint,

8    MPEG LA provides a chart identifying the section of the MPEG-2 standard

9    implicated by the patent families in the MPEG-2 Pool, including each patent

10   identified by Nero.  (*See* Steinberg Decl., Ex. J at 3.)  But Nero does not

11   offer one fact to demonstrate that MPEG LA's essentiality determinations

12   are inaccurate or that a prudent administrator would immediately exclude

13   these patents.

14        Nero's theory that MPEG LA is "adding" patents to extend the

15   temporal scope of the pool is undermined by the reality of how patents are

16   added.  Although it asserts that MPEG LA "controls" the MPEG-2 pool

17   (Am. Compl. ¶ 40), Nero has offered no facts showing that MPEG LA has

18   any control over *when* patents are identified to MPEG LA for inclusion in

19   the pool, precisely because it is up to the patent holder to submit the patents

20   for inclusion.  Further, as the Court already recognized, there are multiple

21   plausible exceptions to Nero's inference that later-added patents are being

22   included to extend the pool  – *e.g.*, that patents take a long time to prosecute

23   or that patent holders have incentives to delay inclusion.  These offer "far

24   more plausible explanations for hundreds of essential patents turning up in

25   the decade following the creation of the pools." (Order at 10.)  Nero has

26   offered no facts to counter these abundantly reasonable inferences.

27        **4.  Expired Patents Cannot Save Nero's Claim**

28        Putting aside Nero's groundless speculation, the remaining alleged

"factual" basis for Nero's monopoly extension claim is the fact — fully disclosed on MPEG LA's website — that the MPEG-2 Pool contains expired patents.  Not only does this fact fail to support Nero's monopoly-extension theory, it is fully explained by the licenses themselves, which expressly allow payment on past infringement.

As an initial matter, the Court has already recognized that expired patents, alone, do not support Nero's claim of monopoly extension.  As the Court noted, to support its inference Nero must identify *both* expired patents *and* nonessential patents added to lengthen the term of the pool.  (*See* Order at 12.) But, as detailed above, Nero has failed to plausibly identify facts showing the existence of any nonessential patents in the MPEG-2 Pool.  Accordingly, the mere fact that the MPEG-2 Pool contains expired patents — which is to be expected over the life of a nearly 13 year-old pool — cannot sustain its inference.

Nor can Nero contend with the "obvious alternative explanation" that these expired patents are included because the MPEG-2 Licenses apply retroactively to infringement beginning June 1, 1994.  In addition to receiving the future right to produce MPEG-2 compliant technology, licensees may pay on prior infringement claims.  (*See*, *e.g*.,  New MPEG-2 License §§ 1.15, 2.1 (providing license for the period any patent was in force, even patents now expired).)  In consideration of this retrospective waiver, licensees are required to pay back royalties.  (*See* MPEG-2 License § 3.3.2 ("Any royalties pursuant to the above schedule which accrued during the period from June 1, 1994 to the latest signature date specified above shall be payable within thirty (30) days of  such signature date . . . ."); New MPEG-2 License § 3.3.2 (same).)  Nero, a signatory to the MPEG-2 License, is certainly aware of this fact.

Nor can Nero seriously contend — although it tries — that it is paying royalties on these expired patents.  The MPEG-2 Licenses expressly provide that a licensee only pays royalties on distributions in a country where at least one patent

1   is "in force" – *i.e.*, not expired.  (*See* MPEG-2 License § 3.1.)  Nero asserts that

2   this changed in the New MPEG-2 License:  "the Extended MPEG-2 License

3   appears to require payment of royalties . . . regardless of whether or not [a] product

4   infringes any unexpired patent in the country in which the product is manufactured

5   or sold."  (Am. Compl. ¶ 11(c).)  This assertion contradicts the plain terms of the

6   New MPEG-2 License, which requires royalties only on products "Manufactured

7   or Sold in a country in which one or more MPEG-2 Patent Portfolio Patent(s) *is in*

8   *force.*"  (New MPEG-2 License § 3.1.1; *see also id.* §§ 3.1.2 – 3.1.7 (same).)

9           In the face of the plain language of these agreements, upon which

10  Nero itself bases its claim, Nero wants the Court to adopt the implausible

11  inferences that (a) licensees are paying royalties on expired patents; and (b)

12  nonessential patents are being added to replace the expired ones.  After four

13  attempts, however, the only *fact* that Nero offers in support of these inference is

14  that MPEG LA lists expired patents — which it identifies as expired — on its

15  website.  Basing an inference of monopoly abuse on this public disclosure is the

16  height of speculation.  (Order at 9 ("Nero's allegations that MPEG LA has packed

17  its patent pools with non-essential patents . . . are speculative.").)

18          **C.      Nero Has Still Failed to Identify Harm to Competition.**

19          The Sherman Act is designed for "the protection of *competition*, not

20  *competitors.*"  *Brown Shoe Co.* v. *United States*, 370 U.S. 294, 320 (1962)

21  (emphasis added).  To establish anti-trust injury, Nero must allege "acts that harm

22  'allocative efficiency *and* raise the price of goods above their competitive level . . .

23  ."  *Pool Water Prods.* v. *Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001); *Atl.*

24  *Richfield Co.* v. *USA Petrol. Co.*, 495 U.S. 328, 344 (1990) ("The antitrust injury

25  requirement ensures that a plaintiff can recover only if the loss stems from a

26  competition-*reducing* aspect or effect of the defendant's behavior.") (emphasis in

27  original).  In other words, Nero must allege "restricted output *and*

28  supracompetitive pricing."  *Forsyth* v. *Humana, Inc.*, 114 F.3d 1467, 1475 (9th

Cir. 1997); *see also In re Ebay Seller Antitrust Litig.*, No. 07-1882, 2010 WL 760433, at *5 (N.D. Cal. Mar. 4, 2010) ("[p]laintiffs have provided no evidence of either restricted output or supracompetitive prices, let alone both."). Nero fails on both counts.[9]

### 1. Nero Has Not Alleged Foreclosure of Alternative Technologies

In *Philips*, 424 F.3d at 1194, the Federal Circuit confirmed that the antitrust injury in patent pool cases is foreclosure of technical alternatives to the purportedly nonessential patents. As with any other tying claim, the inquiry in a patent pooling case is whether the arrangement "has an anticompetitive effect in the market for the second product" – *i.e.*, the nonessential patents. *Id.* at 1193-94. Where there are no competitors in the market for the nonessential patents, no competitive harm can occur. This inquiry is so important to determining whether the pool is anticompetitive that the Federal Circuit incorporated it into the very definition of "nonessential" patents:

> Patents within a patent package can be regarded as "nonessential" only if there are "commercially feasible" alternatives to those patents. If there are no commercially practicable alternatives to the allegedly nonessential patents, packaging those patents together with so-called essential patents can have no anticompetitive effect in the marketplace because no competition for a viable alternative product is foreclosed. In such a case, the only effect of finding per se patent misuse is to give licensees a way of avoiding their obligations under the licensing agreements, with no corresponding benefit to competition in any real-world market.

---

[9]    Nero still fails to allege a plausible market definition. Nero's market definition, which is now limited to MPEG-2 technology, is implausible for the reasons identified in MPEG LA's original Motion to Dismiss (at 12-15) and its Reply (at 9-11), which MPEG LA incorporates herein by reference.

1   *Id.*  Nero, however, has still alleged no alternatives to the patents in the MPEG-2

2   Pool and, again, concedes that no alternatives exist.  (Amended Compl. at 2 n.2

3   ("there are no such substitute standards as the MPEG-2 standard is mandatory for

4   Digital Television, DVD players, Blu-ray players, and similar video devices.").)

5          Instead of identifying any foreclosure of alternative technology, Nero

6   relies on the circular argument that pooled licensing forecloses individual

7   licensing.  As an initial matter, as discussed *supra*, Nero has alleged no facts

8   showing that individual licensing has actually been foreclosed – *i.e.*, by

9   demonstrating that individual licensing is infeasible.  More fundamentally, Nero's

10  theory is nonsensical and runs counter to the analysis in *Philips*.  As the Federal

11  Circuit recognized, without competitors for each individual nonessential patent,

12  there is simply no relevant competition to be foreclosed in the tied product market.

13  *Philips*, 424 F.3d at 1194; *see also Blough* v. *Holland Realty, Inc.*, 574 F.3d 1084,

14  1089 (9th Cir. 2009) (finding no competitive injury where "the tied product is

15  completely unwanted by the buyer. . . because there is no adverse effect on

16  competition in the tied product market . . . .").  Nero's theory amounts to a claim

17  that the nonessential patents — which it claims it is forced to take — provide their

18  own competition.  But as *Philips* makes clear, the alternatives required are

19  alternatives "to the allegedly nonessential patents," not alternatives to the pool

20  itself.  *Id.* at 1194-97.

21          **2.    Offering More Patents for Less Money Does Not Harm**
           **Competition**
22

23          Nero's removal of every mention of supracompetitive pricing from its

24  Amended Complaint — save one passing, conclusory reference (Am. Compl. ¶

25  59(d)) — and its concession that the royalty it pays for MPEG-2 Patents has

26  decreased by more than half undermines any claimed competitive injury.  (*Id.* ¶

27  11(c); *see also Forsyth*, 114 F.3d at 1475.)  Rather than dispute this point, Nero

28  advances the novel and apparently hypothetical theory that individual licensing

1   should become less expensive than pooled licensing in 2014 and 2015, when many

2   of the patents in the MPEG-2 Pool have expired.  (Am. Compl. ¶ 45.)  Not only is

3   this theory another product of Nero's over-active imagination, but it makes no

4   economic sense.  *William O. Gilley Enters.* v. *Atl. Richfield Co.*, 588 F.3d 659, 662

5   (9th Cir. 2009) ("On a motion to dismiss in an antitrust case, a court must

6   determine whether the antitrust claim is 'plausible' in light of basic economic

7   principles." (citing *Twombly*, 550 U.S. at 556)).

8            Nero's theory is fundamentally flawed because it assumes — without

9   any factual support — that individual licensing will automatically be less

10  expensive than pooled licensing.  But that hypothesis, in turn, depends upon the

11  number of patents Nero must license, the transparency of terms, the desire of the

12  individual patent holder to recoup the expenses associated with individual

13  licensing through royalty payments, and a host of other factors.  Nero does not

14  have even one allegation of fact addressed to any of these factors.  Instead, it

15  merely guesses that, because patents in the pool will eventually expire, at some

16  future date individual licensing will become less expensive.  This speculation

17  cannot support Nero's claim.  *See Philips*, 424 F.3d at 1189 ("There is . . . no basis

18  for conjecture that a hypothetical licensing fee would have been lower if Philips

19  had offered to license the patents on an individual basis or in smaller packages.").

20           Because Nero has offered no facts to support its flawed economic

21  hypothesis, its complaint cannot survive a motion to dismiss.  *See*, *e.g.*,

22  *Globespanvirata, Inc.* v. *Texas Instr., Inc.*, No. 03-2854, 2006 WL 543155, at *10

23  (D.N.J. Mar. 3, 2006) (holding absent factual allegations showing that nonessential

24  patents have increased price of pool, plaintiff cannot state an antitrust claim).

25  //

26  //

27  //

28

1
2
3

**D.   Dismissal With Prejudice is Warranted Because Nero Cannot Correct Fatal Deficiencies in Its Amended Complaint — Its Fourth Attempt at Articulating a Monopolization Claim.**

4          Where a party "was advised of its pleading deficiencies and
5  presumably did the best it could to remedy them" without avail, dismissal with
6  prejudice is appropriate.  *United Guar. Mortg. Indem. Co.* v. *Countrywide Fin.*
7  *Corp.*, 660 F. Supp. 2d 1163, 1190 (C.D. Cal. 2009) (Pfaelzer, J.)  In its Order, the
8  Court explicitly advised Nero how it could cure the defects in its pleadings:  by
9  conducting a reasonable inquiry of the facts underlying its claims and, at
10  minimum, identify one or more nonessential patents in MPEG LA's pools.  (*See*,
11  *e.g.*, Order at 12-13 ("Nero contends that it would be prohibitively expensive for it
12  to identify the non-essential patents . . . [b]ut Nero will have to undertake just such
13  an inquiry to prove its allegations in this case.  It is not clear that Nero ever intends
14  to undertake such inquiry.").  Because Nero "presumably did the best it could" to
15  comply with the Court's mandate, and still failed, the Court should dismiss this
16  case with prejudice.  *See United Guar. Mortg. Indem. Co.*, 660 F. Supp. 2d. at
17  1190; *see also Bonin* v. *Calderon*, 59 F.3d 815, 845 (9th Cir. 1995).

18  //
19
20  //
21
22  //
23  //
24
25
26
27
28

1

## V.     CONCLUSION

2

3              MPEG LA respectfully requests that the Court dismiss Nero's

4     Amended Complaint with prejudice.

      Date:     October 18, 2010                    Respectfully submitted,

5

6                                                    /s/  Michael H. Steinberg
                                                    Michael H. Steinberg (SBN 134179)
7                                                   Damion D. D. Robinson (SBN 262573)
                                                    Orly Z. Elson (SBN 240645)
8                                                   SULLIVAN & CROMWELL LLP
9                                                   1888 Century Park East
                                                    Los Angeles, California 90067-1725
10                                                  Telephone:    (310) 712-6640
                                                    Facsimile:    (310) 712-8800
11

12
                                                    *Attorneys for Defendant*
13                                                  *MPEG LA, L.L.C.*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28